UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| **PAN AM SYSTEMS, INC.**, a Florida corporation with a place of business in Dover, County of Stafford, State of New Hampshire<br><br>**SPRINGFIELD TERMINAL RAILWAY COMPANY,** a Vermont corporation with a place of business in North Billerica, County of Middlesex, State of Massachusetts<br><br>and<br><br>**DAVID ANDREW FINK**, of Amherst, County of Hillsborough, State of New Hampshire<br><br>*Plaintiffs*<br><br>v.<br><br>**CHALMERS HARDENBERGH**, of Yarmouth, County of Cumberland, State of Maine<br><br>and<br><br>**ATLANTIC NORTHEAST RAILS & PORTS,** a New York corporation with a place of business in Yarmouth, County of Cumberland, State of Maine<br><br>*Defendants* | Case No. 2:11-cv-00339-NT |

**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Pan Am Systems, Inc., Springfield Terminal Railway Company and David Andrew Fink, by and through their attorneys, Thad B. Zmistowski of the firm of Eaton Peabody,

hereby file this amended complaint against Defendants Chalmers Hardenbergh and Atlantic Northeast Rails & Ports as follows:

## JURISDICTIONAL ALLEGATIONS

1. Plaintiff Pan Am Systems, Inc. ["PAS"] is a Florida Corporation with a place of business in Dover, New Hampshire.

2. Springfield Terminal Railway Company ["ST"] is a Vermont corporation with a place of business in North Billerica, Massachusetts. PAS is the ultimate parent corporation of ST.

3. Plaintiff David Andrew Fink was the President and Chief Executive Officer of Pan Am Systems, Inc. from approximately 1998 to March 2011. As Chief Executive Officer and President of PAS, Plaintiff Fink was responsible for the performance of PAS and ST, including allocation of company resources for railroad operations and the establishment and performance of company directives and goals.

4. Defendant Atlantic Northeast Rails & Ports is a New York corporation that has a weekly trade newsletter and e-bulletin covering the Northeastern United States, Eastern Quebec and the Canadian Maritimes regions, with a place of business in Yarmouth, Maine.

5. Defendant Atlantic Northeast Rails & Ports maintains a website that contains back issues of its newsletters, maps and a database about shippers, ports, railroads and intermodal facilities.

6. Defendant Chalmers Hardenbergh is a resident of the Town of Yarmouth, Maine.

7. Defendant Chalmers Hardenbergh is the editor, publisher, owner and principal of Atlantic Northeast Rails & Ports.

8. This Court has jurisdiction over this matter under Title 28, *United States Code*, § 1332, because (a) it is a civil action; (b) the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs; and (c) it is an action between citizens of different states.

9. Plaintiffs demand a jury trial.

## FACTUAL ALLEGATIONS

10. On or about December 2, 2009, Defendants published, without privilege, as fact false and defamatory statements in Atlantic Northeast Rails & Ports Newsletters and E-Bulletins, as well as on the Atlantic Northeast Rails & Ports website, injurious to Plaintiffs' reputation concerning the condition of their railroad system. Specifically, Defendants published the following defamatory statements in regard to a November 2009 coal train derailment in New Hampshire:

> Peter Burling, chair of the New Hampshire Rail Transit Authority, blamed ST for the accident. 'What has happened here is a perfectly predictable accident – but it's hard to describe it as an accident, since the probabilities were so clear it was going to take place. The only thing we didn't know is when and where… . A horrendously dilapidated railroad system has caused a slow-moving coal train to fall off the tracks.

*Atlantic Northeast Rails & Ports, December 2, 2009, Issue 09#11B*.

11. The Defendants' defamatory statements in paragraph 10 are false in that the derailment was not a perfectly predictable accident nor was it caused by a horrendously dilapidated railroad system, but was instead due to the presence of a rail car owned by another railroad company over which Plaintiffs had no control. Also, Plaintiffs' railroad system was not "horrendously dilapidated;" rather, it met all Federal Railroad Administration requirements for its track class.

12. Defendants did not contact Plaintiffs to ascertain the true cause of the incident and/or the true condition of Plaintiffs' railroad system referenced in paragraph 10.

13. Upon information and belief, Defendants did not contact any governmental agencies, such as the Federal Railroad Administration and/or the Surface Transportation Board, to ascertain the true cause of the incident and/or the true condition of Plaintiffs' railroad system referenced in paragraph 10.

14. Defendants possessed knowledge of the availability of the aforedescribed public and private information but purposefully chose not to consult it.

