## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| PAN AM SYSTEMS, INC., *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | Civil Docket No. 2:11-cv-00339-NT |
| CHALMERS HARDENBERGH, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION FOR SUMMARY JUDGMENT WITH INCORPORATED
## MEMORANDUM OF LAW

NOW COME Defendants Chalmers Hardenbergh and Atlantic Northeast Rails & Ports, Inc. (hereafter collectively, "Hardenbergh") by and through undersigned counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, moves for summary judgment on all Counts. The grounds for this motion for summary judgment are that each of the six alleged defamatory statements placed in issue in Plaintiffs' Amended Complaint are not actionable under the laws of defamation and the rights of free speech and press protected by the First Amendment of the United States Constitution. Further, under the doctrine of substantial truth, the "gist" of each alleged defamatory statement is substantially true, thereby barring this action.[1]

---

[1] Given these deficiencies in the Plaintiffs' case, it is unnecessary for this Court to reach the other strikingly dispositive aspects of this matter – namely, that Plaintiffs fail to meet the constitutional "actual malice" standard to show fault and to recover "presumed damages" under *Gertz* and *Philadelphia Newspapers*, and their progeny. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349-50 (1974) ("It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard of the truth to actual damages.") and *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776-77 (1986) ("the plaintiff bear[s] the burden of showing falsity as well as fault before recovering damages"). *See* Order on Motion to Dismiss, ECF Doc. 20 at 6 & 7-10, and 17; Report of Prefiling Conference Under Local Rule 56(h) (ECF No. 62) at 2.

1

## MEMORANDUM OF LAW

### I.    SIGNIFICANT FACTUAL AND PROCEDURAL BACKGROUND

Pan Am Systems, Inc. – a holding company with a number of wholly-owned subsidiaries – and one of its subsidiaries, Springfield Terminal Railway Company, together with David Andrew Fink (Fink *pere*), the former president and chief executive officer of Pan Am Systems, Inc. (hereafter collectively "Plaintiffs") commenced this action in September of 2011, suing a small trade publication and its editor for alleged defamation.  ECF No. 1.  This Court granted the Defendants' Motion to Dismiss on all Counts, but permitted Plaintiffs 30 days in which to file an amended complaint to address the deficiencies.  ECF No. 20 at 21.  Plaintiffs' amended complaint, while attempting to set forth allegations to address the various deficiencies, nonetheless cannot withstand summary judgment.

The Court has entered an interim bifurcated discovery order, in order to continue to protect Defendants' journalistic sources, in accordance with well-established First Amendment protections.  *See Bruno & Stillman, Inc. v. Global Newspaper Co.*, 633 F.2d 583 (1st Cir. 1980).  Plaintiffs complain that the impact of this bifurcated discovery order prevents them from exploring issues that would be relevant to the "fault" burden of proof, another necessary requisite to any Plaintiff's recovery in this matter. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349-50 (1974).

But this Court, applying existing First Amendment protections, can summarily dispose of this action in full at this threshold.  There is no need to venture into an unduly expensive and burdensome second discovery phase – a phase that will fundamentally challenge the First Amendment's afforded protections to journalists, whose speech should not be "chilled" by vexatious defamation suits brought by billion-dollar corporations and their executives.  First, none of the alleged defamatory statements are legally actionable as statements conveying "an objectively verifiable assertion." *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122 (1st Cir. 1997).  Second, even assuming arguendo an objectively

verifiable assertion in concept (an assumption that with respect to most of the statements is hard to make) Plaintiffs fail as a matter of law to meet their burden of establishing the falsity of the assertion.

Plaintiffs advance the same set of six alleged defamatory statements as they asserted in their original complaint, and we address the deficiencies of each statement in the order appearing in the Amended Complaint. *See* Amended Complaint (ECF No. 25) ¶¶ 10, 15, 20, 27, 32, 39.

## II.    LEGAL ARGUMENT

### II.A.    General Standard of Judicial Review

We begin with the overarching standard that defamation suits such as this one demand heightened judicial oversight to ensure adherence to the constitutional safeguards of First Amendment protection of the rights of free speech and press.  U.S. Const. amend. I.  Here, a large infamous railroad corporation, and its former president and chief executive officer, sue a small weekly trade newsletter, *Atlantic Northeast Rails & Ports*, and its editor, Chalmers Hardenbergh.  Plaintiffs have brought similar vexatious suits before, notably *Guilford Transportation Industries, Inc., David Andrew Fink, and Timothy Mellon v. Frank Wilner,* 760 A.2d 580 (D.C. 2000).[2]  SMF ¶¶ 84-85.  The relevance of the *Guilford* case (beyond demonstrating that Plaintiffs have not yet learned their First Amendment civics lesson) is that the court in *Guilford* emphasized this general principle of judicial review, and paid heed to it:

> But this case implicates serious First Amendment concerns, and to prolong this litigation may inhibit protected speech.  We must therefore remain mindful of our obligation as an appellate court, in a case raising First Amendment issues, "to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression."  "The threat of prolonged

---

[2] The plaintiffs in *Guilford* were Guilford Transportation Industries (the original name of the corporate entity that is now Pan Am Systems), David Andrew Fink (who is the Plaintiff in the present matter) and Timothy Mellon, the majority owner of what is now Pan Am Systems.  The *Guilford* court noted that while it was not necessary in that case to determine whether all of these plaintiffs were limited public figures, the court "expressed the view that all of them were." *Id.* at 588 n.5.  For purposes of this case, it is also not necessary to make this determination for the present issues, but Plaintiffs here are likely collaterally estopped by *Guilford* to argue that they are not public figures for purposes of a defamation case.  *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313 (1971); *Miller Hydro Group v. Popovitch*, 851 F. Supp. 7, 11 (D. Me. 1994).

and expensive litigation has a real potential for chilling journalistic criticism and comment on public figures and public affairs." [citation omitted]. "Because of the compelling First Amendment interest at stake, we regard summary judgment as a useful method of disposing of constitutional libel actions where appropriate."

In *Keogh* [365 F.2d 965 (D.C. Cir. 1966)], the court, after recognizing the importance of summary judgment as a means of avoiding long and expensive litigation and of preventing the harassment and coercion of non-affluent parties, stated that

> [i]n the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate. One of the purposes of the [*New York Times v. Sullivan*, 376 U.S. 254 (1964)] principle, in addition to protecting persons from being cast in damages in libel suits filed by public officials, is to prevent persons from being discouraged in the full and free exercise of their First Amendment rights with respect to the conduct of their government. The threat of being put to the defense of a lawsuit brought by a popular public official may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, especially to advocates of unpopular causes.
>
> <u>Our obligation to protect the right of the citizens to free expression requires us to include these considerations in the summary judgment calculus.</u>

*Id.* at 592 (citations omitted) (emphasis added). So too, in this case. This Court, as it has in past rulings in this case, should continue to keep this standard of judicial scrutiny in the forefront of its analysis.

