UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

PAN AM SYSTEMS, INC. et al.,                    )
                                                )
                                    *Plaintiffs*  )
            v.                                  )          Case No. 2:11-cv-00339-GZS
                                                )
CHALMERS HARDENBERG et al.,                     )
                                                )
                                    *Defendants*  )

<u>OPPOSITION TO MOTION FOR SUMMARY JUDGMENT WITH
INCORPORATED MEMORANDUM OF LAW</u>

NOW COME Plaintiffs Pan Am Systems, Inc., Springfield Terminal Railway Company and David Andrew Fink, by and through counsel, Eaton Peabody, and oppose Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure as follows.

<u>MEMORANDUM OF LAW</u>

## I.    INTRODUCTION

From December 2009 to March 2011,[1] Defendants published statements concerning Plaintiffs that were false and defamatory.  (Opp. S.M.F. ¶ 1.)  These statements falsely asserted that (1) David Andrew Fink was removed from management by owner Tim Mellon for cause (Opp. S.M.F. ¶ 34); (2) Plaintiffs Pan Am Systems, Inc. and Springfield Terminal Railway lose rail cars containing hazardous materials in transit to Jones Chemical Incorporation's facility in Merrimack, New Hampshire, including a TIH[2] rail car for more than 60 days in violation of federal law (Opp. S.M.F. ¶ 25); (3) a coal train derailment on Plaintiffs' Northern Main Line in New Hampshire was caused by its horrendously dilapidated condition (Opp. S.M.F. ¶ 3); and (4) Springfield Terminal Railway Company promised to provide a crew in Concord, New

---

[1] Plaintiffs' commenced this action on September 6, 2011.  (ECF No. 1.)
[2] As explained *infra*, TIH refers to "toxic inhalation hazard" materials.

Hampshire, and provide five days per week service to customers on Plaintiffs' Main Line between Penacook and Manchester, New Hampshire (Opp. S.M.F. ¶ 53).[3]

Defendants argue, *inter alia*, that they are not liable for these false defamatory statements because they are media-defendants protected by the First Amendment of the United States Constitution.  In this respect, Defendants raised issues concerning their asserted confidential sources.  The Court, to accommodate these concerns, bifurcated discovery and placed any inquiry into Defendants' fault off-limits until the second phase of discovery.  (ECF No. 42.)

Defendants previously attempted to use the Court's bifurcation Order to bootstrap fault issues into the first phase summary judgment process, which the Court rejected.  (ECF No. 57; ECF No. 62.)  Notwithstanding the Court's Order, Defendants have nonetheless asserted a conditional privilege in their phase one summary judgment motion, a claimed fair report privilege, that even if cognizable under Maine law is off-limits until the second phase of discovery because it implicates Defendants' fault.  *See Saunders v. VanPelt*, 497 A.2d 1121, 1125 (Me. 1985) ("A conditional privilege does not change the actionable quality of words published but merely rebuts the inference of malice that is imputed in the absence of privilege. To recover, the plaintiff must then show the loss of the conditional privilege through abuse.  A conditional privilege can be abused, if in the publication of defamatory matter concerning another, one acts in reckless disregard as to its truth or falsity.") (internal citations omitted).

Apart from asserting a fair report privilege, Defendants have moved for phase one summary judgment on two bases: (1) the statements in question are not actionable; and (2) the facts in these articles are true.[4]

The Court should deny Defendants' phase one summary judgment motion for the reasons detailed below.

---

[3] Plaintiffs do not oppose Defendants' summary judgment motion with respect to the statements identified in paragraphs 15 and 20 of the Amended Complaint.  (ECF No. 25.)
[4] Defendants have not challenged any other element of a defamation claim or component thereof, apart from the asserted fair report conditional privilege relating to fault.

## II.    MAINE DEFAMATION LAW

A defamation claim concerns a statement that is an assertion of fact, whether explicit or implied.  *Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991).  If a statement resembles or is couched as opinion, it is still actionable if it implies the existence of undisclosed defamatory facts.  *Id.* (*citing Lightfoot v. Mathews*, 587 A.2d 462 (Me. 1991); *True v. Ladner*, 513 A.2d 257, 261-62 (Me. 1986); *Caron v. Bangor Publishing Co.*, 470 A.2d 782, 784 (Me. 1984)).

First Amendment constitutional law does not provide immunity to media-defendants that publish defamatory facts, or opinions that imply undisclosed defamatory facts.  *See, e.g.*, *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990) (stating that liability for opinion that implied undisclosed defamatory facts has not been displaced by First Amendment concerns).[5] Instead, First Amendment constitutional law will, in certain circumstances, require proof of actual malice and place the burden of proving falsity on a defamation plaintiff.  *See, e.g.*, *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 774-77 (1985).   Here, the issue of fault has been postponed until the second phase of discovery per the Court's Bifurcation Order.  (ECF No. 42.)

