UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

PAN AM SYSTEMS, INC., ET AL.,   )
                                )
       *Plaintiffs*           )
                                )
v.                              )   Case No. 2:11-cv-00339-GZS
                                )
CHALMERS HARDENBERGH, ET AL.,   )
                                )
       *Defendants*           )

**PLAINTIFFS' RESPONSES TO DEFENDANTS'
STATEMENTS OF MATERIAL FACT AND PLAINTIFFS'
STATEMENTS OF ADDITIONAL MATERIAL FACT**

**Global Objection:** Plaintiffs object to all numbered paragraphs set forth in Defendants' Statements of Material Fact which violate the "one fact per paragraph" requirement set forth in Local rule 56(b).

**I.   Plaintiffs' Responses to Defendants' Statements of Material Fact**

    1.    Qualified. The article speaks for itself.

    2.    Qualified. The article speaks for itself.

    3.    Qualified. The article speaks for itself.

    4.    Qualified. The article speaks for itself.

    5.    Qualified. The article speaks for itself.

    6.    Qualified. The article speaks for itself.

    7.    Denied. This is not a factual assertion.

    8.    Denied. Fed. R. Evid. 802. Moreover, Springfield Terminal Railway Company's track near Nashua, New Hampshire that is the subject of this summary judgment proceeding met or exceeded the Federal Railroad Administration's standards for its class. Affidavit of David Nagy, ¶ 10.

9. Qualified. The document speaks for itself.

10. Qualified. The documents speaks for themselves.

11. Admitted.

12. Denied. Fed. R. Evid. 802. Moreover, this paragraph should be stricken as it relies on evidence of confidential sources which Defendants are presently unable to discover.

13. Denied. Fed. R. Evid. 802. Moreover, the article contains false information. Affidavit of Doug Steward, ¶ 7.

14. Denied. Fed. R. Evid. 802. Moreover, the article contains false information. Affidavit of Doug Steward, ¶ 7.

15. Qualified. The article speaks for itself.

16. Denied. Fed. R. Evid. 802.

17. Denied. Fed. R. Evid. 802.

18. Denied. Fed. R. Evid. 802.

19. Denied. Fed. R. Evid. 802. Moreover, this paragraph should be stricken as it relies on evidence of confidential sources which Defendants are presently unable to discover. Without prejudice to the determination of the request to strike, Plaintiffs respond as follows: Denied. Affidavit of Doug Steward, ¶ 7.

20. Denied. Fed. R. Evid. 802. Moreover, this paragraph should be stricken as it relies on evidence of confidential sources which Defendants are presently unable to discover.

21. Denied. Fed. R. Evid. 802. Moreover, this paragraph should be stricken as it relies on evidence of confidential sources which Defendants are presently unable to discover.

22. Denied. Fed. R. Evid. 802. Moreover, this paragraph should be stricken as it relies on evidence of confidential sources which Defendants are presently unable to discover.

23. Denied. Fed R. Evid. 802.

24. Admitted.

25. Qualified. The document speaks for itself.

26. Qualified. The document speaks for itself.

27. Admitted.

28. Denied. Fed R. Evid. 802.

29. Qualified. The document speaks for itself.

30. Qualified. The document speaks for itself.

31. Qualified. The document speaks for itself.

32. Denied. Fed. R. Evid. 802.

33. Qualified. The document speaks for itself.

34. Denied. Fed. R. Evid. 802.

35. Denied. Fed. R. Evid. 802.

36. Denied. Fed. R. Evid. 802. Moreover, the assertion contains false information. Affidavit of Robert Culliford, ¶ 8.

37. Qualified. The document speaks for itself. Moreover, it contains false information. Affidavit of Robert Culliford, ¶ 8.

38. Qualified. The document speaks for itself.

39. Qualified. The document speaks for itself.

40. Qualified. The document speaks for itself.

41. Denied. Fed. R. Evid. 802.

42. Qualified. Plaintiffs have insufficient knowledge to admit or deny the truth of JCI's distributions of materials by truck throughout New England.

