# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| PAN AM SYSTEMS, INC., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | |
| ) | Civil Docket No. 2:11-cv-00339-NT |
| CHALMERS HARDENBERGH, *et al.* ) | |
| ) | |
| Defendants. ) | |

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

NOW COME Defendants Chalmers Hardenbergh and Atlantic Northeast Rails & Ports, Inc. (hereafter collectively, "Hardenbergh") by and through undersigned counsel, and pursuant to Local Rule 7(c) respectfully submit this Reply Memorandum in support of summary judgment. The published statements remaining in issue in this case are neither actionable as defamation under the Constitution, nor provably false as a matter of law. Plaintiffs are pursuing this case for the ulterior purpose of vexatious litigation to shut down or chill the speech of a small news source which covers Plaintiffs' railroad operations – both the positive and the negative – and which has on occasion dared to appropriately report criticism of those operations. Summary judgment should be granted now, on all Counts.

**A.     Fink's Complaints, referencing the characterization of his removal from office when the story broke, fail to assert a claim for defamation as a matter of law.**

Plaintiffs begin their opposition to summary judgment with this issue, out of the four remaining statements at issue.[1] We may infer from this priority that this entire case is motivated by the vexation

---

[1] This Memorandum later addresses, in Part E, Plaintiffs' dropping claims based on two of the statements pleaded.

and vindictiveness of Plaintiff David Andrew Fink, Fink *pere*, the now-retired former CEO and president of Pan Am Systems.

This is the same man who has "terrorized employees" (SMF ¶ 70), who has already lost one similar defamation case while succeeding in getting the defendant to incur $200,000 in legal fees (SMF ¶ 84), and who until he left office conducted "a vendetta" against the owner of a connecting railroad (SMF ¶ 82). The record is replete with evidence of Fink's litigiousness, his poor management, and his poor leadership. SMF ¶¶ 32; 48; 66-82; 91-98. He now seeks to "intimidate" (SMF ¶ 96) and terrorize Hardenbergh for daring to report his departure from Pan Am.[2]

Fink's newly-disclosed version of his departure[3] shows that, as Hardenbergh's article reported, Mellon was directly involved. He intervened because of infighting between Fink *pere* and Fink *fils*. OSMF ¶¶ 38-39. Fink *pere* describes his disagreements with his son, who in 2006 became president of the Pan Am group of railroads, while Fink *pere* remained CEO of the Pan Am group of railroads and of parent Pan Am Systems, as differences in "operational philosophy." OSMF ¶ 38.

Fink *pere*'s new version, referencing operational differences, grounds in actual fact the speculation by Hardenbergh's sources that one might expect a change in operations: "more freedom either to spend more money on railroading, or put the existing money into different [and one would hope more productive] places." OSMF ¶ 34.

---

[2] Hardenbergh remains the only news outlet which has reported his departure. SMF ¶ 61.

[3] Fink *pere* initially only said he "resigned." Amended Complaint ¶ 41. In discovery, Defendants sought "all documents or communications concerning . . . [the article about Fink's removal]." Defendants' Request for Production of Documents No. 59. Plaintiffs response, given Fink *pere*'s affidavit, strains credulity: Plaintiffs provided only Fink *pere*'s resignation letter and two ancillary documents to it. Surely a major shakeup of the corporate CEO position would have included other documents, such as those leading up to Mellon's intervention, the need for intervention, and documents in the aftermath describing Fink *fils* elevation to head man.

Fink's new version not only proves the truth of the article in issue, it supports the editorial flourish of "coup de grace" as both poignant and accurate.[4] In Fink's own words, the corporation's principal owner, Tim Mellon, "decided that the above-described dual leadership scenario was no longer working and directed that either I take back control of Pan Am's railroad operations or relinquish all control of the same to my son." OSMF ¶ 39. In other words, the "dual leadership" led to "operational philosophy" dysfunctional differences. To end the suffering, Mellon intervened and applied the coup de grace: either you go, or your son goes. Fink *pere* chose that time to resign. SMF ¶¶ 58-60 (resignation letter). He now calls that resignation a retirement. So be it. To each his own description.

Finally, accepting *arguendo* Fink's version that Mellon did not *directly* remove him (or that Fink avoided direct removal by choosing that time to "retire"), the mere publication of someone's dismissal is not actionable, as this Court has already ruled. ECF No. 20 at 14 (citing *Picard v. Brennan*, 307 A.2d 833, 835 (Me. 1973)). In the final analysis, the "gist" of what was said in the article is true. The way that "gist" is described in the full context of a news article relaying breaking news, clearly expressing surmise from sources and couched in figurative language, cannot be actionable. Further, who is to say that Fink's own new and self-serving description, using stylistic figures of speech of his own (i.e., euphemism and understatement), should prevail over any other person describing the same agreed-upon set of facts? All that can be said with certainty is that a jury does not decide such a question, ever. To submit Fink's claims to jury trial offends the First Amendment.[5]

---

[4] World drama, from *Oedipus* to *Death of a Salesman*, portrays far more than we can how conflict between a father and a son can be poignant, and tragic.