15. On or about October 22, 2010, Defendants published, without privilege, as fact false and defamatory statements in Atlantic Northeast Rails & Ports Newsletters and E-Bulletins, as well as on the Atlantic Northeast Rails & Ports website, injurious to Plaintiffs' reputation regarding service to its customers. Specifically, Defendants published the following defamatory statements in regard to a stretch of Plaintiffs' track in New Hampshire:

> 'PAN AM AT NEARS' 'PATRIOT CORRIDOR CONGESTION' In addition to the complaints from Maine and New Hampshire [see 10#09B] about how long cars are taking to move from Mechanicville to Ayer, one other prominent customer at NEARS was dissatisfied with Pan Am service. She's been familiar with it for many years and would say only this: 'It's been consistent. Consistently bad.' An official from a railroad which interchanges with Pan Am said the PAS inability to move cars quickly meant that three of his significant customers had recently near run out of inbound material and approached the need to shut down. 'I can't have that,' he said; 'I had to route around them.' {ANR&P coverage}.

*Atlantic Northeast Rails & Ports, October 22, 2010, Issue 10#10A; Atlantic Northeast Rails & Ports, October 12, 2010, E-bulletin(ll).*

16. The Defendants' defamatory statements in paragraph 15 are false in that beginning in 2009, Plaintiffs initiated an upgrade of their railroad system between Mechanicville and Ayer, including purchasing numerous locomotives, thus enabling trains to move quickly and

efficiently, resulting in service to its customers which either met or exceeded industry standards for regional railroads of similar size and character.

17. Defendants did not contact Plaintiffs to ascertain the true status of Plaintiffs' Mechanicville and Ayer service.

18. Upon information and belief, Defendants did not contact governmental agencies that address shipper-railroad issues, such as the Surface Transportation Board, to inquire into the true status of Plaintiffs' Mechanicville and Ayer service or obtain public records concerning service between ST and its customers.

19. Defendants possessed knowledge of the availability of the aforedescribed public and private information but purposefully chose not to consult it.

20. On or about November 3, 2010, Defendants published, without privilege, as fact false and defamatory statements in Atlantic Northeast Rails & Ports Newsletters and E-Bulletins, as well as on the Atlantic Northeast Rails & Ports website, injurious to Plaintiffs' reputation concerning safety, employee relations, and locomotive maintenance. Specifically, Defendants published the following defamatory statements:

### ST: HOME-GROWN APUs?

22 October, Waterville. **GOVERNOR JOHN BALDACCI OBSERVED THE 'SUPPLEMENTAL ENERGY SYSTEM' DEVELOPED HERE** at the Waterville Shops of Pan Am Railways, during the all-day rail tour. Directed by Pan Am engineer [unclear if railroad engineer or other–*editor*] Gordon Long, the project began about a year earlier, and has completed a prototype. Long said the shop hopes to build one each month or so. ST locomotives will employ the first units this winter.

Like other APUs (auxiliary power units), the 'Supplementary Energy System' (SES) employs a small, 100- horsepower diesel engine[1] which can keep the water and diesel fuel in the locomotive's main diesel engines heated. The SES uses about one gallon per hour, versus the seven gallons an hour Long said that the prime movers in a locomotive use. An electronic system, monitoring the locomotive when the prime movers are shut down, will start the SES when necessary to heat the prime mover systems. "It will save us a lot of money and

mean less pollution," one of the two Finks [unclear from press reports] said. {Scott Monroe in Waterville *Sentinel* 23.Oct.10; Matthew Wickenheiser in *Bangor Daily News* 23.Oct.10}

**Store-bought APUs**
Earlier, ST was purchasing EcoTrans APUs [see 06#02A *Maine*], and by the end of 2007 had installed ten to fourteen [see 07#12B *Regional*]. EPA has not funded the purchase by Pan Am of any APUs. Abby Swaine, who runs the Diesel Initiative / SmartWay Transport Partnership / Clean Ports USA for EPA New England, wrote that Montachusett Regional Planning Authority applied for a grant from EPA to 'help put APUs on some Pan Am locomotives, but unfortunately they were not selected.' {e-mail to *ANR&P* 26.Oct.10}

**A wise use of company resources?** Terry Judge, sales and marketing director plus communications manager for Kim Hotstart, which manufactures many of the APUs used in North American locomotives, was bemused by the Pan Am move. '*I would think they have plenty of other challenges, [such as] safety challenges, employee relations and locomotive maintenance.*'

*Atlantic Northeast Rails & Ports, November 8, 2010, Issue 10#10B; Atlantic Northeast Rails & Ports, November 2, 2010, E-bulletin(oo).*

21. The Defendants' defamatory statements in paragraph 20 are false in that ST has a safety record that contains fewer accidents and injuries than other regional railroads of similar size and character, a record of successful union negotiations with its employees that either meets or exceeds the industry standard for regional railroads of similar size and character, and a record of locomotive maintenance that meets or exceeds the industry standard for regional railroads of similar size and character.