In addition, this Court's established ruling in this case that the statements in issue all involve matters of public concern, is both correct and compelling for the reasons stated in this Court's order and in that of the *Guilford* court. The matters of public concern – including matters of the safe and efficient operation of the region's railroad system, and the conduct and competence of corporate executives who, under some governmental oversight, are ultimately responsible for that safety and efficiency – reflect the undeniable public need to promote free and robust press coverage of these issues. The tragic derailment and explosion of crude oil in Lac Megantic on July 6th of last year, and the fact that Plaintiff Pan Am before and after the disaster regularly moved tank cars of crude oil through Maine (with intensive coverage by the Defendants), underscore both the Court's finding that Plaintiffs' railroad operations are

a matter of public concern, and the need for freedom of the press – and freedom of expression – in order to serve the public's interest in these matters.

## II.B.    The Statements Are Not Legally Actionable.

"A statement normally is not actionable unless it contains an objectively verifiable assertion." *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122 (1st Cir. 1997). "[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Id.* at 127-28 (quoting *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993) (Posner, C.J.)). Further, "the First Amendment prohibits defamation actions based on loose, figurative language that no reasonable person would believe presented facts," triggering the need for courts "to segregate casually used words, no matter how tastelessly couched, from fact-based accusations." *Id.* at 128.

Plaintiffs in this case seek to rest their defamation claims upon characterizations of viewpoints of others, about which the Plaintiffs apparently disagree. Plaintiffs' disagreement with a viewpoint, as a matter of law, does not give rise to legally actionable statements. In the *Guilford* case, where as part of their complaint against Frank Wilner (the author of an op-ed column in the widely read *Journal of Commerce*, which discussed, inter alia, activities of Plaintiffs' railroad, just as Hardenbergh did here), Fink and Mellon alleged, inter alia, that Wilner's column labeled them as "antagonistic to labor." *Guilford, supra*, 760 A.2d at 597-99. The trial judge ruled that "even if the allegation of anti-labor bias was fairly implied in the column, the charge is not 'provably false. It is much more a subjective assessment of a company's attitude and conduct towards labor.'" *Id.* at 589. The District of Columbia Court of Appeals agreed on its whole record review under the First Amendment. *Id.* at 597-600.

So also in *Levinsky's*. A competitor called the *Levinsky's* store "trashy." *Levinsky's, supra*, 127 F.3d at 129. The First Circuit reversed and entered judgment in favor of the defendant on this claim,

5

holding that as a matter of law the use of the word "trashy" was "quintessentially subjective," allowing for no defamation.  *Id.* at 130.

> Under the aegis of the First Amendment, a particular word or phrase ordinarily cannot be defamatory unless in a given context it reasonably can be understood as having an easily ascertainable and objectively verifiable meaning. The vaguer the term, or the more meanings it reasonably can convey, the less likely it is to be actionable.

Id. at 129 (citing *Phantom Touring*, *Inc. v. Affiliated Publications*, 953 F.2d 724, 728 (1st Cir. 1992) ("holding that newspaper articles that referred to the plaintiffs production of the 'Phantom of the Opera' as 'fake' and 'phony' were not actionable because the descriptions were 'unprovable,' inasmuch as those 'adjectives admit of numerous interpretations'"); *McCabe v. Rattiner*, 814 F.2d 839, 842-43 (1st Cir. 1987) ("holding that a newspaper headline which referred to the plaintiff's real estate development as a 'scam' was not actionable because the word means different things to different people and '[t]he lack of precision makes the assertion 'X is a scam' incapable of being proven true or false'")).

## II.B.i.        Statement 1:  Accurately Quoting the Non-Actionable Opinions of a New Hampshire Governmental Official

The first statement in issue (Amended Complaint ¶ 10) is an accurate quotation of Peter Burling, then chair of the New Hampshire Rail Transit Authority.  SMF ¶¶ 1-7.  Mr. Burling commented on a derailment on the Plaintiff's railroad line in Nashua, New Hampshire the same day as the accident.  SMF ¶¶ 3-4.  The Plaintiffs complain about the portion of Burling's statement that the accident was "predictable" given the condition of the "horrendously dilapidated railroad system."  Amended Complaint ¶ 11.  Burling's statement first appeared in the *Nashua Telegraph*.[3]  SMF ¶¶ 1,4. Hardenbergh described the accident, Fink *fils*' analysis as president of the railroad of the cause of the accident, and then focused upon the fact that a New Hampshire governmental official had expressed an opinion about the railroad **system** and whether its condition as a whole could make accidents only a

---

[3] The interplay between the "truth" of this statement and the doctrine of fair reporting are discussed in the section of this Memorandum on substantial truth, below (Part II.C.i.).

matter of time.  SMF ¶¶ 2-7.  Significantly, Plaintiffs omit the overall context of Burling statements.  *Id.*  The overall context shows that Burling's statements were not necessarily even an informal indictment of the Plaintiffs by Burling, but rather a comment on the overall railroad **system**.  SMF ¶¶ 3-4.  Hardenbergh's quotation of another newspaper's quotation of Burling was clearly not intended to report on the inherent truth of the statement, but on the fact that a governmental official expressed this opinion after an accident had occurred.  SMF ¶ 7.

These underlying facts and the context of the article, including those portions which Plaintiffs have omitted in their complaint, render the Hardenbergh publication non-actionable, especially when it is understood that Burling's opinion, surmising how the condition of the railroad system impacts the likelihood of accidents, itself could not be the basis of a defamation action.  Further, whether a railroad system is "horrendously dilapidated," rendering accidents "perfectly predictable" is clearly a matter of subjective assessment, expressed using loose language or commonly understood hyperbole.  Burling's "horrendously dilapidated" and "perfectly predictable," like "trashy" in *Levinsky's* and "phony" in *Phantom Touring* are simply not actionable.

**II.B.ii.      Statement 2:  Comments on Rail Customer Complaints About Quality of Service and Congestion Are Not Actionable.**

In the second statement in issue (Amended Complaint ¶ 15), Plaintiffs complain of defamation arising out of reporting on comments from rail customers who are dissatisfied with Pan Am service on the Mechanicville to Ayer route (including one source who stated that the service is "bad"), and who reference "congestion" on this corridor.  SMF ¶¶ 11-19.  As with Burling's statement above, these are also not actionable statements.  People, customers, and constituents in general society are entitled to disparage the service of an industry with subjective viewpoints.  Here, there is no other context other than someone called the service in a certain corridor of Plaintiffs' railroad system "bad" or "congested."  "Bad" service is a vague term.  Whether a route is "congested" or not depends on the subjective

7

perspective of the user; it too is a fundamentally relative word.  To open the door to a trial in this matter offends the First Amendment.  We do not turn to "industry standards"; they do not make the vague assertion any more "verifiable."  Indeed, industry standards could themselves be "bad" and still allow "too much congestion."  Industry standards only add to the mix another layer of debatable, variable meaning – another subjective connotation of what the words might mean.  *Dilworth v. Dudley*, 75 F.3d 307, 310-11 (7th Cir. 1996) (no defamation when one scholar called another a "crank").  This statement is not actionable.