A statement is defamatory "if it tends to harm the reputation of another as to lower them in the estimation of the community or to deter third persons from associating or dealing with them."  *Rippett v. Bemis*, 672 A.2d 82, 86 (Me. 1996) (*quoting Bakal v. Weare,* 583 A.2d 1028, 1030 (Me.1990)).  This includes defamatory statements concerning an individual's profession or occupation.  *Saunders v. VanPelt*, 497 A.2d 1121, 1124 (Me. 1985); *see also Galerneau v. Merrill Lynch, Pierce, Fenner & Smith*, 504 F.3d 189, 203 (D. Me. 2007).  A statement is also defamatory when it discredits a corporation in a manner that tends to cause loss in the conduct of its business.[6]  *Restatement (Second) of Torts* § 561 Comment b and § 573 Comment b (1977);

---

[5] The Supreme Court in *Milkovich* noted that statements of opinion relating to matters of public concern which do not contain a provably false factual connotation were already afforded constitutional protection.  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990).

[6] A for-profit business, such as a corporation, has a business reputation and therefore may be defamed in this respect.  *Restatement (Second) of Torts* § 561; *Bouligny, Inc. v. United Steel Workers of America, AFL-CIO*, 154 S.E.2d 344, 352 (N.C. 1967); *see Finnish Temperance Soc. Sovittaja v. Publishing Co.*, 130 N.E. 845, 847 (Mass. 1921) ("A corporation therefore may have a reputation which is equally as valuable to it as to a natural person, and

*see also Sandler v. Calcagni*, 565 F. Supp. 2d 184, 193 (D.Me. 2008) ("Maine law generally follows the Restatement (Second) of Torts."); *c.f. Vahlsing Christina Corp. v. Stanley*, 487 A.2d 264 (Me. 1985) (involving a corporation defamation plaintiff). Corporate defamation includes statements that concern: (i) the honesty of its methods;[7] (ii) its credit;[8] and (iii) the efficiency of its operations or other important business characteristics.[9]

A court reviews whether a statement is unambiguously a fact or opinion as a question of law; however, if a statement is susceptible to being read as fact or opinion, that question is decided by a jury. *Ballard v. Wagner*, 2005 ME 86, ¶ 11, 877 A.2d 1083 ("The determination whether an allegedly defamatory statement is a statement of fact or opinion is a question of law . . . [but if] the average reader could reasonably understand the statement as either fact or opinion, the question of which it is will be submitted to the [fact-finder].") (*quoting Caron v. Bangor Publ'g Co.*, 470 A.2d 782, 784 (Me. 1984));  *see also Haworth v. Feigon*, 623 A.2d 150, 156 (Me. 1993).

For opinion to be actionable, the statement must imply the existence of facts that can be proven true or false. *Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 248 (1st Cir. 2000). Facts couched as "opinion" are actionable when the expression is, or implies, a proposition of fact. *Id.* ("[T]o say 'I think' is not enough to turn fact into opinion, where what is supposedly 'thought' is, or implies, a proposition of fact. Rather, the cases are likely to protect a statement as 'opinion' where it involves expressions of personal judgment, especially as the judgments become more vague and subjective in character.") (*citing Milkovich v. Lorain Journal*, 497 U.S.

---

may be injured in that reputation in the same way."); *see Dun & Bradstreet v. Greenmoss Builders, Inc.*, 472 U.S. 749, 754 (1985) (concerning a libel *per se* suit by a corporation); *see also Vahlsing Christina Corp. v. Stanley*, 487 A.2d 264 (Me. 1985) (concerning a defamation action brought by a corporation and its president).

[7] *Pullman Standard Car Mfg. Co. v. Local Union No. 2928*, 152 F.2d 493 (7 Cir.1945); *Den Norske Ameriekalinje Actiesselskabet v. Sun Printing & Pub. Ass'n*, 226 N.Y. 1, 122 N.E. 463 (1919); *Converters Equipment Corp. v. Condes Corp.*, 80 Wis.2d 257, 258 N.W.2d 712 (1977).

[8] *Aetna Life Ins. Co. v. Mutual Benefit Health & Acc. Ass'n*, 82 F.2d 115 (8 Cir.1936); *Maytag Co. v. Meadows Mfg. Co.*, 45 F.2d 299 (7 Cir.1930), certiorari denied, 283 U.S. 843, 51 S.Ct. 489, 75 L.Ed. 1452; *Mid-America Food Service, Inc. v. ARA Services, Inc.*, 578 F.2d 691 (8 Cir.1978); *Wayne Works v. Hicks Body Co.*, 115 Ind.App. 10, 55 N.E.2d 382 (1944); *GTP Leisure Products v. B-W Footwear Co., Inc.*, 55 A.D.2d 1009, 391 N.Y.S.2d 489 (1977).

[9] *Axton-Fisher Tobacco Co. v. Evening Post Co.*, 169 Ky. 64, 183 S.W. 269 (1916); *St. James Military Academy v. Gaiser*, 125 Mo. 517, 28 S.W. 851 (1894); *Ohio & Miss. R. Co. v. Press Pub. Co.*, 48 F. 206 (C.C.S.D.N.Y. 1891); *Gross Coal Co. v. Rose*, 126 Wis. 24, 105 N.W. 225 (1905).