43. Denied. Fed. R. Evid. 802.

44. Denied. Fed. R. Evid. 802.

45. Denied. Fed. R. Evid. 802. Moreover, this paragraph should be stricken as it relies on evidence of confidential sources which Defendants are presently unable to discover. Without prejudice to the determination of the request to strike, Plaintiffs respond as follows: Denied. Affidavit of Doug Steward, ¶¶ 6 & 7.

46. Denied. Fed. R. Evid. 802. Moreover, this paragraph should be stricken as it relies on evidence of confidential sources which Defendants are presently unable to discover. Without prejudice to the determination of the request to strike, Plaintiffs respond as follows: Denied. Affidavit of Doug Steward, ¶¶ 6 & 7.

47. Qualified. The document speaks for itself. Moreover, Plaintiffs deny the assertion that Defendants were not referring to lost TIH cars. Affidavit of Doug Steward, ¶ 9.

48. Denied. Fed. R. Evid. 802.

49. Denied. Fed. R. Evid. 802.

50. Denied. Affidavit of Doug Steward, ¶ 10.

51. Denied. Affidavit of Robert Culliford, ¶ 8.

52. Denied. This is not a factual assertion.

53. Qualified. The document speaks for itself.

54. Qualified. The documents speaks for itself. Moreover, the FRA report does not list any lost TIH cars that were in the custody or control of Plaintiffs. Affidavit of Doug Steward, ¶ 10.

55. Admitted.

56. Admitted.

57. Qualified. The document speaks for itself.

58. Qualified. The document speaks for itself.

59. Qualified. The document speaks for itself.

60. Qualified. The document speaks for itself.

61. Qualified. The documents speaks for themselves.

62. Qualified. The document speaks for itself. Moreover, the record source Defendants cite to is a *Boston Globe* article, not an announcement issued by Plaintiffs.

63. Qualified. The document speaks for itself. Moreover, the record source Defendants cite to is a *Progressive Railroading* article, not an announcement issued by Plaintiffs.

64. Qualified. The document speaks for itself.

65. Qualified. The document speaks for itself.

66. Denied. Fed. R. Evid. 802.

67. Denied. Fed. R. Evid. 802.

68. Qualified. The document speaks for itself.

69. Denied. Fed. R. Evid. 802.

70. Denied. Fed. R. Evid. 802.

71. Denied. Fed. R. Evid. 802.

72. Qualified. The document speaks for itself.

73. Denied. Fed. R. Evid. 802.

74. Denied. Fed. R. Evid. 802.

75. Denied. Fed. R. Evid. 802.

76. Denied. Fed. R. Evid. 802.

77. Denied. Fed. R. Evid. 802.

78. Denied. Fed. R. Evid. 802.

79. Denied. Fed. R. Evid. 802.

80. Denied. Fed. R. Evid. 802.

81. Denied. Fed. R. Evid. 802

82. Denied. Fed. R. Evid. 802.

83. Admitted.

84. Qualified. The document speaks for itself.

85. Qualified. The document speaks for itself.

86. Denied. Fed. R. Evid. 802.

87. Qualified. The document speaks for itself.

88. Denied. Fed. R. Evid. 802.

89. Denied. Plaintiffs are without sufficient knowledge to admit or deny the truth of the statements.

90. Qualified. The document speaks for itself.

91. Denied. Fed. R. Evid. 802.

92. Denied. Fed. R. Evid. 802.

93. Qualified. The document speaks for itself. Moreover, this paragraph should be stricken as it relies on evidence of confidential sources which Defendants are presently unable to discover.

94. Qualified. The document speaks for itself.

95. Qualified. The document speaks for itself. Moreover, this paragraph should be stricken as it relies on evidence of confidential sources which Defendants are presently unable to discover.