[5] Smolla, *Law of Defamation*, § 6:21 at 6-34 (2013) ("But by steadfastly adhering to the requirement that actionable speech be factual speech, the [United States Supreme] Court [in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)] did in fact create constitutional immunity for genuine opinion."). See also, Smolla, *supra*, §§ 6.1 et seq., including § 6:2 ("New world after *Milkovich*") & § 6.21 at 6-34.1:

> In conclusion, it would misread *Milkovich* and be a grave encroachment on First Amendment freedoms to treat the case as opening the door to defamation actions based upon what most courts had come to treat as constitutionally protected "opinion." "Opinion" by any other name is still free speech; statements not

The remainder of Plaintiffs' disagreement with this article relates to the disputes, including litigation, between Peter Leishman and David Andrew Fink. SMF ¶¶ 66, 79-82. It is fair opinion – i.e., non-actionable, figurative hyperbole – to convey that a source characterized those disputes, and Fink's aggressive dealings with Leishman, as "holy wars." *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 125 (1st Cir. 1997) (Circuit Judge Selya in the First Circuit opinion describes the litigation between Levinsky's and Wal-Mart as "STORE WARS"); *CACI Premier Technology, Inc. v. Rhodes,* 536 F.3d 280, 300-303 (4th Cir. 2008) (several statements laced with hyperbole and exaggeration, such as those that plaintiffs' military contractor employees were "hired killers" who could kill without being held account, were not actionable as "quintessential examples of non-actionable hyperbole"). *See also Levinsky's*, 127 F.3d at 128 ("Hyperbole is very much the coin of the modern realm.").

**B.     Plaintiffs fail to meet their burden of proving that TIH rail cars always arrive on time.**

Plaintiffs quarrel with the following statement:[6]

> The railroad "loses" cars on a consistent ongoing basis, including one car "lost" for over 60 days....even though certain DHS and DOT statutes require carriers to release [TIH] cars within 48 hours.

SMF ¶ 45.

Plaintiffs rely solely on an affidavit of one Doug Steward to show the statement is false. (The one car "lost" for 60 days statement was clarified in a later issue as not a TIH car. SMF ¶ 47.) The affidavit agrees with the statement of the source: "TIH cars must be forwarded every 48 hours until they reach final destination."

---

subject to objective proof, including statements of imaginative expression, rhetorical hyperbole, and emotional caricature are still immune from liability under the First Amendment.

§ 6.21 at 6-34.1.

[6] Plaintiffs, while quarrelling with the second sentence in the final section of the article, do not contest the first sentence describing "difficulty with consistency of service."

The affidavit, like all other submissions of Plaintiffs, fails to take account of context, including in this instance the quotation marks surrounding the terms "lost" and "loses." Now known as "scare quotes," they "are defined as '. . . a pair of quotation marks used to emphasize a word or phrase or to indicate its special status, especially to express doubt about its validity or to criticize its use.'" *Waltner v. Commissioner of Internal Revenue*, 2014 WL 7755179 at *15 n.29 (February 27, 2014) (quoting *The American Heritage Dictionary of the English Language* 1555 (4th ed.2000)); see also *International Business Machines Corp. v. ACS Human Services*, *LLC*, 999 N.E.2d 880, 889 & n.5 (Ind. App. 2013) ("The term, scare quotes, convey[s] the idea that what is labeled in quotes is " 'so-called-but-not-really.' ") (quoting in part Bryan A. Garner, *Legal Writing in Plain English: A Text with Exercises* 157 (2001)).

Clearly, then, coupled with the statement about "difficulty with consistency of service," the term "loses" cars in this instance does not literally mean lost forever, only that the cars did not arrive on time.

To show the falsity of the statement that cars are "lost," Plaintiffs must show that rail cars carrying TIH substances always arrived on time. They have produced no records showing that every TIH car arrived within 48 hours, or indeed that any arrived on time. Defendants' RSMF ¶¶ 26-27. The sworn declaration of Peter Dearness (RSMF ¶ 26) describes Plaintiffs' indifference to whether or not TIH rail cars violate the DOT 48-hour release rule.