22. Defendants did not contact Plaintiffs to ascertain their record for safety, employee relations, and locomotive maintenance as referenced in paragraph 21.

23. Upon information and belief, Defendants did not contact any governmental agencies, such as the Federal Railroad Administration, to investigate the Plaintiffs' record for safety and locomotive maintenance as referenced in paragraph 21.

24. Upon information and belief, Defendants did not contact Plaintiffs' employees or union representatives that work for and/or have collective bargaining agreements with Plaintiffs and ascertain the true status of the union relationship.

25. Defendants possessed knowledge of the availability of the aforedescribed public and private information but purposefully chose not to consult it.

26. Defendants acted with ill will and actual malice against Plaintiffs in that Defendants were aware of Plaintiffs' industry-leading safety record as demonstrated in Defendants' own articles regarding Plaintiffs' safety record, but nonetheless published the above-referenced false and defamatory statements regarding Plaintiffs. Specifically, Defendants published the following prior to the aforedescribed defamatory statements in paragraph 20:

> **Guilford won the Harriman Gold Medal Again**, signifying it as the safest railroad in its group, with 0.70 injuries per 200,000 man hours worked as reported to the Federal Railroad Administration.
>
> In its group, line-haul railroads with fewer than 4 million employee-hours, Guilford Rail System won the silver medal a year ago. Nine railroads, Guilford included, received special certificates of commendation for continuous improvement in safety performance. The railroad has won Harriman awards in 1994, 1995, 1997, 1999, 2001 and 2002 {AAR and other press releases}

*Atlantic Northeast Rails & Ports, June 4, 2003, Issue 03#05B*.

27. On or about December 21, 2010, Defendants published, without privilege, as fact false and defamatory statements in Atlantic Northeast Rails & Ports Newsletters and E-Bulletins, as well as on the Atlantic Northeast Rails & Ports website, injurious to Plaintiffs' reputation regarding service to its customers. Specifically, Defendants published the following defamatory statements:

> **Better interchange would mean more customers.** Despite ST's promise to locate a crew in Concord and switch customers five days a week [see 10#05A], Dearness reported that ST has done neither. It is now providing a switch one day a week. He believed that to serve major customers Blue Seal and Ciment Quebec,

> ST had to switch at least three times a week, which is 'what I provided before I left.' If ST would provide the service it promised, Dearness believes he could land two more customers. One is 'very frustrated because it would like to start now, and can't due to the level of service and is familiar' with ST's lack of service. The other one would like to start in May or June.

*Atlantic Northeast Rails & Ports, December 21, 2010, Issue 10#12A; Atlantic Northeast Rails & Ports, December 10, 2010, E-bulletin(ww).*

28. The Defendants' defamatory statements in paragraph 27 are false in that (i) Plaintiffs never made a promise to locate a crew in Concord and switch customers five days a week; and (ii) Plaintiffs nonetheless provided appropriate service to its customers on the Concord Line that either met or exceeded the level of service provided in similar circumstances by regional railroads of similar size and character as ST.

29. Defendants did not contact Plaintiffs to ascertain whether or not Plaintiffs in fact made the above asserted promise and whether or not Plaintiffs' service in fact fell below that provided in similar circumstances by regional railroads of a similar size and character as ST.

30. Upon information and belief, Defendants did not contact any governmental agencies, such as the Surface Transportation Board, to investigate the Plaintiffs' application to that agency which application plainly *omits* any promise by the Plaintiffs as described in paragraph 27 or to investigate Plaintiffs' service record as compared with that of regional railroads of similar size and character in similar circumstances.

31. Defendants possessed knowledge of the availability of the aforedescribed public and private information but purposefully chose not to consult it.

32. On or about March 21, 2011, Defendants published, without privilege, as fact false and defamatory statements in Atlantic Northeast Rails & Ports Newsletters and E-Bulletins, as well as on the Atlantic Northeast Rails & Ports website, injurious to Plaintiffs' reputation for

complying with laws and regulations regarding rail cars that contain Toxic by Inhalation (TIH) materials. Specifically, Defendants published the following defamatory statements:

> 'PAN AM: HAZ-MAT SERVICE'  'The railroad 'loses' cars on a consistent ongoing basis, including one car 'lost' for over 60 days….even though certain DHS and DOT statutes require carriers to release [TIH] cars within 48 hours.'