**II.B.iii.      Statement 3:  An Accurate Quote of A Person's Opinion About What Challenges Pan Am Faces as a Railroad Owner Is Not Actionable.**

The third statement in issue (Amended Complaint ¶ 20), is another example of a non-actionable statement which Plaintiffs seek to contort into the basis for a defamation claim.  Plaintiffs claim that they have been defamed when Terry Judge, the sales and marketing director and communications manager for Kim Hotstart, is accurately quoted musing, "I would think they have plenty of other challenges, [such as] safety challenges, employee relations and locomotive maintenance."  SMF ¶¶ 25-26.  Again, Plaintiffs excise one snippet out of a lengthy article in which Hardenbergh was publishing a summary of two newspaper articles describing the Plaintiffs' development of their own auxiliary power unit (APU) and then-Maine Governor John Baldacci's visit to Waterville to see it.  SMF ¶ 25.

Any statements about the existence of a railroad owner's business "challenges" – such as safety challenges, employee relations and locomotive maintenance – is fair and subjective opinion, like calling a *Levinsk's* store "trashy" or a Phantom of the Opera production "phony".  These expressions are hardly provable as verifiably false fact.  The speaker's use of the phrase "I would think" further underscores this connotation.  SMF ¶ 26.

How would one conduct at trial on a railroad owner's business "challenges"?  "Safety" is an open, variously defined term – we do not know what aspects of "safety" are being referred to; the same

8

is true with broad terms like "employee relations." If a business meets many "safety challenges" but not all, or if it addresses many of its "employee relations" challenges, but not all, is the speaker's assertion here true or "false"? The "challenges" present the very "moving target" that the First Circuit cautioned against, in reversing the trial court's subjecting a defendant to a full-fledged trial on such matters in the *Levinsky's* case. *Levinsky's, supra*, 127 F.3d at 130. Such relative, subjective inquisitions like this in the context of a defamation action against a journalist are prohibited by the First Amendment.

**II.B.iv.    Statement 4: An Accurate Quote from The Owner of the New England Southern Railroad About a Promise Made By Plaintiffs to "Locate A Crew In Concord" Is Not Actionable.**

The fourth statement in issue (Amended Complaint ¶ 27) is also not defamatory as a matter of law. Put simply, when Hardenbergh reported what Peter Dearness (owner of the New England Southern Railroad) said about Plaintiffs' "promise to locate a crew in Concord and switch customers five days a week," there is nothing false and defamatory about the statement. SMF ¶¶ 36-37. Plaintiffs seem to complain that the statement implies that whether or not they ever made a promise (and we know Plaintiffs did make the promise, publicly – see Part II.C.iv., below) they are nonetheless providing "appropriate service to [their] customers on the Concord Line." Amended Complaint ¶ 28. Again, whether or not Plaintiffs are providing an "appropriate service", or not, is not in the nature of an "objectively verifiable assertion" susceptible to proof at trial. For all protestation Plaintiffs make that, in their view, they are providing "appropriate service", there will be witnesses like Peter Dearness or others who complained that they were not, for various reasons. *See* SMF ¶¶ 16-24, 34, 72-75. Differences of opinions or perspectives are not the subject of defamation trials. Whatever does or does not constitute "appropriate" service – and whether it requires a crew in Concord – is not anything that can be "easily ascertained" by any objective proof. This statement, too, is not actionable.

**II.B.v.       Statement 5:  An Accurate Quotation of the Loose and Figurative Expression That the Railroad "Loses" Cars Is Not Actionable.**

The fifth statement (Amended Complaint ¶ 32) is also not actionable.  Loose and figurative language is within the purview of the First Amendment, such that a defamation claim can never be based upon an exacting, literal reading of loose language or editorial flourish.  *Letter Carriers v. Austin*, 418 U.S. 264, 284-86 (1974) (use of the word "traitor" to describe a worker who crossed the picket line was not actionable); *Greenbelt Co-op Publishing Ass'n v. Bresler*, 398 U.S. 6, 13-14 (1970) (newspaper's characterization of a developer's negotiation position as "blackmail" was not defamatory); *Phantom Touring*, *supra*, 953 F.2d at 728 (calling a play "a rip-off, a fraud, a scandal, a snake-oil job" was mere hyperbole and, thus, constitutionally protected).  The same is true of any speaker who is quoted in a publication clearly using looser, more figurative terms of expression.

Here, the undisclosed source, who is quoted, put the word *loses* in quotations marks – i.e., "'loses'." SMF ¶ 45.  Obviously the quote was not intended to suggest that the railroad permanently "loses" cars, within the wide ambit of connotation of the verb "to lose." Instead, the more subjective, looser connotation was intended.  Hence, the use of quotation marks to underscore the point.[4]  The word "lose" is not to be taken literally.  Indeed, the source again uses quotation marks in the next phrase, mentioning "one car has been 'lost'".  *Id.*  There is no question that the idea is not that Plaintiffs literally lose cars, but that Plaintiffs had difficulty tracking where certain cars may be at any given time on the system.  The source underscores that interpretation by stating – as have many others, see Statement 2 and SMF ¶¶ 12, 16-24 – "JCI has had difficulty with consistency of service."

In fact, it appears from Plaintiffs' allegations that Plaintiffs are not even claiming that the railroad never "loses" cars in this non-literal sense.  Amended Complaint ¶ 33.  One reads Plaintiffs'

---

[4] For another ordinary example, consider the difference between referring to a person as missing, or as "missing."  Without more context, the two are still quite different expressions of language, though using the same word.  The use of quotation marks in the latter form of expression is a style that conveys that the word – missing – is *not* to be taken literally, or at least not necessarily so.

allegations strictly to mean not that the railroad never loses rail cars, but that the railroad never loses rail cars *containing (TIH)* – i.e., "TIH rail cars." *Id.* ("Plaintiffs have never lost railcars *containing (TIH)* material; indeed, Plaintiffs have a computerized tracking system that allows ST to track *TIH railcars with accuracy.*") (italicized emphasis added).  This is an important distinction, as discussed below, on the substantial truth doctrine, but it is also a key part of this threshold actionability analysis.  All the statement means to imply is that the railroad is not always consistent in keeping track of the location of every rail car at all times, and that this perception has caused some customers (at least this particular unnamed source) enough frustration in the past that the frustration is thus conveyed to a person such as Hardenbergh who is reporting on the railroad's operations.   It is still subjective assessment – a frustration – that is clearly being conveyed using stylistic, loose language. *See*, *Veilleux v. National Broadcasting Co.*, 206 F.3d 92, 113 (1st Cir. 2000) (statement that worker "hasn't taken time off" was vague and susceptible of more than one meaning); *McCullough v. Visiting Nurse Service of Southern Maine, Inc.*, 691 A.2d 1201, 1204 (Me. 1997) (no defamation in describing visiting nurse as "unavailable" to perform her assigned tasks).