1, 18-19 (1990), and *Levinsky's v. Wal–Mart Stores, Inc.,* 127 F.3d 122, 127 (1st Cir.1997)) (internal citations omitted). Further, when inquiring whether a statement can reasonably be interpreted as stating defamatory facts rather than rhetorical, hyperbolic, or figurative speech, any clearly stated facts are actionable and, when such statements are ambiguous and capable of conflicting interpretations, they are submitted to the factfinder. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990); *see also Haworth v. Feigon*, 623 A.2d 150, 156 n.3 (Me. 1993).

A court also reviews alleged statements to determine if they are capable of bearing a defamatory meaning. *Bakal v. Weare*, 583 A.2d 1028, 1030 (Me. 1990). "If a court determines that the statement is capable of bearing a defamatory meaning, the matter goes to the factfinder to determine if the statement was understood by the recipient as defamatory." *Schoff v. York Cnty.*, 2000 ME 205, ¶ 8 n.2, 761 A.2d 869 (*citing* Restatement (Second) of Torts § 614 (1977)).[10]

As demonstrated below, Defendants' phase one summary judgment motion should be denied because Plaintiffs have shown the defamatory statements published by Defendants are both actionable and false.

## III.    DEFENDANTS' STATEMENTS ARE ACTIONABLE AND FALSE

Defendants' disputed statements all contain verifiable defamatory facts capable of being proven true or false.

### A.    Defendants' Assertion that Plaintiff Fink was Removed from Management by Owner Tim Mellon for Cause is Actionable.

Plaintiff Fink contends that Defendants' March 21, 2011 article defamed him by impliedly asserting that owner Tim Mellon removed him from leadership of Pan Am Systems, Inc. and its related entities for cause. The specific language cited by Plaintiff Fink which

---

[10] Defendants argue that this Court should apply *Hepps* to also mean that it should rule in favor of media-defendants in a summary judgment motion when there are equally valid interpretations concerning the defamatory meaning of statements. (Def.'s M. Summ. J. at 22, ECF No. 65.) The U.S. Supreme Court in *Hepps*, however, held that the common law presumption of <u>falsity</u> does not apply to defamation claims involving media defendants on matters of public concern, which is separate and distinct from the inquiry into the defamatory meanings of statements. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776-77 (1985).

conveys this defamatory assertion is (1) "PAN AM OWNER TIM MELLON REMOVED DAVE FINK PERE from management of the company;" (2) "Sources differ on what precipitated the action . . . but all agree that David Andrew Fink, the head of Pan Am Systems, is no longer in charge;" and (3) [Sources differ] "whether Mellon came to New England to administer the coup de grace or did it by telephone."

**Elements of Defamation**

Under Maine law, the elements of defamation are:

(1) a false and defamatory statement concerning another;
(2) an unprivileged publication to a third party;
(3) fault amounting at least to negligence on the part of the publisher; and
(4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Gavrilovic v. Worldwide Language Resources, Inc*., 441 F. Supp. 2d 163, 182 (D. Me. 2006) (citations omitted).

In their Motion for Summary Judgment, Defendants challenge only Plaintiff Fink's proof of the first element. They argue (1) the article cannot reasonably be said to assert the alleged defamatory statement; rather, the above-quoted material is non-actionable opinion in the form of "an editorial flourish;" and (2) even assuming it to be asserted, the statement is true.

The framework for analyzing this question under Maine law is clear. "A statement, ostensibly in the form of an opinion, gives rise to liability if it implies the allegation of undisclosed defamatory facts as the basis of the opinion." *Caron v. Bangor Pub. Co., Inc.,* 470 A.2d 782, 784 (Me. 1984), citing *Restatement (Second) of Torts* § 566 (1977) "On the other hand, a comment, ostensibly in the form of a statement of fact, is an opinion if it is clear from the surrounding circumstances that the maker of the statement did not intend to state an objective fact but intended rather to make a personal observation on the facts." *Id.* The critical distinction between fact and opinion "'depends upon whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the ... writer's opinion, or as

a statement of existing fact.'" *Id.* at 785, quoting *Mashburn v. Collins,* 355 So. 2d 879, 885 (La. 1977).  *See also Gavrilovic,* 441 F. Supp. 2d at 182 ("A statement of opinion may be actionable if it implies the existence of undisclosed defamatory facts."), quoting *Ballard v. Wagner*, 877 A.2d 1083, 1088 (Me. 2005); *Haworth v. Feigon*, 623 A.2d 150, 156 ("[S]tatements of opinion that can reasonably be interpreted as implying factual assertions" are actionable).

The question is one for the Court in the first instance.  If the Court concludes as a matter of law that "the average reader could not reasonably understand the statement *as anything other than opinion*, no genuine issue of material fact exists and summary judgment ... may be entered."  *Caron*, 470 A.2d at 784 (emphasis added).  If, however, the Court concludes that "the average reader could reasonably understand the statement as either fact or opinion, the question of which it is will be submitted to the jury."  *Id.*

In performing its analysis, this Court should appreciate that the fact that the term "coup de grace" is, in the abstract, of a hyperbolic character does not mean that as used by Defendants in their March 21, 2011 article it does not serve to convey a factually defamatory meaning.  *See, e.g., Gavrilovic*, 441 F. Supp. 2d at 182 (email from Plaintiff's supervisor labeling her as "the Bagram Fuck toy" was found to imply defamatory factual assertion that Plaintiff was sexually promiscuous).