96. Qualified. Plaintiffs are without sufficient knowledge to admit or deny the truth of the statements made by the quoted railroad official. Moreover, this paragraph should be stricken as it relies on evidence of confidential sources which Defendants are presently unable to discover.

97. Denied. Fed. R. Evid. 802.

98. Qualified. The document speaks for itself.

## II. Plaintiffs' Opposing Statements of Material Fact

1. From December 2009 to March 2011, Defendants published statements concerning Plaintiffs that were false and defamatory. Amended Complaint.

### A. Coal Train Derailment

2. The Executive Director of Safety and Rail Security Coordinator for STRC (hereinafter "Springfield Terminal") is responsible for management and oversight of the condition of Springfield Terminal's railroad lines and investigations concerning any train derailments. Affidavit of David Nagy, ¶ 5.

3. In the December 2, 2009 issue of Atlantic Northeast Rails & Ports, the following article appeared regarding a derailment on Company track near Nashua, New Hampshire:

> **ST: COAL DERAILMENT**
>
> "Peter Burling, chair of the New Hampshire Rail Transit Authority, blamed ST for the accident. 'What has happened here is a perfectly predictable accident – but it's hard to describe it as an accident, since the probabilities were so clear it was going to take place. The only thing we didn't know is when and where… . A horrendously dilapidated railroad system has caused a slow-moving coal train to fall off the tracks."

Affidavit of David Nagy, ¶ 6.

4. The above statement that this accident was perfectly predictable and caused by a horrendously dilapidated railroad track owned by Springfield Terminal near Nashua, New Hampshire, is false. Affidavit of David Nagy, ¶ 7.

5. Contrary to the statement in the article, the cause of the train derailment was another rail car (NW 132509) owned by a railroad company over which Springfield Terminal had no control. It was not due to a dilapidated track. Affidavit of David Nagy, ¶ 8.

6. Rail car NW 132509 was severely corroded to a degree that significantly compromised its ability to carry loaded freight, which was coal at the time of this incident. Affidavit of David Nagy, ¶ 8, Ex. A.

7. As a result, the body of this rail car was in contact with its wheels while in motion, restricting the rail car's truck swivel. Affidavit of David Nagy, ¶ 8, Ex. A.

8. This rail car also had insufficient side bearing clearance that contributed to restricting its truck swivel. Affidavit of David Nagy, ¶ 8, Ex. A.

9. A freely moving truck swivel is critical for a rail car to properly travel along a rail. Affidavit of David Nagy, ¶ 8, Ex. A.

10. Due to the restricted truck swivel, there was undue lateral stress on the rail head (the uppermost part of the rail profile), which ultimately caused this rail car to derail. Affidavit of David Nagy, ¶ 8, Ex. A.

11. This resulted in a chain reaction with several subsequent rail cars that, as a consequence, also derailed. Affidavit of David Nagy, ¶ 8, Ex. A.

12. Contrary to the statements in the article, this line of track is not horrendously dilapidated. Affidavit of David Nagy, ¶ 9.

13. The track line in question is proximate to milepost 11 on the Northern Main Line, and is a Class 1 track pursuant to 49 C.F.R. Part 213 of the Federal Railroad Administration's Track Safety Standards and speeds along the track are determined in accordance with the classification. Affidavit of David Nagy, ¶ 9.

14. Prior to the derailment incident, on October 23, 2009, representatives from the Federal Railroad Administration inspected the track and found no defects. Affidavit of David Nagy, ¶ 9.

15. Springfield Terminal also conducted testing and analysis of the track's integrity, which demonstrated there were no defects or issues concerning the track and its suitability to handle freight trains such as the one described above, and that it met and exceeded the Federal Railroad Administration Tracy Safety Standards for this Class 1 track. Affidavit of David Nagy, ¶ 10, Ex. B.