The record is undisputed that many Plaintiffs' customers complained about inconsistency of service or that Plaintiffs' rail car delivery was undependable. SMF ¶¶ 12-14, 19-24; 74-75; 98. Tellingly, Plaintiffs have dropped their defamatory charges relating to the complaints of "consistently bad" service (see Part E, below). SMF ¶¶ 11-24. The record contains evidence confirming the source's communication to Hardenbergh that one rail car – albeit not carrying TIH substances – went missing for 60 days. SMF ¶ 46 (communication from source's attorney).

Plaintiffs' argument that they were never notified about a lost TIH car is unavailing. Violations may occur without any interested person ever reporting them to the authorities. Even then, the nature of such a report to a government official might be made and never recorded, or merely noted by the official receiving the report as not worth further official action. See RSMF ¶ 28 (Dearness Declaration). Plaintiffs look like a trucker trying to prove that he never violated the speed limit by asserting he has never been issued a speeding ticket. Plaintiffs in fact look worse than the trucker. They show a propensity for undependable and inconsistent service (SMF ¶¶ 11-24; 34-35, 45; 74-75; 98)[7]; indifference towards rail car delivery violations (RSMF ¶¶ 26-28); and a corporate reputation of indifference to environmental regulations (SMF ¶¶ 48-49; 73) – plus one direct report of a "lost" rail car. SMF ¶¶ 45-46.

As this Court has already ruled, Plaintiffs have the "burden of showing the falsity of the statements." ECF No. 20 at 6. Plaintiffs fall far short of this burden: they lack any actual facts to support their burden. The application of the Best Evidence rule precludes Plaintiffs' only evidence (a verified statement merely stating the conjecture that "no cars were lost"). RSMF ¶ 27. Finally, the substantial truth doctrine, to the extent the substance of the statement is even actionable as loose expression (i.e., putting the term "lost" in quotes), bars this claim.[8]

**C.       There is no liability as a matter of law for Hardenbergh's accurate quotation of an opinion from Peter Burling, a governmental official.**

**C.i.     Burling's opinion is inherently not actionable as defamation of Plaintiffs.**

---

[7] See the original Atlantic Northeast Rails & Ports article, penultimate sentence. At least the hypothetical trucker can show that by speeding his customer did receive the goods punctually.

[8] We reiterate that this allegation is also based on an accurate quotation from a source (whose identity remains undisclosed pursuant to the First Amendment constitutional protections to journalists' sources). SMF ¶ 45. It is quite clear at this juncture, as argued in Defendants' Memorandum of Law, that the Plaintiffs would also fail to meet the requisite standard of proof on "fault" under the circumstances ("actual malice"), were the Court ever to reach that issue. ECF No. 65 at footnote 9, page 21. Should the Court require additional briefing on the issue on this record, Defendants would agree that no additional discovery would be needed to address the issue, and the parties should be able to submit the additional briefing on an expedited basis.

Plaintiffs persist in pressing their defamation claim based upon Hardenbergh's accurate quotation of a governmental official, Peter Burling, then chair of the New Hampshire Rail and Transit Authority. See Plaintiffs' Memorandum (ECF No. 69) at 14.

After a derailment occurred on Plaintiff Springfield Terminal's rail line, Burling said that "[a] horrendously dilapidated railroad system has caused a slow-moving coal train to fall off the tracks." Burling opined that "a track upgrade . . . might have been provided had the state won funding for passenger service to Concord . . ." Again, Plaintiffs ignore the overall context of the article, ignore that Burling was talking about the rail "system" as a whole, and ignore that he was using figurative subjective non-actionable rhetoric ("horrendously dilapidated") to make his point that perhaps the condition of the rail system deserved funding and upgrades.

These are perfectly legitimate expressions of opinion, by a governmental official, and no myopic after-the-fact dissection from the Plaintiffs of the overall context and of what was said will parse the report into a defamation claim. Plaintiffs also ignore Hardenbergh's report of Fink *fil*'s comment on Burling's viewpoint, offering his contrasting views. SMF ¶ 5.

The Court should not allow Hardenbergh's quotation of this statement to move beyond summary judgment. Doing so offends freedom of expression and freedom of the press for both the speaker (Burling) and the press (Hardenbergh, and others).[9]

**C.ii.  The Fair Report Privilege Protects Hardenbergh's quotation of a governmental official.**

These arguments are dispositive of any liability for this defamatory charge, but the fair report privilege also clearly applies. At the end of Plaintiffs' Memorandum (Part IV), Plaintiffs argue that the fair report privilege is "not recognized" in Maine, and Plaintiffs suggest that the issue is not ripe for

---

[9] We reiterate that Hardenbergh was not the only news source to report on Burling's statement, and in fact Hardenbergh's whole report was a summary of the content of three other newspaper articles – two in the *Nashua Telegraph*, and one in the Manchester *Union Leader*. SMF ¶ 1.