*Atlantic Northeast Rails & Ports, March 21, 2011, Issue 11#02B; Atlantic Northeast Rails & Ports, March 10, 2011, E-Bulletin(1).*

33. The Defendants' defamatory statements in paragraph 32 are false in that Plaintiffs have never lost rail cars containing (TIH) material; indeed, Plaintiffs have a computerized tracking system that allows ST to track TIH rail cars with accuracy. Moreover, Plaintiffs' customers are given access to this tracking system free of charge.

34. In addition to the tracking system, Plaintiffs isolate TIH rail cars to be transported in a single train without switching them with any other trains, thus providing additional assurance that no TIH rail cars will go missing.

35. Defendants did not contact Plaintiffs to ascertain whether or not Plaintiffs have lost any TIH rail cars.

36. Upon information and belief, Defendants did not contact any of Plaintiffs' customers to investigate whether or not they were able to track TIH rail cars transported by Plaintiffs and/or whether or not such cars were "lost."

37. Upon information and belief, Defendants did not contact any governmental agencies, such as the Federal Railroad Administration, to investigate whether or not Plaintiffs had actually lost any TIH rail cars or had been cited for violations of any laws or regulations concerning the transport of TIH rail cars.

38. Defendants possessed knowledge of the availability of the aforedescribed public and private information but purposefully chose not to consult it.

39. On or about March 21, 2011, Defendants published, without privilege, as fact false and defamatory statements in Atlantic Northeast Rails & Ports Newsletters and E-Bulletins, as well as on the Atlantic Northeast Rails & Ports website, injurious to Plaintiff David Fink's reputation and fitness as the Chief Executive Officer of Plaintiff PAS. Specifically, Defendants published the following defamatory statements:

> PAN AM: A NEW DAWN?  PAN AM OWNER TIM MELLON REMOVED DAVE FINK PERE from management of the company according to four separate sources: one MBTA, one union, one Maine source, and one from other railroad management in New England.  Sources differ on what precipitated the action, whether Fink is formally removed or is only on a 'leave of absence', and whether Mellon came to New England to administer the coup de grace  or did it by telephone, but all agree that David Andrew Fink, the head of Pan Am Systems, is no longer in charge.  . . . If Fink *pere* has definitely left, then perhaps, as one source said, 'The holy wars, such as those against Peter Leishman, will cease.' Others thought that young Fink might have more freedom either to spend more money on railroading, or put the existing money into different [and one would hope more productive] places.

*Atlantic Northeast Rails & Ports, March 21, 2011, Issue 11#02B; Atlantic Northeast Rails & Ports, March 10, 2011, E-Bulletin(1).*

40. Defendants' statements in paragraph 39 are defamatory, since they assert either directly or indirectly that (i) Plaintiff David Fink was removed from his position as Chief Executive Officer and President of PAS, a large closely held corporation, by its Owner Tim Mellon; (ii) Plaintiff David Fink was removed via a "coup de grace" which is defined as "a death blow or shot administered in mercy to end suffering", *Merriam-Webster's Collegiate Dictionary* (11th ed. 2004); (iii) Plaintiff David Fink was removed due to his poor leadership; (iv) Plaintiff David Fink was misusing or misappropriating company resources by engaging in a holy war against Peter Leishman; and (v) Plaintiff David Fink was misusing or misappropriating existing railroad resources nonproductively.

41. Defendants' statements in paragraph 39 are false in that (i) Plaintiff David Fink was not removed from his position as Chief Executive Officer and President of PAS or otherwise demoted by the Owner, but instead voluntarily resigned; (ii) Plaintiff David Fink was not removed via a "coup de grace", but instead voluntarily resigned by a letter of resignation; (iii) Plaintiff David Fink was not removed due to his poor leadership but instead voluntarily resigned; (iv) Plaintiff David Fink did not engage in inappropriate actions against Peter Leishman, legal or otherwise, but rather Plaintiffs were forced to defend against numerous lawsuits filed by Mr. Leishman all of which thus far have been successfully defeated; and (v) Plaintiff David Fink used existing railroad resources productively as demonstrated by the revenues of Plaintiffs' railroad operations as compared with those of regional railroads of similar size and character.

42. Defendants did not contact Plaintiff David Fink to ascertain (1) whether or not he was removed as Chief Executive Officer of Plaintiff PAS or otherwise demoted; (2) whether or not he was removed via a "coup de grace;" (3) whether or not he had taken any inappropriate actions, legal or otherwise, against Peter Leishman; and (4) whether or not Plaintiffs' railroad operations were productive in comparison to regional railroads of similar size and character.