### II.B.vi.        Statement 6:  Opinions, Clearly Identified As Surmise and Conjecture, Arising From Undisputed Actual Events Are Not Actionable.

The sixth statement in issue (Amended Complaint ¶ 39) is another unconscionable stretch, trying to define as defamation several people editorializing about an actual event:  one day in March of 2011, David Andrew Fink (Fink *pere*) – the longtime president, chief executive officer, and de facto face of Pan Am Systems – left his job.  SMF ¶¶ 58-60.  The departure was precipitous, happening almost literally overnight.  This is not the usual way a longtime executive of a large and renowned corporation in the United States leaves his job after decades of command in that position of authority.[5]

---

[5] As background to this analysis, it may also be worth repeating that this Court has already correctly noted that "a statement that an individual is fired, without defamatory reasons for the firing, is not defamatory."  Order on Motion to Dismiss ECF No. 20) at 14 (citing *Picard v. Brennan*, 307 A.2d 833, 835 (Me. 1973)).

The Hardenbergh article in issue began by simply stating that undisputed event – the fact that Fink left his position. SMF ¶ 57. It reports that four separate sources – "one MBTA, one union, one Maine source, and one from other railroad management in New England" – confirmed that Fink's departure was not wholly voluntary or on his own volition. SMF ¶ 57.

The remainder of the article describes conjectures by sources. *Id.* It openly acknowledges that "sources differ on what precipitated the action" and therefore openly disavows any information on why Fink left his job, whether he was "formally removed" or is on a "leave of absence" or whether Mellon (the board chair) "came to New England to administer the coup de grace." *Id.* The article openly acknowledges that it is not clear whether Fink has "definitely left." *Id.*

The bottom line is that anyone reading this paragraph would know that it conveys the author's opinion and perspective, based on reporting from sources, on the uncertain state of current knowledge about what happened, and what will happen, involving the undisputed event – Fink leaving. It is far from actionable, because the section is not couched as authoritative reporting of known reasons for an event, but is rather a reporting on a range of people's thinking about what may have occurred, conjecture about what the reasons for the event may be, and what the subjective consequences may be. This article can be no more defamatory than editorials written about politicians jumping in or out of a race, college coaches resigning or being removed from positions, or any other incident that is presented as "breaking news" and then filled out with people's subjective comments editorializing about what might have happened.

Further, we know now through discovery in this action that Fink did not want to resign when he did. SMF ¶¶ 58-60, 61, 64. Hence, there is nothing actionable about the way Fink's sudden departure was reported by Hardenbergh. Hardenbergh was careful not to speculate, and to report using only sourced information. The editorial flourishes – characterizing the removal of Fink as a possible "coup de grace" – are protected, free expression under the First Amendment. Plaintiff Fink may not like the

12

expression, he may not like the editorial flourish, but to each his own.  He precipitously left his longstanding position of highest authority in one of the nation's prominent corporations.  Fink must live with the way other people describe or interpret what happened and what he did – even the way some people who may not particularly like him interpret or describe it.  The First Amendment does not tolerate stripping society of all artistic license, style, and imaginative expression, nor does the law of defamation punish one who sets forth his own interpretation or description of factual events or who reports on the opinions of others.  Fink has no defamation claim based on these comments.  *See Veilleux*, *supra*, 206 F.3d at 111 (citing *Bakal v. Weare*, 583A.2d 1028, 1030 (Me. 1990) (defamation claim may not be based on interpretation of language in most negative way possible); *Hudson v. Guy Gannett Broadcasting Co.*, 521 A.2d 714, 717 (Me. 1987) (the meaning of the statement to an ordinary, intelligent person is determined free of negative "innuendo, insinuation, colloquium, [etc.]").

**II.C.    Even If Considered Legally Actionable, Each Assertion Is Substantially True.**

This Court has already determined that each alleged defamatory statement covers matters of public concern.  ECF No. 20 at 10.  Leaving open the question of whether Plaintiffs are public figures, the Court's "matter of public concern" finding means that Plaintiffs must bear the burden of proving the "falsity" of each statement.  As this Court stated:  "In defamation actions against a media defendant on matters of public concern, the [United States Supreme] Court has rejected the common law presumption of falsity and instead imposed the burden of showing falsity of the statements on the plaintiffs."  *Id.* at 6 (citing *Philadelphia Newspapers*, *Inc. v. Hepps*, 475 U.S. 767, 776-77 (1986)).

When the evidence is in equipoise, the Constitution requires the balance to tip in favor of protecting free speech. "In a case presenting a configuration of speech and plaintiff like the one we face here, and where the scales are in such an uncertain balance, we believe that the Constitution requires us to tip them in favor of protecting free speech. To ensure that true speech on matters of public concern is not deterred, we hold that the common-law presumption that defamatory speech is false cannot stand

when a plaintiff seeks damages against a media defendant for speech of public concern." *Hepps*, 475 U.S. at 776-77.  As one leading commentator has noted, "[u]nder *Hepps*, therefore, ties go to the press." Smolla, *Law of Defamation* § 5:13 (Second Ed. 2013) at 5-20.

"'Truth' will protect the defendant from liability even if the precise literal truth of the defamatory statement cannot be established." *Id.* at § 5:14 at 5-25 to -26 & 5-25 n.1 (and extensive citations at n.1).  Falsity 'overlooks minor inaccuracies and concentrates upon substantial truth.'" *Veilleux*, *supra*, 206 F.3d at 108 (quoting in part *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991)); *McCullough*, *supra*, 691 A.2d 1201, 1203 (Me. R997) ("slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance").  Accordingly, "[m]inor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'"  *Masson*, *supra*, 501 U.S. at 517.

Finally, this Court should take note of Plaintiffs' bemoaning the fact that Hardenbergh did not contact them to ascertain the truth of each statement in issue. Amended Complaint ¶¶ 12, 17, 22, 24, 29, 35, and 42.  Plaintiffs have themselves to blame, as they have since 2001 explicitly told Hardenbergh that they would not respond to his inquiries. SMF ¶¶ 83, 86-90.  Indeed, current Pan Am Executive Vice-president Cynthia Scarano stated as recently as 2012, "[W]e under no circumstances talk to Chop [Hardenbergh]." SMF ¶ 90.