Moreover, "[i]n assessing whether a statement expresses fact or opinion, this Court must look "to the totality of the circumstances and to whether the statement was intended to state an objective fact or a personal observation."  *Ballard*, 877 A.2d at 1087-88.  *See, e.g., Ballard*, 877 A.2d at 1088-89 (When read in context of entire website, Defendant's repeated use of word "lie" conveyed factually defamatory meaning); *Haworth*, 623 A.2d at 156 (When considered in context of all the circumstances, statement "I hear you hired the drunk" referencing Plaintiff conveyed factually defamatory meaning).  Thus, in *True v. Ladner*, 513 A.2d 257 (Me. 1986), the Law Court, in holding that Plaintiff, a teacher, was defamed by her former principal in connection with a subsequent job application at another school, concluded as follows:

> Here the statements made by Ladner, although arguably in the form of opinions, imply undisclosed defamatory facts.  For example, the statement that True is not a good mathematics teacher implies that Ladner had personally evaluated True's teaching and found it wanting *or that evaluations made by others were unfavorable and Ladner had received these unfavorable evaluations*.  The statement that True was "more concerned with living up to the terms of his contract rather than going the extra mile" implies a lack of involvement in extracurricular activities, a failure to give assistance to students outside of the classroom, and a failure to assume other responsibilities not mandated by the contract.  The statement that Ladner "did not feel [True] turned the students on" implies a low level of performance by the students and a lack of initiative on their part either in mathematics-related programs at the high school or in pursuing mathematics as a field of study beyond high school.

*Id.* at 262 (emphasis added).

Finally, when considering the expression "coup de grace" as used by Defendants in the March 21, 2011 article, Maine law requires that the phrase be given its general meaning and usage.  *Ballard,* 877 A.2d at 1088; *Gavrilovic*, 441 F.Supp.2d at 182.  According to the *American Heritage Dictionary* (4th ed. 2009), the phrase "coup de grace" means "a deathblow delivered to end the suffering of a mortally wounded victim, a finishing stroke or decisive event."  Like the phrase "The Bagram Fuck toy" in *Gavrilovic*, the phrase "coup de grace" is a colorful expression -- but as in that case it has a specific defamatory meaning in the circumstances of the March 21, 2011 article.

**Defendant Hardenbergh's Admissions at Deposition**

Plaintiff Fink's counsel pursued with Defendant Hardenbergh at deposition the question whether a reasonable reader of the March 21, 2011 Fink article would be justified in concluding that Fink was removed from his leadership role for cause.  The following is what occurred:

> Q.  But you don't say that he left.  You say he was removed by the owner, correct?
> Q.  That's your headline, correct?
> A.  I say what I said here, he was removed -- that Timothy Mellon removed David Fink pere from management.

Q. Okay. And you said that he did it by administering a coup de grace either by telephone or in person, correct?

A. Correct. And as we see --

Q. And are you going to testify -- are you going to testify to the jury that by saying that -- are you prepared to testify to the jury that by saying that you were not suggesting that Mr. Fink was removed for performance problems?

A. I'm saying what I said here. And I'm saying that it -- *I will agree that it looks as though*, but it's not what I'm saying. I don't know why he was removed. But if we take his resignation letter -- forced resignation letter, Tim Mellon sure wanted him out of there.

Hardenbergh Depo., p. 60, line 3 – p. 61, line 2.

Q. Can you tell me that you know every reader who reads your publication?

A. I know -- not every single one, but I know every single one of the subscribers, yes.

Q. But you don't know the readership, correct?

A. No.

Q. So I would like you to assume that one of the readers is a reader who is not familiar with Mr. Fink's reputation in the way that you contend your subscribers are. And you contend all 220 of them feel the same way, that he's Atilla the Hun, correct?

A. I'm not sure that all 220 feel like this, especially since some of the subscribers are at Pan Am; so --

Q. But assuming that this is a reader who is not familiar with Mr. Fink's reputation as you just contend his reputation to be, if he is in the public eye as you contend he's in the public eye, do you agree with me that your article tends to injure his reputation, your article which states that his owner and boss fired him from leadership of his company by means of the administration of a coup de grace?

A. I'm having a hard time imagining any reader in that situation. Let's say somebody in China. Somebody in China in an airport in Shanghai and picks up, Pan Am -- a new dawn, Pan Am owner Tim Mellon removed David Fink pere. I think that a reasonable -- a person in Shanghai would read that and say, gee, maybe David Fink -- David Andrew Fink did something wrong.

Hardenbergh Depo., p. 91, line 16 – p. 92, line 25.