    **B.    Lost TIH Cars**

16. Doug Steward is responsible for management and oversight on tracking rail cars moving on the Company's rail system, including TIH rail cars to ensure they are fully accounted for and are not lost or go missing. Affidavit of Doug Steward, ¶ 5.

17. "TIH" refers to the rail transportation of materials poisonous by inhalation, known as "Toxic Inhalation Hazard" ("TIH") materials. Affidavit of Doug Steward, ¶ 6.

18. Rail transportation of TIH materials is strictly regulated by the United States Department of Homeland Security and United States Department of Transportation, which require railroad carriers, such as Springfield Terminal Railway Company, to follow and comply with standards when transporting or handling rail cars containing TIH materials. Affidavit of Doug Steward, ¶ 6.

19. Specifically, these regulations require railroad carriers comply with 49 C.F.R. § 174.14, which generally requires that rail cars containing hazardous materials such as TIH be forwarded every 48 hours until they reach final destination. Affidavit of Doug Steward, ¶ 6.

20. The Federal Railroad Administration and the Transportation Security Administration routinely perform audits and inspections to determine whether or not the Company is in compliance with this and other regulations. Affidavit of Doug Steward, ¶ 6.

21. This regulatory scheme requires that the Company have procedures in place to determine the location and shipping information at all times for each rail car under its custody and control that contains TIH materials. Affidavit of Doug Steward, ¶ 6, Ex. A.

22. These procedures include a computerized system to record when a rail enters and leaves Company property, as well as where that car is located at any one time. Affidavit of Doug Steward, ¶ 6, Ex. A.

23. The majority of rail cars that are transported by the Company are owned by third parties, and the compensation due to those parties for the use of those rail cars are governed by Association of American Railroads Circular No. OT-10. Affidavit of Doug Steward, ¶ 7.

24. Pursuant to Circular OT-10, the Company is required to report and pay for the amount of time that rail cars are on Company property and therefore also tracks these cars in order to meet its obligations and to constantly be aware of the location of all rail cars on its system. Affidavit of Doug Steward, ¶ 7.

25. In the March 21, 2011 issue of Atlantic Northeast Rails and Ports, the following article appeared regarding the Company's transport and handling of rail cars in general, and TIH rail cars in particular to the Jones Chemical Incorporation facility in Merrimack, New Hampshire:

> 'PAN AM: HAZ MAT SERVICE' 'The railroad 'loses' cars on a consistent ongoing basis, including one car 'lost' for over 60 days….even though certain DHS and DOT statutes require carriers to release [TIH] cars within 48 hours.'

Affidavit of Doug Steward, ¶ 8.

26. The above statement that the Company loses rail cars, particularly rail cars carrying TIH materials, including one TIH rail car for over 60 days, is false. Affidavit of Doug Steward, ¶ 9.

27. Contrary to the statement in the article, the Company does not lose TIH or other rail cars on a consistent and ongoing basis, and did not lose a TIH or other rail car for more than 60 days. Affidavit of Doug Steward, ¶ 10.

28. The Company was never notified by either the Federal Railroad Administration or any customer regarding such an occurrence. Affidavit of Doug Steward, ¶ 10.

29. The Company has a separate computerized system to determine the location and shipping information of all rail cars transporting TIH materials with accuracy so they are fully accounted for. Affidavit of Doug Steward, ¶ 10.

30. This includes rail cars that transport TIH materials to Jones Chemical Incorporation's facility in Merrimack, New Hampshire. Affidavit of Doug Steward, ¶ 10.

31. The data log shows that no TIH rail cars were lost or missing, and no single TIH rail car was lost or missing for more than 60 days. Affidavit of Doug Steward, ¶ 10, Ex. A.

32. The Company also isolates TIH rail cars to be transported in a single train without switching them with any other trains, providing additional assurance that no TIH rail cars are lost or go missing as falsely claimed in the above article. Affidavit of Doug Steward, ¶ 11.