7

decision on this motion because of the Magistrate Judge's discovery order.[10] Plaintiffs are wrong on both fronts.

In the previous ruling on motion to dismiss, this Court did not need to reach the question of applying fair report privilege, because this claim was dismissed as pled on other grounds. ECF No. 20 at 12. There is no justification for Plaintiffs' suggestion that, should the Court need to reach this issue now on summary judgment, it should similarly decline. As argued in Defendants' Memorandum of Law, a federal court sitting in diversity has the duty to ascertain and predict state law when the highest state court has not yet spoken on the issue. *Nolan v. CN8*, 656 F.3d 71, 76 (1st Cir. 2011). See also our discussion of the issue in footnote 6 of Defendants' Memorandum (ECF No. 65 at 16-17). We had assumed there would be no serious controversy over this basic precept of the federal court's application of state common law in accordance with the rule-of-decision doctrine of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

Maine law would join the Restatement (Second) of Torts and *all* other jurisdictions that have confronted the issue, and adopt the long-standing doctrine of fair report as a defense in defamation actions. One Superior Court justice in Maine has so found. *Kampf v. Maine Publishing Corp. d/b/a Casco Bay Weekly, et al*, 1998 WL 35550605 (Me. Super. Oct. 21, 1998) (Mills, J.) at *1. Further, "Maine law generally follows the Restatement (Second) of Torts." *Sandler v. Calcagni*, 565 F. Supp. 2d 184, 193 (D. Me. 2008).[11] The Restatement recognizes a fair report doctrine. See *Restatement (Second) of Torts* § 611. Moreover, "the common law has long recognized the unique privilege to publish fair and accurate reports of certain defined [governmental] proceedings." Smolla, *Law of Defamation* §8:66

---

[10] To the extent Plaintiffs suggest that the arguments should also be barred by this Court's Report of Prefiling Conference Under Local Rule 56 (h), this Court clearly recognized that one basis for the proposed summary judgment motion could include whether the Defendants' "publication of at least one of the statements was privileged." ECF No. 62 ¶ 1 at 2. This fair report privilege argument is not part of the "actual malice" issue that the Court relegated to a second summary judgment motion should any portion of the case survive this one. ECF. No. 62 ¶ 2.

[11] Plaintiffs agree with this point, by citing the *Sandler* case on page 4 of their memorandum in opposition. ECF No. 69 at 4.

(2013) at 8-61. The fair report privilege is "often viewed as an exception to the common law republication rule." *Trainor v. The Standard Times*, 924 A.2d 766, 770 (R.I. 2007) (citing *Medico v. Time, Inc.*, 643 F.2d 134, 137 (3rd Cir. 1981); *Costello v. Ocean County Observer*, 643 A.2d 1012, 1018 (N.J. 1994)). "To ameliorate the chilling effect that the republication rule would have on the reporting of controversial matters of public interest, common law courts . . . recognize a privilege for fair and accurate accounts of governmental proceedings." *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1299 (D.C. Cir. 1988). "The rationale for the privilege is of considerable vintage, but remains as relevant as ever: the reporter is a surrogate for the public, permitting it to observe through the reporter's eyes how the business of government is being conducted." Smolla, *supra*, § 8:67 at 8-63. This defense – which may now be a constitutionally required privilege (*Restatement (Second) of Torts* § 611, Comment b) – fits well within the Law Court's existing expansive test for recognition of common law privileges in defamation actions. *Cole v. Chandler*, 2000 ME 104, ¶ 6, 752 A.2d 1189.

Application of the fair report doctrine in this case readily disposes of Plaintiffs' action based on the Peter Burling quotation. There is no evidence that Burling was quoted inaccurately. The "critical aspect of the fair report privilege is that what matters is not the *underlying* truth or falsity of the defamatory statement that is reported, but rather the accuracy and fairness of the *summary* of the proceeding in which the statement was made." Smolla, *supra*, at 8-62 to 8-63. While Burling's statement itself does not constitute actionable defamation, even assuming arguendo that it could, Hardenbergh is not liable as a matter of law for republishing the statement under the fair report privilege.

**D.     The report quoting Peter Dearness, who cited federal STB findings about locating a crew in Concord and serving customers five days a week, is not actionable.**

Plaintiffs' attempt to base a defamation claim on the statements of Peter Dearness, referring to Plaintiff Springfield Terminal's promise to locate a crew in Concord and switch customers five days a

week, is unavailing. The governmental entity with authority (Surface Transportation Board) made a finding of the promise. SMF ¶ 39. Dearness merely referred to it. SMF ¶¶ 36-37.