43. Defendants did not contact Plaintiff ST or Plaintiff PAS to ascertain (1) whether or not Plaintiff David Fink was removed as Chief Executive Officer of Plaintiff PAS or otherwise demoted; (2) whether or not Plaintiff David Fink was removed via a "coup de grace;" (3) whether or not Plaintiff David Fink had taken any inappropriate actions, legal or otherwise, against Peter Leishman; and (4) whether or not Plaintiffs' railroad operations were productive in comparison to regional railroads of similar size and character.

44. Defendants did not contact David Fink *fils* to ascertain (1) whether or not Plaintiff David Fink was removed as Chief Executive Officer of Plaintiff PAS or otherwise demoted; (2)

whether or not Plaintiff David Fink was removed via a "coup de grace;" (3) whether or not Plaintiff David Fink had taken any inappropriate actions, legal or otherwise, against Peter Leishman; and (4) whether or not Plaintiffs' railroad operations were productive in comparison to regional railroads of similar size and character.

45. Defendants did not contact Tim Mellon to ascertain (1) whether or not Plaintiff David Fink was removed as Chief Executive Officer of Plaintiff PAS or otherwise demoted; (2) whether or not Plaintiff David Fink was removed via a "coup de grace;" (3) whether or not Plaintiff David Fink had taken any inappropriate actions, legal or otherwise, against Peter Leishman; and (4) whether or not Plaintiffs' railroad operations were productive in comparison to regional railroads of similar size and character.

46. Defendants possessed knowledge of the availability of the aforedescribed sources of information but purposefully chose not to consult them.

## COUNT I - DEFAMATION

47. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 46 as if more fully set forth herein.

48. Defendants published false and defamatory statements about Plaintiff ST and Plaintiff PAS including those described in paragraphs 10, 15, 20, 27, 32 and 39.

49. Defendants published false and defamatory statements relating to Plaintiff David Andrew Fink in his profession, occupation, and/or official station including those described in paragraph 39.

50. The aforedescribed false and defamatory statements were published without privilege by Defendants to readers of the Atlantic Northeast Rails & Ports' Newsletters, E-Bulletins and website.

51. The Defendants' aforedescribed actions amount to at least negligence.

52. Defendants published the aforedescribed false and defamatory statements with knowledge of their falsity, or in reckless disregard of the truth or falsity of such statements.

53. The publication of the false and defamatory statements caused Plaintiffs to suffer economic damages and reputational harm in the community.

WHEREFORE, Plaintiffs respectfully request that they be awarded judgment against Defendants Chalmers Hardenbergh and Atlantic Northeast Rails & Ports in an amount which is just and reasonable under the circumstances, that they be awarded their costs, and that the Court order such other and further relief as it deems to be just and proper.

## COUNT II – FALSE LIGHT

54. Plaintiff David Fink repeats and realleges the allegations set forth in paragraphs 1 through 46 as if more fully set forth herein.

55. The aforedescribed actions by Defendants were highly offensive and constitute placing Plaintiff David Fink before the public in a false and disparaging light.

56. Defendants had knowledge, or acted in reckless disregard, regarding the falsity of the aforedescribed publicized matter and the false light in which it placed Plaintiff David Fink.

57. As a direct and proximate result of Defendants' false light conduct towards Plaintiff David Fink, he has suffered damages for which he deserves to be compensated.

WHEREFORE, Plaintiff David Fink respectfully requests that he be awarded judgment against Defendants Chalmers Hardenbergh and Atlantic Northeast Rails & Ports in an amount which is just and reasonable under the circumstances, that he be awarded his costs, and that the Court order such other and further relief as it deems to be just and proper.

## COUNT III - PUNITIVE DAMAGES

58. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 46 as if more fully set forth herein.

59. Defendants' aforedescribed actions regarding the safety of Plaintiffs' railroad operations were committed with actual or implied malice towards Plaintiffs.

60. Plaintiffs are entitled to an award of punitive damages against Defendants.

WHEREFORE, Plaintiffs respectfully request that they be awarded judgment against Defendants Chalmers Hardenbergh and Atlantic Northeast Rails & Ports in an amount which is just and reasonable under the circumstances, including punitive damages, that they be awarded their costs, and that the Court order such other and further relief as it deems to be just and proper.

Dated at Bangor, Maine, this 21st day of June, 2012.

PAN AM SYSTEMS, INC., SPRINGFIELD TERMINAL RAILWAY COMPANY and DAVID ANDREW FINK, PLAINTIFFS

By /s/ Thad B. Zmistowski
Thad B. Zmistowski, Esq.
Maine Bar No. 6960
Eaton Peabody
P.O. Box 1210
80 Exchange Street, 8th Floor
Bangor, Maine 04402-1210
(207) 947-0111
Attorneys for Plaintiffs