This undisputed refusal to comment leaves Plaintiffs in a distinctly suspect position when later, in the context of this lawsuit, they quibble about minor details.  The refusal by Plaintiffs to respond to Hardenbergh's reporting (SMF ¶ 90) puts the lie to the implication in Plaintiffs' Amended Complaint that Plaintiffs would have corrected the information if asked.  Yet, as discussed below, the statements interpreted under the substantial truth doctrine contain nothing of great import for the Plaintiffs to correct.

**II.C.i.  Statement 1:  The Railroad System Is Fairly Characterized As "Dilapidated"**

Setting aside the Plaintiffs' disagreement with the opinion, it is nonetheless a fair

characterization of the railroad *system* – of which Plaintiffs are only a part – that the system in places

was in serious need of repair at the time of the publication in issue.  For example, in 2008, The

Committee to Improve Rail Service in Maine noted, in a filing to the federal Surface Transportation

Board, that the [2008 Springfield Terminal] track was far below the standard set by [Pan Am Railways]

itself.  According to the 22 July [2008] Temporary Speed Restriction Summary, "the railroad's main line

in Maine, which lists a track speed of 40 miles per hour between Mattawamkeag and Portland . . . was

limited by track bulletin to either 10 or 25 miles per hour for this entire length of nearly 200 miles," and

a spokesperson for the Committee stated, "We could not find a single mile that could be traversed at the

40 miles per hour timetable speed.'"  SMF ¶ 8.  Speed restrictions for trains operating on them are a

valid indicator of whether a track has fallen into disrepair or needs an upgrade (i.e., whether the track is

"dilapidated").  SMF ¶¶ 8-10.  In August of 2008 the Brotherhood of Locomotive Engineers and the

United Transportation Union submitted this comment to the Surface Transportation Board: "It also

needs to be noted that the tracks on Springfield Terminal's lines have not been maintained to 40 mile per

hour standards for years and accordingly the trains operating on them are subject to speed restrictions. . .

."  SMF ¶ 8.  See also SMF ¶¶ 9-10.  Furthermore, Plaintiffs themselves admit in their pleadings that

they "initiated an upgrade of the railroad system between Mechanicville and Ayer" sometime in 2009.

Amended Complaint  ¶ 16.  If that is the case, then presumably that part of their system was in need of

an upgrade, because it had fallen into disrepair.

Again, it is important not to read into any statement an alleged defamatory meaning or to draw

the most negative interpretation and thereby grasp for defamatory charge.  *Veilleux*, *supra*, 206 F.3d at

111 (citing *Bakal v. Weare*, 583A.2d 1028, 1030 (Me. 1990)).  Peter Burling, a New Hampshire

government official, was merely stating his opinion about the state of the railroad system, and read in

context his point was that more funds need to be devoted to upkeep and upgrades, in order for the system to run more quickly.  SMF ¶ 4.  That statement is in fact true.  In his opinion the state of the track system was in essence an accident waiting to happen.  He was not blaming anyone:  "[t]he point is not to say 'I told you so,' but to say this is why we feel it is so important to get this line upgraded and to maintain it for passenger and freight operations. We believe there are institutions of the federal government that can move to carry this along."  SMF ¶ 4.  There is no defamatory charge in this statement, and – in substantial truth – the railroad system at the time of this publication was in need of upgrade and repair.  SMF ¶ 8-10.

Plaintiffs quibble that Burling stated the cause of the accident falsely. To the contrary, Chair Burling stated the cause of the accident **truthfully.**  As Fink *fils* stated and Hardenbergh reported, the derailment was caused by a faulty railcar. Railcars – regardless of ownership – when operated by Plaintiffs are part of the rail system.  Thus Burling accurately said:  "A horrendously dilapidated railroad **system** has caused a slow-moving coal train to fall off the tracks."  SMF ¶ 3 (emphasis added).

The fair report privilege is tied to this particular alleged defamatory charge.  This is government official Peter Burling's actual statement of opinion; the opinion was accurately reported by Hardenbergh.  The fair report privilege protects the media from liability for reporting on actions or statements of government officials. "The purpose of the privilege is to ensure that publications may perform the important function of informing the public of actions taken by government agencies and officials." *Yohe v. Nugent*, 321 F.3d 35, 42-43 (1st Cir. 2003).  Here, there should be no liability for Hardenbergh's truthful reporting of a governmental official's opinion following an accident on the railroad system.[6]

---

[6] We recognize that this Court has previously expressed some reluctance to apply a "fair report privilege" because the Maine Law Court has not yet had occasion to expressly recognize it.  ECF No. 20 at 12.  First, on the issue of federal court reluctance to "blaze new trails" in state law, we point out that that reluctance of the federal judicial branch must be tempered by the fact that Defendants in this case did not choose the federal forum. *Nolan v. CN8*, 656 F.3d 71, 76 (1st Cir. 2011) ("Where the highest [state] court has not spoken directly on the question at issue, [the federal court] must predict, as best [it]

**II.C.ii.**      **Statement 2:  Rail Customer Descriptions of Service and Congestion Are Substantially True.**

It is substantially true that Plaintiffs had issues in 2009-2010 with the "bad" quality of service, and with "congestion" on the "Patriot Corridor" from Mechanicville to Ayer which led to less ability to move railcars quickly.  Plaintiffs themselves admit these dependability and reliability issues.  SMF ¶ 24. Beginning in November 2009 and extending into 2010, Plaintiffs and one of their chief customers, the Verso paper mills in Maine, met in order to focus on "improving consistency and rail service" and addressing "multiple concerns." *Id.*  The spokesperson for Verso was accurately quoted in 2011 as saying that the railroad's performance over the year has been a problem and that Verso officials would like to return to using more rail, but "we need to see dependability and reliability." SMF ¶ 23.  Notably, Plaintiffs do not challenge these reports, which cite to articles appearing in the *Bangor Daily News* and even Plaintiffs' own publication, *Pan Am Clipper*. SMF ¶¶ 23-24.  While loose terms such as "bad" service and "congestion" are not actionable as a matter of law (see Part II.B.ii.), the record is replete with foundation for the complaints. SMF ¶¶ 16-24, 33-34, 73-75.  Officials in Plaintiffs' partner in the Patriot Corridor, Norfolk Southern Railways (NS) reported that volume had nearly doubled (SMF ¶ 16),