As the above demonstrates, Defendant Hardenbergh admitted that a reasonable reader of his March 21, 2011 Fink article would be justified in concluding that owner Tim Mellon removed Plaintiff Fink from leadership of Pan Am Systems, Inc. and its affiliated entities for cause. Even had Hardenbergh refrained from doing so, it is the correct finding. Contrary to

Defendants' contention at page 12 of their Memorandum, Defendants did not characterize the removal of Fink from management as a *possible* coup de grace -- rather, the assertion was that all of Hardenbergh's sources agree that the removal *was, in fact, by means of a coup de grace*. The specific facts undergirding this defamatory assertion are unexpressed in the article. The question of whether the article suggests as a factual matter that Fink's removal was for cause should therefore go to the jury. There is no First Amendment protection barring this result. As explained by the Law Court in *Haworth*, the United States Supreme Court in the case of *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) established that, from a constitutional perspective, pure hyperbole, rhetoric or figurativisms, like pure statements of opinion, are not actionable; but "mixed" usages which convey defamatory facts are. Where the usage is ambiguous and capable of reasonable conflicting interpretations, the matter must be submitted to the jury. *Haworth*, 623 A.2d at 156n.3, citing *Milkovich*, 497 A.2d at 20. Such is the case here.

Defendants further contend that, even assuming that the article does, in fact, convey the alleged defamatory assertion, it is non-actionable for the reason that it is true. The affidavits of David Andrew Fink and Tim Mellon directly contradict this contention. David Andrew Fink was not removed for cause -- in fact, he was not removed at all. (Opp. S.M.F. ¶ 35.)

**B.    Defendants' Assertions that Plaintiff Fink (1) Engaged in a Holy War Against Peter Leishman; and (2) Misused and/or Misappropriated Railroad Assets Nonproductively are Actionable.**

Plaintiff Fink contends that the assertions that (1) he engaged in a "holy war" against Peter Leishman; and (2) he misused and/or misappropriated railroad assets nonproductively, are actionable. Defendants make no specific argument in regard to the second assertion and the affidavit of David Andrew Fink adequately establishes that it is, in fact, false. (Opp. S.M.F. ¶¶

42-44). With regard to the assertion that Fink acted inappropriately toward Peter Leishman, the affidavit of David Andrew Fink establishes that it, too, is false. (Opp. S.M.F. ¶¶ 43-44).

### C. Defendants' Assertion that Plaintiffs Lose Rail Cars Carrying Hazardous Materials, Including a TIH Rail Car for More than 60 Days, is Actionable.

On March 21, 2011, Defendants published the following statement regarding Springfield Terminal Railway Company's transport of hazardous materials to Jones Chemical Incorporation's facility in Merrimack, New Hampshire:

> **PAN AM: HAZ MAT SERVICE** 2 March, Merrimack. *ST IS OPERATING SPECIAL TRAINS TO MOVE CHLORINE TO JONES CHEMICAL*
>
> "The railroad 'loses' cars on a consistent and ongoing basis, including one car 'lost' for over 60 days . . . even though certain DHS and DOT statutes require carriers to release [TIH] cars within 48 hours."

(Opp. S.M.F. ¶ 25.)

Defendants argue that this statement which appeared in Issue 11#03A of Atlantic Northeast Rails & Ports is loose figurative expression that does not contain any verifiable facts capable of being proven true or false. (Def.'s M. Summ. J. at 10-11, 20-22, ECF No. 65.) The basis for their argument is the use of quotation marks around the terms "lose" and "lost." Defendants argue that by placing quotation marks around the terms "lose" and "lost," they were suggesting not that Plaintiffs permanently lose rail cars, but only that they temporarily lose them due to Plaintiffs' inability to track them, which they further claim is non-actionable. *Id.*

Defendants' arguments are belied by the statement itself when read in the context of the article in which it appears. The article specifically concerns Springfield Terminal Railway Company's ["Springfield Terminal's"] transport of hazardous materials to the Jones Chemical Incorporation's ["JCI's"] facility in Merrimack, New Hampshire. It is not an article concerning Springfield Terminal's general operations, but one targeted at its operations supplying JCI's Merrimack facility with hazardous materials. The title of the article itself makes this clear: "**PAN AM: HAZ-MAT SERVICE** 2 March, Merrimack. *ST IS OPERATING SPECIAL TRAINS TO MOVE CHLORINE TO JONES CHEMICAL.*" (Opp. S.M.F. ¶25.)

In the context of Springfield Terminal's transport of hazardous materials to JCI, Defendants state, in their concluding remarks, that Springfield Terminal "'loses' cars on a consistent and ongoing basis, including one car 'lost' for over 60 days…even though certain DHS and DOT statutes require carriers to release [TIH] cars within 48 hours'". (Opp. S.M.F. ¶ 25.) This is far from a subjective view of the quality of a railroad's service, as the Defendants argue, but is instead an express proposition of facts: (i) that Springfield Terminal "loses" rail cars on a consistent and ongoing basis containing hazardous materials that are transported to JCI's facility in Merrimack, New Hampshire; and (ii) that Springfield Terminal "lost" a specific TIH car en route to JCI's facility for more than 60 days in violation of federal law.[11] On this basis alone the above statement is actionable, since the disclosed facts are themselves defamatory: losing, or in the Defendants' view temporarily losing, rail cars containing hazardous materials clearly harms the reputation of Plaintiffs who are prominent railroad carriers (particularly when the defamatory statement is in a rail industry trade publication).