33. All rail cars transporting TIH materials to Jones Chemical Incorporation's facility in Merrimack, New Hampshire, are isolated in this manner in addition to being tracked by the Company's computerized system described above. Affidavit of Doug Steward, ¶ 11.

**C.    David A. Fink leadership**

34. In the March 21, 2011 issue of Atlantic Northeast Rails and Ports, the following article appeared:

> PAN AM: A NEW DAWN?  PAN AM OWNER TIM MELLON REMOVED DAVE FINK PERE from management of the company according to four separate sources: one MBTA, one union, one Maine source, and one from other railroad management in New England.  Sources differ on what precipitated the action, whether Fink is formally removed or is only on a 'leave of absence', and whether Mellon came to New England to administer the coup de grace or did it by telephone, but all agree that David Andrew Fink, the head of Pan Am Systems, is no longer in charge.  . . . If Fink *pere* has definitely left, then perhaps, as one source said, 'The holy wars, such as those against Peter Leishman, will cease.' Others thought that young Fink might have more freedom either to spend more money on railroading, or put the existing money into different [and one would hope more productive] places.

Affidavit of David Andrew Fink, ¶ 2.

35. Contrary to the statements in the article, at no time were David Fink's management responsibilities over Pan Am Systems, Inc. and/or its affiliated entities removed from him by principal owner Tim Mellon.  Affidavit of David Andrew Fink, ¶ 3.

36. In 2006, at the urging of David Andrew Fink, David Armstrong Fink was made President of the Pan Am group of railroad entities while David Andrew Fink remained CEO. Affidavit of David Andrew Fink, ¶ 3.

37. This development did not affect David Andrew Fink's status as President and CEO of Pan Am Systems, Inc. and its other affiliated entities.  Affidavit of David Andrew Fink, ¶ 3.

38. As time wore on, a difference in operational philosophy developed between the

two men which came to a head in early 2011. Affidavit of David Andrew Fink, ¶ 3.

39. At that point, principal owner Tim Mellon declared that the dual leadership scenario was no longer working and directed that either David Andrew Fink take back total control of Pan Am's railroad operations or relinquish control to his son. The choice was David Andrew Fink's to make. Affidavit of David Andrew Fink, ¶ 3.

40. For some time prior to Tem Mellon's directive, David Andrew Fink had been contemplating retirement. Affidavit of David Andrew Fink, ¶ 4.

41. After doing some soul searching and talking the matter over with his family, with no prompting from ownership whatsoever, David Andrew Fink decided not only to cede control of railroad operations to his son but also to relinquish all of his leadership responsibility over Pan Am Systems, Inc. and its subsidiary entities as well as ownership interest in the same, thereby retiring completely from the work force. Affidavit of David Andrew Fink, ¶ 4.

42. Contrary to the statements in the article, David Andrew Fink did not mismanage Pan Am's railroad operations. Affidavit of David Andrew Fink, ¶ 5.

43. With respect to Peter Leishman, the company never took any inappropriate actions against Peter Leishman. Affidavit of David Andrew Fink, ¶ 5.

44. Rather, Mr. Leishman and his company brought two legal proceedings against Pan Am's railroad group, both of which were successfully defended. Affidavit of David Andrew Fink, ¶ 5, Exs. A & B.

45. With regard to the railroad group's operational performance, Pan Am's independent auditors approved the financials every year and banks lent Pan Am money based on the strength of its performance as an operating railroad. Affidavit of David Andrew Fink, ¶ 5.

46. For example, in 2006, Bank of America loaned the railroad group $65,000,000; in

2009, Citibank loaned the railroad group $35,000,000. Affidavit of David Andrew Fink, ¶ 5.

47. During this entire period all of David Andrew Fink's budgets were approved by ownership. Affidavit of David Andrew Fink, ¶ 5.