Plaintiffs do not dispute that the promise was not kept, but resort to quibbling about the scope, certitude, or conditions of the promise. But Hardenbergh's report is accurate, and Peter Dearness' reference to the promise in public filings is true, certainly substantially true, and therefore not actionable.

The Dearness statements can also be characterized as republications of statements made in governmental proceedings and hence within the expansive test for general common law privilege recognized by the Law Court in *Cole v. Chandler*, 2000 ME 104, ¶ 6, 752 A.2d 1189. Dearness has a privilege to repeat what is said in public filings and STB findings; anyone from the press accurately quoting him on the same subject has the same privilege. "To ameliorate the chilling effect that the republication rule would have on the reporting of controversial matters of public interest, common law courts . . . recognize a privilege for fair and accurate accounts of governmental proceedings." *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1299 (D.C. Cir. 1988).

Plaintiffs argue in vain that they had caveats applied to the promises. The verified statement under oath filed by the assistant to the vice president of transportation of Plaintiff Springfield Terminal, Richard Miller, represented to a federal agency that "in order to provide service to these customers on a consistent basis one crew will be required on a five day per week basis," and "it is planned to headquarter a crew in Concord, New Hampshire." SMF ¶ 40. There were no caveats.

### E. Plaintiffs Waive Argument on Statements 2 and 3 (Amended Complaint ¶¶ 15, 20).

With no explanation and only in a footnote (ECF No. 69 at 2 n.3), Plaintiffs state they do not oppose summary judgment on the alleged defamatory charges set forth in the Amended Complaint at ¶¶ 15, 20 (addressed as Statement 2 ("consistently bad" service and "congestion") and Statement 3

("challenges") in Defendants' Memorandum of Law; ECF No. 65 at 7-9, 17-19). Thus, Defendants are entitled to summary judgment on the charges contained in the Amended Complaint ¶¶ 15-19 & 20-26.[12]

The remaining four charges should also be dismissed, as no more defamatory that the "congested" or "bad service" Statement 2 or the "challenges" Statement 3. The safest characterization of the entire set of six defamatory charges is that they consist of only a footnote in the record of failed attacks on freedom of the press.[13]

For all of the foregoing reasons, together with the reasons set forth in Defendants' Memorandum of Law in Support of Summary Judgment, this Court should enter summary judgment in favor of the Defendants on all Counts of the Amended Complaint, and thus put an end to the Plaintiffs' attempt to chill free speech and press by exerting expensive and protracted litigation on a small news publication.

Dated at Portland, Maine this 21st day of March, 2014.

/s/ Russell B. Pierce, Jr.
Russell B. Pierce, Jr., Esq.
Attorney for Defendants

NORMAN, HANSON & DeTROY, LLC
Two Canal Plaza
P.O. Box 4600
Portland, Maine 04112-4600
(207) 774-7000
(207) 775-0806 - fax
**rpierce@nhdlaw.com**

---

[12] Plaintiffs also do not argue in opposition to the principles on Counts II and III set out in Defendants' Memorandum of Law (ECF No. 65 at 24-25), that punitive damages claims and claims reliant on deficient defamatory charges are also subject to summary judgment. Not responding to a defendant's argument will result in waiver of objection to judgment in defendant's favor on the issue. *Griffin v. Town of Cutler*, 2005 WL 2476249 (D. Me. October 5, 2005) at *1 (citing *Fuller-McMahan v. City of Rockland*, 2005 WL 1645765 (D. Me. July 12, 2005) at *9); *Andrews v. American Red Cross Blood Services, New England Region*, 251 F. Supp. 2d 976, 978-79 (D. Me. 2003).

[13] Paraphrasing Alfred North Whitehead: "The safest general characterization of the European philosophical tradition is that it consists of a series of footnotes to Plato." Whitehead, *Process and Reality* (Free Press 1979) at 39.

**CERTIFICATE OF SERVICE**

       I hereby certify that on March 21, 2014, I electronically filed the foregoing Defendants' Reply Memorandum in Support of Motion for Summary Judgment with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to all registered counsel of record as follows:

**JONATHAN ANDREW POTTLE**
**THAD B. ZMISTOWSKI**
EATON PEABODY
P. O. BOX 1210
BANGOR, ME 04402
(207) 947-0111
Fax: 942-3040
Email: jpottle@eatonpeabody.com
Email: tzmistowski@eatonpeabody.com

                                        /s/ Russell B. Pierce, Jr.
                                        Russell B. Pierce, Jr., Esq.