---

can, that court's likely answer."); *Jenks v. New Hampshire Motor Speedway*, 2012 WL 1393977 (D.N.H. 2012) at *1. "While a federal court cannot change existing state law by adopting new exceptions, when precedent is lacking, a federal court must predict, if possible, the course the state court would take." *Jenks, supra*, at *1 (citing *Barton v. Clancy*, 632 F.3d 9, 17 (1st Cir. 2011)).  Defendants are not deprived of substantive law merely as the result of a plaintiff's decision to sue in diversity in federal court.  *Id.*  We respectfully suggest that this may be an occasion when the Court must, in accordance with *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), ascertain state law.  On that point, a decision of the Maine Superior Court, *Kampf v. Maine Publishing Corp. d/b/a Casco Bay Weekly , et al*, 1998 WL 35550605 (Me. Super. Oct. 21, 1998) (October 21, 1998) (Mills, J.) ruled that the Law Court "would recognize a fair report privilege." *Id.* at *1 (citing *Restatement (Second) of Torts*  § 611 (1977)).  There is every indication that the fair report privilege is part of Maine law.  But further, a growing number of legal authorities, including the drafters of the Restatement (Second) of Torts, have suggested that the fair report privilege is constitutionally required:  "If the report of a public official proceeding is accurate or a fair abridgment, an action cannot be Constitutionally maintained, either for defamation or for invasion of the right of privacy."  *Restatement (Second) of Torts* §611, Comment b (emphasis added).  Thus, statements by public officials at press conferences or in an interview have been held to be within the privilege. *Jones v. Taibbi*, 512 N.E.2d 260, 267 (Mass. 1987); *Friedman  v. Israel Labour Party*, 957 F. Supp. 701, 714 (E.D.Pa. 1997).  "[S]o long as the newspaper's 'rough and ready summary'  . . . is 'substantially correct', the newspaper's report is protected by the privilege." *Yohe v. Nugent*, 321 F.3d 35, 43 (1st Cir. 2003).  This privilege should  bar recovery in this case, on Statement 1 (quoting a New Hampshire government official) and on Statement 4 (quoting a person referencing a promise contained in one of Plaintiffs' public governmental filings).

and that "improvements" were coming (SMF ¶ 17).  See also SMF ¶¶ 18, 24.  Plaintiffs have no

evidence to controvert these facts, and fail to meet their *Hepps* burden of proof.

**II.C.iii.        Statement 3:  It is Substantially True That Pan Am Faces Challenges as a Railroad Owner.**

With regard to the third statement, again the principle that courts refrain from reading negative

defamatory innuendo into an alleged statement requires a finding of no liability as a matter of law.

Plaintiffs concede each of these challenges.  Pan Am Railways Vice-president Ed Motte, mere months

before Statement 3, described operating the railroad as "a challenge every day."  SMF ¶ 27.  VP Cynthia

Scarano, another Pan Am executive, wrote to the Bangor Daily News to say "in a Bangor Daily News

article on the state of freight railroads in Maine, Christopher Cousins highlighted a few of the many

obstacles that freight rail customers must contend with.  Weather conditions in the Northeast contributed

*to those already complex challenges*." SMF ¶ 28 (emphasis added).  With regard to safety, the Federal

Railroad Administration's statistics show that Plaintiffs' rate of accidents and incidents per million train

miles increased from 2008 to 2009 from 17.1 to 20.1.  SMF ¶ 29.  And, as argued above in Part II.B.iii.,

who can say that even one or two accidents makes the railroad "safe" – or removes the "safety

challenges"?  There have been accidents every single year throughout Plaintiffs' ownership and

operation.  *Id.*  With respect to employee relations, as opposing counsel in this matter is well aware, the

First Circuit has noted the Brotherhood of Locomotive Engineers and United Transportation Union

engaged in a "major" labor dispute with Springfield Terminal Railway Company. SMF ¶ 31.  Later that

same year the District of Columbia Court of Appeals also noted Guilford Transportation Industries, Inc.

(formerly Pan Am Systems) was "hostile to labor."  SMF ¶ 30.  A union filing in August of 2008 also

commented to the US DOT that Pan Am Railways management is "either lacking in competence or

lacking compliance disposition" such that the record in that case "would necessarily cause any outsider

observer to question the ability and willingness" of Pan Am Railways to honor its commitments.  SMF ¶

32.  The public record in a federal court in New Hampshire led United States District Judge Barbadoro to exclaim in open court during a sentencing hearing that Plaintiff Fink "terrorized his employees." SMF ¶ 70.  Not surprisingly, for a large railroad owner, the record also reflects locomotive maintenance challenges.  SMF ¶ 33.  See also SMF ¶¶ 72-75, 91-97.  On the state of this undisputed record Plaintiffs cannot meet their burden of proving falsity in relation to any of these issues.

**II.C.iv.     Statement 4:  An Accurate Quote from The Owner of the New England Southern Railroad About An Actual, Documented Promise Made By Plaintiffs to "Locate A Crew In Concord" Is Substantially True.**

The fourth statement in issue provides yet another clear example of the substantial truth doctrine defeating Plaintiffs' case.  The record contains documented, uncontested proof of a written promise by Plaintiffs to locate a crew in Concord.  SMF ¶¶ 38-40.  Plaintiffs' written promise was submitted in their own application to the Surface Transportation Board in June of 2009.  SMF ¶ 39 ("Once Pan Am service is restored to the Subject Line, Pan Am will assign a crew to be headquartered in Concord, New Hampshire to work a five day per week schedule . . . .).  In granting the application, the Surface Transportation Board repeated Plaintiffs' promise:  "Pan Am states that: (1) it will operate one crew on a 5-day-a-week basis; (2) the crew will be headquartered in Concord...."  SMF ¶ 38.

Further, the report Plaintiffs complain of here is an accurate report of what Peter Dearness, the owner of the New England Southern Railroad, was quoted as saying in reference to these public records filed with the adjudicatory body of the USDOT (the Surface Transportation Board).  SMF ¶¶ 36-37.  Thus, the fair report privilege also applies. See, Part II.C.i, footnote 6, above.  In summary, this fourth statement is an accurate quotation from a person accurately referring to an actual public promise made by Plaintiffs.  The substantial truth doctrine eliminates this claim.

**III.C.v.     Statement 5:  An Accurate Quotation From a Trusted Source That the Railroad "Loses" Cars Is Not Actionable.**

With regard to the fifth statement in issue, Plaintiffs have once again yanked a statement out of context and labeled it defamatory.  A review of the entire article  (SMF ¶¶ 45, 47) shows that it consisted of five paragraphs, reporting in the main that Plaintiffs were using special trains to move chlorine to Jones Chemical Incorporated (JCI), charging JCI much more than normal, and adding cars other than JCI's onto the train for a free ride.  *See* SMF ¶¶ 41-44.  At the end, in the final, fifth paragraph, a source complains about consistency of service to JCI.  The undisputed facts are that the source wrote to Hardenbergh (the source remains confidential under the protections afforded by the First Amendment), and Hardenbergh accurately quoted the source. SMF ¶ 45.  The publication containing the words at issue reads:

> **"Quality of rail service"**
> In addition to price and the need for special trains, JCI has had difficulty with consistency of service, according to another source. It requires switching of at least four cars a week. The railroad 'loses' cars on a consistent ongoing basis, including one car 'lost' for over 60 days...even though certain DHS and DOT statutes require carriers to release [TIH] cars within 48 hours.