Defendants argue that the above statement is opinion since, in their own view, it can be *implied from these disclosed facts* that Defendants believe the Plaintiffs have difficulty tracking rail cars on its transportation system. This inverts the legal analysis between fact and opinion, inviting the Court to ignore disclosed defamatory facts because of a media-defendant's *undisclosed* subjective opinion of those facts. The Court should decline this invitation.

Moreover, even if the Court were to construe Defendants' statement as opinion, it is clear that the statement implies the proposition of defamatory facts, which are (1) that Plaintiffs cannot adequately track rail cars carrying hazardous materials and (2) that Plaintiffs violated federal laws by failing to keep track of a TIH rail car that was lost for more than 60 days. It is no stretch of the imagination to imply these facts from the statement: "The railroad 'loses' cars on a

---

[11] Recognizing that this statement is false and defamatory, Defendants published a correction more than a year after Plaintiffs filed their complaint. (Def.'s M. Summ. J. at 21 n.8, ECF No. 65.) While the publication of a correction may have relevance to the measure of damages, it does not absolve Defendants of liability for publishing false defamatory statements concerning Plaintiffs. Defendants further argue that the 2012 correction shows that Plaintiffs cannot prove actual malice in the second phase of discovery, *Id.* But the fact that Defendants used *the very same source* in 2011 strongly suggests that they knew no TIH rail cars were lost, but nonetheless published this statement.

consistent and ongoing basis, including one car 'lost' for over 60 days…even though certain DHS and DOT statutes require carriers to release [TIH] cars within 48 hours."

In this respect, it bears emphasis that "TIH" refers to materials poisonous by inhalation, known as "Toxic Inhalation Hazard" ("TIH") materials, whose transport by rail is strictly regulated by the United States Department of Homeland Security and United States Department of Transportation.  (Opp. S.M.F. ¶ 18.)  As a trade publication, the readers of Atlantic Rails & Ports readily understand the seriousness and gravity of violating federal laws concerning the transport and handling of hazardous materials.  These regulations specifically require railroad carriers to forward hazardous materials, such as TIH materials, every 48 hours until they reach their final destination.  49 C.F.R. § 174.14.  Federal regulations further require rail carriers, such as Plaintiffs, to have procedures in place to determine the location and shipping information at all times for each rail car under its custody and control that contains hazardous materials.   49 C.F.R. § 1580.13.

In short, "losing" rail cars carrying hazardous materials in violation of federal law, whether permanently or temporarily in Defendants' view, is both verifiable and defamatory. These assertions are not based upon a person's subjective view of Springfield Terminal's operations, but rather on comments stemming from specific events allegedly occurring at JCI's Merrimack facility.

Moreover, it can be amply demonstrated that this statement contains verifiable facts that are actionable because they are provably false.

Plaintiffs have a computerized monitoring system that specifically tracks all rail cars on their rail system.  (Opp. S.M.F. ¶ 29.)  This includes tracking rail cars containing hazardous materials, such as TIH, to ensure that they are not lost or gone missing.  (Opp. S.M.F. ¶ 32.) Plaintiffs also isolate rail cars containing hazardous materials in a single train to provide additional assurance that they are not lost or gone missing.  (Opp. S.M.F. ¶ 32.)

With respect to transporting rail cars to JCI's Merrimack facility as referenced in Defendants' article, Plaintiffs did not lose any rail cars, permanently or temporarily.  (Opp.

S.M.F. ¶¶ 30 & 33.)  Further, Plaintiffs did not lose any rail car for a period of more than 60 days.  (Opp. S.M.F. ¶ 31.)  Indeed, Plaintiffs' records show that all rail cars transported to JCI's facility were fully accounted for at all times.  They were not lost as Defendants falsely assert. (Opp. S.M.F. ¶¶ 31 & 33.)

As further proof, there are no reports by the Federal Railroad Administration that state or suggest that the Plaintiffs violated any federal laws in transporting rail cars to JCI as asserted in Defendants' article.   (Opp. S.M.F. ¶ 28.)   It bears emphasis that the Federal Railroad Administration is the agency charged with auditing and inspecting Plaintiffs' operations for compliance with federal laws, which includes tracking rail cars containing hazardous materials.

Collectively, this evidence demonstrates that the Defendants' assertions that Springfield Terminal loses rail cars en route to JCI's facility in Merrimack, including one TIH rail car for over 60 days in violation of federal law, are patently, and provably, false.

**D.    Defendants' Assertion that Plaintiffs' Horrendously Dilapidated Rail Line Caused a Derailment is Actionable.**

On December 2, 2009, Defendants published the following statement regarding a derailment on Springfield Terminal Railway Company's track near Nashua, New Hampshire:

**ST: COAL DERAILMENT** 17 November, Nashua.  ***THE LOADED ST BOW COAL TRAIN DERAILED SEVEN CARS***

"Peter Burling, chair of the New Hampshire Rail Transit Authority, blamed ST for the accident.  'What has happened here is a perfectly predictable accident – but it's hard to describe it as an accident, since the probabilities were so clear it was going to take place.  The only thing we didn't know is when and where.' Burling said the accident, occurring on a stretch of line with a speed limit of under 10 miles per hour for large freight trains, made a track upgrade which might have been provided had the state won funding for passenger service to Concord [see 09#10A] more important.  'A horrendously dilapidated railroad system has caused a slow-moving coal train to fall off the tracks.'"