48. There was no mismanagement of any kind. Affidavit of David Andrew Fink, ¶ 5.

49. Publication of the above-quoted false and defamatory statements caused injury to David Andrew Fink's reputation and a great deal of emotional harm. Affidavit of David Andrew Fink, ¶ 6.

50. A palpable loss of prestige in the railroad community brought about by publication of the article was evidenced by the drying up of railroad related dinner function invitations, political function invitations and railroad business advice seeking. Affidavit of David Andrew Fink, ¶ 6.

51. Mr. Fink was shunned by the railroad community and reports got back to him that he was viewed, based on the article, as having been cashiered due to incompetence. Affidavit of David Andrew Fink, ¶ 6.

### D. Concord Promises

52. Robert Culliford's responsibilities as General Counsel include representation of the Company in all legal matters, including those before the Surface Transportation Board. Affidavit of Robert Culliford, ¶ 5.

53. In the December 21, 2010 issue of Atlantic Northeast Rails & Ports, the following article appeared regarding an alleged promise made by Springfield Terminal Railway Company:

**NEGS: UPDATE**

Despite ST's promise to locate a crew in Concord and switch customers five days a week [see 10#05A], Dearness reported that ST had done neither. It is now providing a switch one day a week. He believed that to serve major customers Blue Seal and Ciment Quebec, ST had to switch at least three times a

week, which is "what I provided before I left."

Affidavit of Robert Culliford, ¶ 6.

54. The above statement that the Springfield Terminal Railway Company promised to locate a crew in Concord and switch customers five days a week is false. Affidavit of Robert Culliford, ¶ 7.

55. Contrary to the statement in the article, Springfield Terminal Railway Company did not promise to locate a crew in Concord or switch customers five days a week. Affidavit of Robert Culliford, ¶ 8.

56. Instead, Springfield Terminal Railway Company represented to the Surface Transportation Board that, if warranted by customer demand, it would place a crew in Concord and provide service five days per week to customers – but only if customer demand existed to justify this level of service. Affidavit of Robert Culliford, ¶ 8.

57. The above article concerns an Application for Adverse Discontinuance of Operating Authority filed by the Boson and Maine Corporation and Springfield Terminal Railway Company on June 19, 2001, STB Docket AB-32 (Sub-No. 100). Affidavit of Robert Culliford, ¶ 9, Ex. A.

58. The above article concerns an Application for Adverse Discontinuance of Operating Authority filed by the Boston and Maine Corporation, Inc. and Springfield Terminal Railway Company on June 19, 2009, STB Docket AB-32 (Sub-No. 100). Affidavit of Robert Culliford, ¶ 9, Ex. A.

59. The Application arose out of a dispute with New England Southern Railroad Co., Inc. ("NES"), a former lessee that had voluntarily agreed to terminate the lease but refused to

cease operations on one of the Company's railroad lines. Affidavit of Robert Culliford, ¶ 10 & Ex. A.

60.   The Application stated, *inter alia*, that Boston and Maine Corporation, Inc. and Springfield Terminal Railway Company were prepared to assume operation of the disputed railroad line, which would improve service by eliminating the need to switch rail cars operated by NES since they would be served by the Company's integrated system.  Affidavit of Robert Culliford, ¶ 10 & Ex. A.

61.   The Application further stated Boston and Maine Corporation, Inc. and Springfield Terminal Railway Company would "assign a crew in Concord, New Hampshire to work a five day per week schedule providing service to the four major customers and a few smaller customers on the Subject Line <u>as long as traffic levels support such service</u> . . . ." Affidavit of Robert Culliford, ¶ 10 & Ex. A (emphasis supplied).

62.   This level of service representation was restated in the Reply filed by Boston and Maine Corporation, Inc. and Springfield Terminal Railway Company on September 14, 2009: "PAR [collectively the Boston and Maine Corporation, Inc. and Springfield Terminal Railway Company] is committed to this operating plan, <u>but notes that it must be contingent upon adequate service levels to support it</u>.  Affidavit of Robert Culliford, ¶ 11, Ex. B (emphasis supplied).