Exhibit 21, SMF ¶ 45.  Plaintiffs maintain that the quote supplied by the source to Hardenbergh in the last sentence of the entire article is false, "in that Plaintiffs have never lost rail cars containing (TIH) material."  Amended Complaint ¶ 33.[7]

The source, through his or her attorney, later clarified that the "one car 'lost' for over 60 days" was not a TIH car.  SMF ¶ 46.  Hardenbergh published this clarification. SMF ¶ 47.

Plaintiffs argue that the paragraph is subject to an interpretation that Plaintiffs actually "lost" TIH cars.  The statement read literally does not say that.  Moreover, the statement is subject to a second, different interpretation.  Read in the context of the source's complaint that the railroad was not

---

7  Plaintiffs would also have Hardenbergh contact the FRA for information on "lost" TIH cars.  Amended Complaint ¶ 37. The FRA accident/incident report (SMF ¶ 54) for the years in question does show accidents and incidents involving hazmat cars, but no separate line for TIH cars, far less for "lost" TIH cars.  SMF ¶¶ 52-54.

providing consistent service, the source was simply saying that "inconsistent service" referred to "lost" cars which were late and the railroad could not immediately ascertain why TIH cars had not arrived at the JCI facility in Merrimack, New Hampshire at the time they were promised.

We know from the 2012 clarification[8] that the source was not saying that Plaintiffs lost only a TIH car for 60 days. Thus the question is whether the statement is reasonably subject to the interpretation by a reader that Plaintiffs merely could not deliver the TIH cars at the time promised. Readers of Hardenbergh's widely read trade newsletter (ECF No. 25 ¶ 4) are, in the main, experienced in the railroad industry. They were well aware of JCI's problems with Plaintiffs, as Hardenbergh reported in 2007 on Plaintiffs socking JCI with a 400% rate increase, and the "financial strain" that placed on JCI. SMF ¶¶ 43-44. Readers were also aware, at the time of the March 2011 statement in question, of Plaintiff's' service difficulties (SMF ¶¶ 50-51) and Plaintiffs' historically long track record of indifference to environmental laws (SMF ¶¶ 48). They might be aware that FRA safety statistics show 247 accidents or incidents on Plaintiffs' railroad involving hazmat cars. SMF ¶ 53. They would reasonably interpret the statement as "Plaintiffs could not deliver the TIH cars at the time promised."[9]

---

8 Plaintiffs may well complain that the clarification emerged more than a year after the publication of the statement at issue. Were Plaintiffs willing to talk to Hardenbergh, the clarification could have emerged immediately. But Plaintiffs have chosen since 2001 "under no circumstances" to talk to Hardenbergh. SMF ¶¶ 56, 90.

9 Hardenbergh would also raise here, still cognizant of the Court's Report of the Prefiling Conference Under Local Rule 56(h) ¶ 2, that the Plaintiffs' required showing of "fault" – actual malice or reckless disregard of the truth – is nonetheless facially defeated by these undisputed facts of record. It would not be necessary to identify the confidential source of the information to reach this conclusion. The attorney for the source, in his correspondence demanding to maintain the confidentiality, implicitly acknowledges and reaffirms the overall substantial truth of his client's original statement – that Plaintiffs "lost" a car. SMF ¶ 46. This documents also that the source is reliable (he or she had his attorney follow up on the information previously provided), and all other circumstances of record show that Hardenbergh was not knowingly publishing an untruth and was not, as a matter of law, acting in reckless disregard with respect to the truth. SMF ¶¶ 47-56. As the First Circuit stated in *Veilleux*, 206 F.3d at 114: "Reporters have leeway to draw reasonable conclusions from the information before them without incurring defamation liability." This provides further grounds for summary judgment in Defendants' favor in this case.

When the meaning of an allegedly defamatory statement is in dispute, the court makes the determination about the reasonable interpretation. *Bakal v. Weare*, 583 A.2d 1028, 1030 (Me. 1990). The court must not automatically draw the most negative interpretation of the comment, as urged by a plaintiff, if the language is susceptible to a non-defamatory construction. *Id.* Under *Hepps*, Plaintiffs have the burden of proving that their interpretation ("Plaintiffs actually lost TIH cars, and one for more than 60 days") is correct and therefore false and defamatory. When, as here, the Court is faced with a second, equally valid interpretation, it should apply *Hepps* to the effect that "where the scales are in uncertain balance . . . the Constitution requires us to tip them in favor of protecting free speech." *Hepps*, *supra*, 475 U.S. at 776-77.

Moreover, Plaintiffs do not contest the charge that they "lose" rail cars; they only contest the charge that they "lose" rail cars carrying toxic inhalation hazards (so-called "TIH cars"). Amended Complaint ¶ 33. The distinction between "lost" cars and "lost TIH cars" is an example of a minor inaccuracy that does not change the "gist" or "sting" of the defamatory charge. *Masson*, *supra*, 501 U.S. at 517; *Collins v. Detroit Free Press, Inc.*, 627 N.W.2d 5, 9-11 (Mich. App. 2001) (admittedly inaccurate quotation did not paint a different picture from actual quotation).

In short, in this case, the cumulative undisputed facts – e.g., that the Plaintiffs have a historically long track record of noncompliance with environmental laws, that the Plaintiffs' track was congested from Mechanicville to Ayer during the period leading up to March 2011 (SMF ¶¶ 12-19, 50), and that the Plaintiffs do "lose" cars – result in the substantially true "stings" of the charge. Thus, whether the source was referring to a TIH car or another type of car is a relatively minor inaccuracy.

### II.C.vi.    Statement 6: The "Gist" of Fink Having Resigned Against His Personal Volition Or Under Protest is Substantially True.

As noted above in Part II.B.vi, Plaintiffs are noticeably cagey still about all of the details and the circumstances of Fink's sudden resignation. It is uncontested that the resignation was sudden. No press

release or other statement by Plaintiffs announced a transition or planned retirement of Fink. SMF ¶ 61. The resignation letter displays, on its face, displeasure at the necessity of his resignation, and shows no suggestion of a planned departure. SMF ¶¶ 58-59. The counter-signature, on the same day, by Board Chair Timothy Mellon (who by all reports resides in Wyoming), betrays any suggestion that this was a wholly uncontentious, pleasant, pre-planned and innocuous departure. SMF ¶ 58-60. Other Pan Am officials departing that same spring received warm thanks for their service (SMF ¶ 65). Fink's employers published no statements of gratitude; indeed they made no public statement about the departure. SMF ¶ 61.