(Opp. S.M.F. ¶ 3.)

Defendants argue that the above statement appearing in Issue 09#11B of Atlantic Northeast Rails & Ports concerned the condition of the railroad system as a whole rather than

Springfield Terminal's specific rail line where the derailment occurred, and that the use of the phrases "horrendously dilapidated" and "perfectly predictable" are subjective assessments that do not expressly state or imply the proposition of defamatory facts.  (Def.'s M. Summ. J. at 6-7, ECF No. 65.)  They also argue that their re-publication of the above statement was not intended to report its inherent truth, but only the opinion of a governmental official.  *Id.*

The statement in the above article, however, is targeted at Springfield Terminal's Northern Main Line near Nashua, New Hampshire, where the derailment occurred.  (Opp. S.M.F. ¶ 13.)  It is not an article on the condition of the region's overall railroad system.  This is plainly evident from the article's title and discussion of this incident: "**ST: COAL DERAILMENT** 17 November, Nashua.  ***THE LOADED ST BOW COAL TRAIN DERAILED SEVEN CARS.***"

Moreover, the article focuses on the condition of Springfield Terminal's rail line as being the cause of this derailment, which is a verifiable fact capable of being proven true or false.  It is not a vague, loose and figurative assessment of the overall railroad system as Defendants contend, but rather a proposition of fact that Springfield Terminal's rail line caused a specific derailment incident near Nashua, New Hampshire.  This view is further supported by the statement "Peter Burling…blamed ST for the accident" rather than the overall condition of the railroad system.

Plaintiffs have also set forth affirmative evidence demonstrating that the Defendants' assertion that Springfield Terminal's rail line caused this derailment incident is false.

Contrary to the assertions in Defendants' article, the true cause of the derailment was a rail car owned by a different railroad company.  (Opp. S.M.F. ¶ 5.)  This rail car was severely corroded to the degree that movement of its truck swivel was restricted, which caused it to derail taking with it several subsequent rail cars.  (Opp. S.M.F. ¶ 6.)  There is no evidence, direct or circumstantial, indicating that the derailment was caused by the condition of Springfield Terminal's rail line.

There is also no evidence that indicates that this rail line is "horrendously dilapidated", which plainly implies defamatory facts that Springfield Terminal's rail line is unfit and unsafe for rail transportation to the degree it causes derailments.  To the contrary, the evidence shows that this rail line met or exceeded the standards for its class pursuant to the Federal Railroad Administration's classification system.  (Opp. S.M.F. ¶ 13.)  Indeed, just prior to the derailment incident, representatives from the Federal Railroad Administration had inspected this rail line and found no defects.   (Opp. S.M.F. ¶ 14.)    This was further confirmed by Springfield Terminal's testing and analysis of the rail line's integrity, which demonstrated that there were no defects or issues that could potentially cause a train derailment as falsely asserted by the Defendants. (Opp. S.M.F. ¶ 15.)   This evidence affirmatively establishes that the severely corroded rail car owned by a different railroad company was the true cause of the derailment, not the condition of Springfield Terminal's Northern Main Line in New Hampshire as falsely stated by Defendants.

### E.    Defendants' Statement that Plaintiffs Break Promises to Provide Customers with a Specific Level of Service is Actionable.

On December 21, 2010, Defendants published the following statement regarding an alleged promise made by Springfield Terminal Railway Company:

**NEGS: UPDATE**

"Despite ST's promise to locate a crew in Concord and switch customers five days a week [see 10#05A], Dearness reported that ST had done neither.  It is now providing a switch one day a week.  He believed that to serve major customers Blue Seal and Ciment Quebec, ST had to switch at least three times a week, which is 'what I provided before I left.'"

(Opp. S.M.F. ¶ 6.)

Defendants argue that the above statement appearing in Issue 10#12A of Atlantic Northeast Rails & Ports is, as a matter of law, non-actionable.  They contend that (i) breaking promises to customers is not defamatory; and (ii) it is true that Springfield Terminal promised to

locate a crew in Concord and provide service to customers on that rail line five days per week. (Def.'s M. Summ. J. at 9, ECF No. 65.)[12]

Contrary to Defendants' argument, an assertion that a railroad carrier breaks service promises to specific customers plainly harms that business's reputation and is defamatory since such assertions go directly to an important business characteristic of a railroad carrier: its honesty toward its customers. *See, e.g.*, *N. Shore Pharmacy Servs., Inc. v. Breslin Associates Consulting LLC*, 491 F. Supp. 2d 111, 128 (D. Mass. 2007) ("[A] corporation might recover for damage to its reputation for conducting its affairs honestly or competently without establishing out-of-pocket damages.")

Further, Plaintiffs can prove that they did not make a promise to locate a crew in Concord, New Hampshire and provide service five days a week.