63.   To mandate a minimum level of service as suggested by NES would be inequitable and inefficient, because if PAR were required to continue to provide minimum service levels on the Line that may be unprofitable due to a lack of demand would inevitably lead to abandonment of the Line.  Affidavit of Robert Culliford, ¶ 11, Ex. B.

64. Therefore, PAR requests that the Board decline to impose minimal service requirements as a condition of granting the Application." Affidavit of Robert Culliford, ¶ 11, Ex. B.

65. In its decision on the Application, the Surface Transportation Board granted Boston and Maine Corporation, Inc.'s and Springfield Terminal Railway Company's request and did not impose a five day per week minimum service level as a mandate. Affidavit of Robert Culliford, ¶ 12, Ex. C.

66. The Surface Transportation Board stated, "Pan Am plans to integrate the Line into its existing system and states that it is: 1) committed to working with NES to achieve a smooth transition and to establish conditions that support present and reasonably foreseeable traffic levels; (2) intent on meeting and exceeding the service needs and demands of this region of New Hampshire; and (3) committed to an operating plan that, if adequately supported, will improve the Line's current level of service." Affidavit of Robert Culliford, ¶ 12, Ex. C.

67. The Surface Transportation Board further denied the New Hampshire Department of Transportation's ["NHDOT"] request to require Boston and Maine Corporation, Inc. and Springfield Terminal Railway Company to establish an interchange in Concord. Affidavit of Robert Culliford, ¶ 13, Ex. C.

68. Specifically, the Surface Transportation Board's Decision stated, "we will deny NHDOT's request for a condition requiring Pan Am to establish an interchange at the Concord Yard." Affidavit of Robert Culliford, ¶ 13, Ex. C.

69. Defendants' source for this information is apparently Peter Dearness, who owns and controls NES and on whose behalf pleadings were filed at the Surface Transportation Board

contesting the Boston and Maine Corporation's and Springfield Terminal Railway Company's Application. Affidavit of Robert Culliford, ¶ 14.

70. In those pleadings, NES acknowledged that no unequivocal, enforceable promise was made. Affidavit of Robert Culliford, ¶ 14.

71. Instead, relying solely on one paragraph in a Verified Statement supporting the application and ignoring the actual pleadings, NES noted: "But the proof will be in ST's actual delivery on its promise of five day per week service." and that, "...the Board should be mindful of the *representations* Pan Am has made in this proceeding regarding the service it will provide." Affidavit of Robert Culliford, ¶ 14, Ex. D at 9, 11 (emphasis supplied).

72. Springfield Terminal Railway Company has also consistently reiterated its position regarding service levels, informing customers that more frequent service was available, provided that the traffic levels supported additional service. Affidavit of Robert Culliford, ¶ 15.

73. To date, no entity has filed a formal complaint with the Surface Transportation Board with regard to Springfield Terminal Railway Company's service to this line segment. Affidavit of Robert Culliford, ¶ 15.

Dated at Bangor, Maine, this 7th day of March, 2014.

PLAINTIFFS,

BY  /s/ Thad B. Zmistowski
Thad B. Zmistowski, Esq.
Jonathan A. Pottle, Esq.
Eaton Peabody
P.O. Box 1210
Bangor, Maine 04402-1210
(207) 947-0111
tzmistowski@eatonpeabody.com
jpottle@eatonpeabody.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2014, I electronically filed the foregoing Responses to Defendants' Statements of Material Facts and Plaintiffs' Opposing Statements of Material Facts with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Russell B. Pierce, Jr., Esq.
Norman, Hanson & DeTroy, LLC
P.O. Box 4600
Portland, ME  04112-4600
rpierce@nhdlaw.com

>   */s/ Thad B. Zmistowski*
>   Thad B. Zmistowski