However, the record of David Andrew Fink's stormy tenure as the head of Pan Am Systems and subsidiaries Pan Am Railways and Boston-Maine Airways contains much cause for which Mellon might have fired him. As a boss who "terrorized employees," he was publicly chastised for that trait by a federal judge during a federal criminal sentencing hearing against one of his employees. SMF ¶ 70. The presiding judge also opined that Fink's company was lucky not to have been prosecuted itself. SMF ¶ 69. As the head of Boston-Maine Airways Corporation, Fink was the subject of a show cause order issued by the United States Department of Transportation stating that he and his company "lacked the requisite disposition to comply with the laws of the United States as well as the managerial competence to run an airline." SMF ¶ 71. Fink's documented antagonisms with Peter Leishman (proved by the statements under oath of a former Pan Am executive, SMF ¶¶ 79-81) lend credence to the rhetorical hyperbole used by one of the persons quoted, referring to that known antagonism as a "holy war" – i.e., an antagonism that had grown irrational to outside observers. *See also* SMF ¶ 82. These are just some of the aspects of poor leadership reflected, in substantial truth, on the record. SMF ¶¶ 66-78.

Another noted example is the public record of the *Guilford v. Wilner* case, where Fink brought, and lost, a defamation action strikingly similar to this one. *Guilford*, *supra*, 760 A.2d 580 (D.C. 2000). In *Guilford* and here, Fink's heavy-handed tactic of deploying expensive, economically debilitating

litigation of marginal claims has the ulterior aim of chilling freedom of expression and the press. SMF ¶¶ 84-85. These are not the qualities of a "good leader," and earn the label of poor leadership.

**D.    For the Above Reasons, Defendants Are Entitled to Summary Judgment on Fink's False Light Claim in Count II.**

Fink's claim for "False Light" in Count II suffers from the identical deficiencies set forth above. Where a defamation claim fails – especially on the constitutional elements of the claim – the false light label put on the same conduct cannot circumvent that dismissal. ECF No. 20 at 18-19 (citing *Veilleux*, 206 F.3d at 134). In *Hustler Magazine v. Falwell*, 585 U.S. 46 (1988), the United States Supreme Court held that plaintiffs cannot avoid the constitutional limitations placed on defamation claims against media defendants by the simple expedient of relabeling those claims as others torts. *Id.* at 47-48. Since the *Hustler* decision, courts have uniformly held that tort claims contingent upon the underlying alleged defamation are subject to the same constitutional analysis and standards of proof. *Levesque v. Doocy*, 560 F.3d 82, 87 (1st Cir. 2009); *Brown v. Hearst Corp.*, 54 F.3d 21, 27 (1st Cir. 1995); *Howard v. Antilla*, 294 F.3d 244, 248-9 (1st Cir. 2002); *Schatz v. Republican State Leadership Committee*, 777 F. Supp. 2d 181, 190-91 (D. Me. 2011), *aff'd*, 669 F.3d 50 (1st Cir. 2012); *Collins v. Detroit Free Press, Inc.*, 627 N.W.2d 5, 10-11 (Mich. App. 2001) (First Amendment limitations "are not exclusive to defamation claims" and "apply to all of plaintiff's claims"). In this case, the false light claim is expressly subsumed by the defamation allegations of the Amended Complaint, and rests upon the identical conduct an issue. Amended Complaint ¶¶ 55- 56 (referring only to the "aforedescribed actions by Defendants" and the "aforedescribed publicized matter"). Therefore, Defendants are entitled to summary judgment on Count II of the Amended Complaint.[10]

---

[10] Defendants are also entitled to summary judgment on Count III, seeking "punitive damages." ECF No. 20 at 20 (citing *Havlik v. Johnson & Wales University*, 509 F. 3d 25, 34 (1st Circuit 2007) ("punitive damages are not a separate cause of action but, rather, an element of damages in, and thus wholly derivative of, the plaintiffs' defamation claim"). Furthermore, the Amended Complaint also does not cure the original defects of the punitive damages claim (see Order on Motion to Dismiss, ECF No. 20 at 20), independently as a matter of law, because Plaintiffs did not allege sufficient factual support for an inference that Defendants acted either with subjective ill will towards the Plaintiffs or in a manner so outrageous that

## III.    CONCLUSION

With *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), the United States Supreme Court ushered in an era of "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270. The evolution of strict constitutional rules supplanting state common law of defamation has been "faithful to this ideal." *Levinsky's*, *supra*, 127 F.3d 122, 126 (1st Cir. 1997). The rules exist so that defamation lawsuits, such as the current case, brought by powerful corporate executives and corporations, will not be turned into weapons for chilling the exercise of First Amendment freedoms, even when the free expression is unflattering, offensive to the plaintiff, or in some degree inaccurate. *Id.* at 125 ("[o]ur enduring national devotion to freedom of expression, embodied in the First Amendment and renewed in [New York Times Co. v. Sullivan], inevitably means that much offensive and inaccurate speech will remain free from legal constraints."); *Guilford*, *supra*, 760 A.2d at 592.

Defendants respectfully request summary judgment in their favor on all Counts.


Dated at Portland, Maine this 31st day of January, 2014.

                              /s/ Russell B. Pierce, Jr.
                              Russell B. Pierce, Jr., Esq.
                              Attorney for Defendants

NORMAN, HANSON & DeTROY, LLC
Two Canal Plaza
P.O. Box 4600
Portland, Maine 04112-4600
(207) 774-7000
(207) 775-0806 - fax
**rpierce@nhdlaw.com**

---

malice towards them can be implied. *Tuttle v. Raymond*, 494 A. 2d 1353, 1361 (Me. 1985). "For the purposes of assessing punitive damages, such 'implied' or 'legal' malice will not be established by the defendant's mere reckless disregard of the circumstances." *Id.* Here, even despite Plaintiffs' second attempt at pleading in this case, there is no genuine issue of material fact to support a punitive damages claim.

**CERTIFICATE OF SERVICE**

     I hereby certify that on January 31, 2014, I electronically filed the foregoing Motion for Summary Judgment and Incorporated Memorandum of Law with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to all registered counsel of record as follows:

**JONATHAN ANDREW POTTLE**
**THAD B. ZMISTOWSKI**
EATON PEABODY
P. O. BOX 1210
BANGOR, ME 04402
(207) 947-0111
Fax: 942-3040
Email: jpottle@eatonpeabody.com
Email: tzmistowski@eatonpeabody.com

                                       /s/ Russell B. Pierce, Jr.
                                       Russell B. Pierce, Jr., Esq.