The statement in the above article concerns an Application for Adverse Discontinuance of Operating Authority filed by the Boston and Maine Corporation and Springfield Terminal Railway Company on June 19, 2009, STB Docket AB-32 (Sub-No. 100), regarding Plaintiffs' Main Line between Penacook and Manchester, New Hampshire. (Opp. S.M.F. ¶ 57.) In this proceeding, Springfield Terminal made it clear that it would only place a crew in Concord and provide five days per week service <u>if</u> customer demand justified this level of service. (Opp. S.M.F. ¶ 56.) The Application clearly stated that Springfield Terminal would "assign a crew in Concord, New Hampshire to work a five day per week schedule providing service to the four major customers and a few smaller customers on the Subject Line *as long as traffic levels support such service . . . .*" (Opp. S.M.F. ¶ 61) (emphasis supplied).

This level of service representation was re-stated in the Reply filed by Springfield Terminal, stating: "PAR [collectively the Boston and Maine Corporation, Inc. and Springfield Terminal Railway Company] is committed to this operating plan, *but notes that it must be contingent upon adequate service levels to support it.* To mandate a minimum level of service as

---

[12] Defendants' assume, incorrectly, that the gravamen of Plaintiffs' complaint with respect to this statement is that it implies they are not providing an appropriate level of service. (Def.'s M. Summ. J. at 9, ECF No. 65.)

suggested by NES would be inequitable and inefficient, because if PAR were required to continue to provide minimum service levels on the Line that may be unprofitable due to a lack of demand would inevitably lead to abandonment of the Line.  Therefore, PAR requests that the Board decline to impose minimal service requirements as a condition of granting the Application."  (Opp. S.M.F. ¶ 64) (emphasis supplied).

Further evidence that Springfield Terminal did not make the promise that Defendants assert is found in the Surface Transportation Board's decision on this Adverse Discontinuance Application, which stated "we…deny NHDOT's request for a condition requiring Pan Am to establish an interchange at the Concord Yard," and "Pan Am plans to integrate the Line into its existing system and states that it is: 1) committed to working with NES to achieve a smooth transition and to establish conditions that support present and reasonably foreseeable traffic levels; (2) intent on meeting and exceeding the service needs and demands of this region of New Hampshire; and (3) committed to an operating plan that, if adequately supported, will improve the Line's current level of service."  (Opp. S.M.F. ¶¶ 65 & 66.)

It also bears emphasis that, to date, no entity has filed a formal complaint with the Surface Transportation Board regarding Springfield Terminal's service to this rail line segment. (Opp. S.M.F. ¶ 73.)

Collectively, this evidence shows that the truth is that Plaintiffs did not make a promise to locate a crew in Concord, New Hampshire, or provide five day per week service to customers. Defendants statements in this regard are false.

## IV.    THE FAIR REPORT PRIVILEGE IS NOT RECOGNIZED IN MAINE

The Court has already rejected Defendants' attempt to assert the fair report privilege, which is not recognized in the State of Maine.  (ECF No. 20 at p.12 "The Defendants ask the Court to apply this privilege even though it has not yet been recognized in Maine.  The Court declines this invitation.") (*citing Katz v.* Pershing, LLC, 672 F.3d 64, 74 (1st Cir. 2012).  The Court should renew this declination for the same reasons stated in its Order.

Moreover, as stated, *supra*, even if a fair report privilege were recognized, it is a conditional privilege that can be rebutted by inquiry into a defamation defendant's fault, which in this case has been postponed until the second phase of discovery. *Saunders v. VanPelt*, 497 A.2d 1121, 1125 (Me. 1985); (ECF No. 42). It would be inequitable to deny Plaintiffs access to the discovery they need to rebut such a privilege and at the same time grant a phase one summary judgment motion on that basis. The Court should reject Defendants' "Heads I win, Tails you lose" approach to this litigation.

## CONCLUSION

For each of the above reasons Plaintiffs respectfully respect that the Court deny Defendants' Motion for Summary Judgment.[13]

Dated:  March 7, 21014                    Respectfully submitted,

                                          **PAN AM SYSTEMS, INC.,**
                                          **SPRINGFIELD TERMINAL RAILWAY**
                                          **COMPANY and DAVID ANDREW**
                                          **FINK, PLAINTIFFS**

                                   By */s/  Thad B. Zmistowski*
                                          Thad B. Zmistowski, Esq.
                                          Jonathan A. Pottle, Esq.

                                          Eaton Peabody
                                          P.O. Box 1210
                                          80 Exchange Street, 8th Floor
                                          Bangor, Maine 04402-1210
                                          (207) 947-0111
                                          tzmistowski@eatonpeabody.com
                                          jpottle@eatonpeabody.com

                                          Attorneys for Plaintiffs

---

[13] Since the Defendants' summary judgment motion fails on Plaintiffs defamation claims, it similarly fails with respect to false light and punitive damages.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 7, 2014, I electronically filed the foregoing Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Russell B. Pierce, Jr., Esq.
Norman, Hanson & DeTroy, LLC
P.O. Box 4600
Portland, ME  04112-4600

/s/  Thad B. Zmistowski
Thad B. Zmistowski, Esq.
Maine Bar No. 6960

Eaton Peabody
P.O. Box 1210
80 Exchange Street, 8th Floor
Bangor, Maine 04402-1210
(207) 947-0111
tzmistowski@eatonpeabody.com

Attorneys for Plaintiffs