| | | |
|---|---|---|
| PAN AM SYSTEMS INC., SPRINGFIELD TERMINAL RAILWAY COMPANY, and DAVID ANDREW FINK, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil No. 2:11-cv-00339-NT |
| CHARLES HARDENBERGH and ATLANTIC NORTHEAST RAILS AND PORTS, | ) ) ) ) | |
| Defendants. | ) ) | |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Plaintiffs, Pan Am Systems, Inc., Springfield Terminal Railway Company, and David Andrew Fink, bring claims for defamation and false light against Defendants Atlantic Northeast Rails & Ports and Charles Hardenbergh. The Plaintiffs also seek punitive damages. Before the Court is the Defendants' motion (ECF No. 65) seeking summary judgment on all the Plaintiffs' claims. For the reasons that follow, the Court **GRANTS** the Defendants' motion.

## THE PARTIES

Pan Am Systems, Inc. ("**Pan Am**") is a railroad company with substantial operations in New England. David Andrew Fink[1] served as Pan Am's president and

---

[1]     Two individuals named David Fink appear in this decision. David Andrew Fink is the father of David Armstrong Fink. For the sake of clarity, the Court generally refers to David Andrew Fink (the father) by his last name alone and David Armstrong Fink (the son) by his full name.

CEO during most times relevant to this suit. Springfield Terminal Railway Company ("**Springfield Terminal**" or "**ST**") is Pan Am's subsidiary.

Atlantic Northeast Rails & Ports ("**ANR&P**") produces an eponymous trade newsletter about the railroad industry. Charles Hardenbergh is ANR&P's editor and publisher.

The Plaintiffs claim that four articles written and published by the Defendants defamed them and placed Fink in a false light. Because each article presents a different factual background, the Court will present the facts in the Discussion section of this opinion.

## PROCEDURAL HISTORY

The Plaintiffs initiated this suit in September of 2011 when they filed their original complaint (ECF No. 1). There, the Plaintiffs alleged the Defendants had defamed them in six different articles. Compl. 3-5. The Defendants moved to dismiss the Complaint for failure to state a claim, arguing the Plaintiffs had failed to allege falsity or fault and that five of the six statements in question were not capable of conveying a defamatory meaning as a matter of law. Defs.' Mot. to Dismiss (ECF No. 14). The Court granted the motion and dismissed the Plaintiffs' claims without prejudice. Order of May 14, 2012 (ECF No. 20). In its order, the Court determined that, for First Amendment purposes, the Defendants should be treated as "media defendants" and all the speech at issue implicated "matters of public concern." Order of May 14, 2012 at 7-10. The Court held that the issue of whether the Plaintiffs should be treated as "public figures" was not yet ripe for decision. *Id.* at 10-11.

The Plaintiffs subsequently filed an expanded Amended Complaint (ECF No. 25) based on the same six articles. A standard scheduling order issued (ECF No. 27), and the Defendants objected (ECF No. 31). Concerned that inquiry into the fault element of defamation would require them to reveal confidential sources and threaten First Amendment interests, the Defendants proposed bifurcating discovery according to a procedure laid out by the First Circuit in *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583 (1st Cir. 1980). The Court referred the issue to Magistrate Judge John H. Rich III, who issued an order (ECF No. 42) largely adopting the Defendants' proposal. The Magistrate Judge's order contemplated that the parties would proceed by engaging in discovery on all issues other than fault, followed by summary judgment motion work on those issues, followed by further discovery if necessary.

After the first phase of discovery, the Defendants filed the motion for summary judgment (ECF No. 65) currently before the Court. In their opposition to the Defendants' motion (ECF No. 69), the Plaintiffs represented that they are no longer pressing their claim with respect to two of the six statements identified in their complaints, one from an article published on October 22, 2010 and the other from an article published on November 3, 2010.[2] They continue to assert their claims with respect to the four remaining articles.

---

[2] The Court grants summary judgment with respect to those two statements on the basis of the Plaintiffs' representation.

# LEGAL STANDARD

The Court may grant a motion for summary judgment brought under Federal Rule of Civil Procedure 56 where the movant shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). " 'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case.' " *Jakobiec v. Merrill Lynch Life Ins. Co.*, 711 F.3d 217, 223 (1st Cir. 2013) (quoting *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004).

In deciding a motion for summary judgment, the Court construes the record in the light most favorable to the nonmovant and resolves all reasonable inferences in its favor. *See Jakobiec*, 711 F.3d at 223. The Court may not weigh the evidence or make credibility determinations and must set aside "conclusory allegations, improbable inferences, and unsupported speculation." *Pina v. Children's Place*, 740 F.3d 785, 788 (1st Cir. 2014) (quoting *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 134 (1st Cir. 2013)). The motion should be denied if the nonmoving party's evidence is strong enough "to support a verdict in her favor." *Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145, 153 (1st Cir. 2009) (quoting *Calero-Cerezo*, 355 F.3d at 19).

Procedures like summary judgment take on added urgency in suits that have the "potential of . . . chilling constitutionally protected speech." *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 582, 592 (D.C. Cir. 2000) (citing *Washington Post Co. v. Keogh*, 385 F.2d 965, 968 (D.C. Cir. 1966). In such cases, " '[t]he threat of being put to the defense of a lawsuit . . . may be as chilling to the exercise of First

Amendment freedoms as fear of the outcome of the lawsuit itself.'" *Guilford,* 760 A.2d at 592 (quoting and affirming oral order entered by lower court).

## DISCUSSION

### I.   Count I: Defamation

### A.  The Governing Law

#### 1.   The Maine Common Law

Under Maine law, the tort of defamation consists of:

(1) a false and defamatory statement concerning another;

(2) an unprivileged publication to a third party;

(3) fault amounting at least to negligence on the part of the publisher;[3]

(4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Rippett v. Bemis*, 672 A.2d 82, 86 (Me. 1996) (quoting *Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991). Relevant here, the common law rule provides that "one who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it." Restatement (Second) of Torts § 578 (1977).

As discussed above, Magistrate Judge Rich issued a bifurcated discovery order in October of 2012, which postponed discovery on the fault element because it might require the Defendants to reveal confidential sources. The Defendants now move for summary judgment on the grounds that the Plaintiffs cannot establish that the

---

[3]     Under certain circumstances, the First Amendment requires the plaintiff to prove a higher degree of fault to make out the third element—that the defendant made the statements at issue "with knowledge of their falsity or with reckless disregard for their truth or falsity." *Ballard v. Wagner*, 877 A.2d 1083, 1088 (Me. 2005).

statements at issue are defamatory or false and that two of the statements at issue are protected by the fair report privilege.

If the fair report privilege does apply, as the Defendants contend, the Court would still have to determine whether the Defendants abused the privilege, an inquiry that requires examining the issue of fault. *See* Restatement (Second) of Torts §§ 600, 611 (common law fair report privilege is conditional, and can be defeated by showing the defendant knew the matter to be false or acted in reckless disregard as to its truth or falsity); *Yohe v. Nugent*, 321 F.3d 35, 42-45 (1st Cir. 2003) (Massachusetts's fair report privilege is conditional, not absolute, and can be defeated by showing at least some types of malice). Accordingly, the issues of whether Maine law provides for a fair report privilege and whether any of the Defendants' statements are protected by it are not yet ripe for decision. The Court proceeds to the Defendants' remaining arguments for summary judgment, which implicate the first element of defamation and the publication component of the second element of defamation.

### 2. Interaction of Maine Common Law and First Amendment Law

As the Court explained in an earlier order in this case:

> Over the last fifty years, the Supreme Court has imposed various constitutional restrictions on common law defamation actions. The Court, concerned about the chilling effect of defamation actions on free speech, has sought to ensure robust public debate on areas of public concern.

*Pan Am. Sys., Inc. v. Hardenbergh*, 871 F. Supp.2d 6, 11 (D. Me. 2012). Relevant to this motion, the First Amendment limits how state courts may define what is "defamatory," *see, e.g., Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6, 12-13

(1970), and requires a plaintiff bringing a defamation claim against a media defendant (such as ANR&P and Hardenbergh) to prove the falsity of the defendant's statement. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347 (1974).

Given defamation's common law roots and constitutional overlay, this Court must adhere to both the holdings of the Law Court applying Maine law *and* the holdings of the Supreme Court and the First Circuit applying First Amendment law. *See Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 107-108 (1st Cir. 2000).

### a. "Defamatory"

Under Maine's common law, a statement is "defamatory" only if "it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Schoff v. York Cnty.*, 761 A.2d 869, 871 n.3 (Me. 2000) (quoting Restatement (Second) of Torts § 559 (1977)) (internal quotation marks omitted). Whether a statement "is capable of conveying a defamatory message at all is a question of law," to be determined by the Court. *Bakal v. Weare*, 583 A.2d 1028, 1030 (Me. 1990)). However, "[i]f a court determines that the statement is capable of bearing a defamatory meaning, the matter goes to the factfinder to determine if the statement was understood by the recipient as defamatory." *Schoff*, 761 A.2d at 871 n.2.

In making these determinations, context matters. *Chapman v. Gannett*, 132 Me. 389, 398 (1934). As the Law Court has explained:

> In determining whether a given publication is libelous, the language thereof must be taken in its ordinary significance and must be construed in the light of what might reasonably have been understood therefrom by the persons who read it. The question is how would persons of ordinary intelligence understand the language. The published article

alone must be construed, stripped of innuendo, insinuation, colloquium, and explanatory circumstances. In interpreting the language, it is not a question of the intent of the speaker, or author, or even of the understanding of the plaintiff, but of the understanding of those to whom the words are addressed and of the natural and probable effect of the words upon them. A person is presumed to intend the natural consequences of his acts and defamation consists solely in the effect produced upon the minds of third parties.

*Id.* (quoting Cooley on Torts (4th Ed.) 503, § 146).

Additionally, "Maine's common law of defamation does not allow recovery for statements of opinion alone," though "[a] statement of opinion may be actionable . . . if it implies the existence of undisclosed defamatory facts." *Lester*, 596 A.2d at 71. "Whether an allegedly defamatory statement is a statement of fact or opinion is a question of law . . . but if the average reader could reasonably understand the statement as either fact or opinion, the question of which it is will be submitted to the fact-finder." *Ballard*, 877 A.2d at 1087 (internal citations, quotation marks, and bracketing omitted).

Under the First Amendment, a statement may not be held defamatory "unless in a given context it reasonably can be understood as having an easily ascertainable and objectively verifiable meaning." *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 129 (1st Cir. 1997). Whether a statement has an easily ascertainable and objectively verifiable meaning is question of law, for the court. *Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 248 (1st Cir. 2000).

Under this rule, only statements that can be proved true or false are actionable. *Id*. Statements based on "loose, figurative, or hyperbolic language" cannot support a claim. *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 727-8 (1st

Cir. 1992) (statement that production was "fake" and "phony" not actionable). Nor can statements which lack a "precise meaning." *McCabe v. Rattiner*, 814 F.2d 839, 842–43 (1st Cir. 1987) (statement that timeshare real estate development was a "scam" not actionable).

Making the "easily ascertainable and objectively verifiable" determination requires examining the various potential meanings the statement could have and the context in which the statement was made. *Levinsky's*, 127 F.3d at 129. In *Levinsky's*, the First Circuit held that a statement that retail customers were left waiting on the phone for twenty minutes was objectively verifiable, whereas a statement that a store was "trashy" was not. *Id.* at 130. The court explained that "trashy" could have a number of meanings and that, on the specific facts of the case, its "inherent elusiveness" was "not pinned down by context." *Id.* In *Gray*, the First Circuit held that a statement in an article that a public relations firm had "failed" was not defamatory where the writer stated in the same article that the company had sold for $16 million. *Id.* at 249. In context, the court explained, it was clear that the author was not claiming that the company went bankrupt or lost money, but was rather expressing a subjective, unverifiable viewpoint that the company had not succeeded in spreading its message. *Id.*

### b.   "Materially False"

At common law, a defendant pressing the affirmative defense of truth could not be held liable if he proved that his statement was "substantially true," even if not "technically accurate." *McCullough v. Visiting Nurse Serv. of S. Me., Inc.*, 691 A.2d 1201, 1204 (Me. 1997). It was not necessary for the defendant "to establish the literal

truth of the precise statement made." *Id.* (citing Restatement (Second) of Torts § 581A cmt. f (1977)). "Slight inaccuracies of expression" were "immaterial provided that the defamatory charge" was "true in substance." *Id.* (statement that nurse was fired due to "several" incidents of misconduct deemed "substantially true" even though in fact nurse was fired due to only two incidents of misconduct). Where, as here, the plaintiff bears the burden of proving falsity, the doctrine of substantial truth remains in force but is flipped on its head; the plaintiff must establish not only that the statement in question was false, but that it was "materially false." *Vellieux*, 206 F.3d at 105.

### B.    Presentation of Facts and Application of Facts to Law

#### 1.    The Bridge Street Derailment

##### a.    Presentation of Facts

In November 2009, several rail cars derailed while traveling along train tracks owned by Springfield Terminal. Pls.' Statement of Additional Material Facts ¶¶ 10, 11 ("**PSMF**") (ECF No. 75).[4] Citing to and liberally borrowing from articles which appeared in the *Nashua Telegraph* and Manchester *Union Leader*, ANR&P published its own story about the derailment on December 2, 2009. PSMF ¶¶ 1, 3; *see also* Defs.' Ex. 3 (copy of November 18, 2009 article in *Nashua Telegraph* by David Brooks). The Court reproduces the entire ANR&P article below, preserving all original spacing and punctuation. The allegedly defamatory portion consists of quotations from Peter Burling, the chair of the New Hampshire Rail Authority, which appear under the

---

[4]    Citations to paragraphs of the Plaintiffs' Statement of Material Facts refer to specific facts proposed by the Plaintiffs at pages 7-18 of ECF No. 75 and the Defendants' responses to those facts at pages 11-29 of ECF No. 79.

header, "Shows need for track investment?" Am Compl. ¶ 10; Pls.' Opp'n to Defs.' Mot.

for Summ. J. 14-16 (ECF No. 69).

## ST: COAL DERAILMENT

17 November, Nashua. ***THE LOADED ST BOW COAL TRAIN DERAILED SEVEN CARS*** of an 87-car train near Bridge Street at about 11 AM. Three turned over, with coal spilling out.

David Fink, ST president, arrived on the scene in the afternoon. He said preliminary investigation showed that one of the truck sides (a truck contains axels, springs, and other equipment for suspension) had fallen off one of the cars. That caused a chain reaction among several subsequent cars. Asked whether he thought there was a problem with the tracks, Fink said, "We're looking at everything, but we don't think so" because of the evidence with the truck. An investigation into the cause of the derailment would likely go on for about a month because of metal that needs to be tested and other factors.

Crews were expected to realign the four upright cars and move them that same day. Most of the train – an estimated 74 cars – continued on to the Merrimack Station power plant in Bow without a problem. {Karen Lovett in Nashua *Telegraph* 18.Nov.09}

**Shows need for track investment?**
Peter Burling, chair of the New Hampshire Rail Transit Authority, blamed ST for the accident. "What has happened here is a perfectly predictable accident – but it's hard to describe it as an accident, since the probabilities were so clear it was going to take place. The only thing we didn't know is when and where."

Burling said the accident, occurring on a stretch of line with a speed limit of under 10 miles per hour for large freight trains, made a track upgrade which might have been provided had the state won funding for passenger service to Concord [see 09#10A] more important. "A horrendously dilapidated railroad system has caused a slow-moving coal trail to fall off the tracks."

"The point is not to say 'I told you so,' but to say this is why we feel it is so important to get this line upgraded, and to maintain it for passenger and freight operations. We believe there are institutions of the federal government that can move to carry this along. I'm going to Washington in [the] next couple of weeks to have further discussions about the issue." {David Brooks in Nashua *Telegraph* 18.Nov.09}

**Fink Response**
Any number of reasons could explain why the cars jumped the track, including equipment failure, Fink said on 19 November, responding to

Burling's remarks. "I don't know what (Burling) is basing that on. I don't think he has any knowledge on it."

Specialists from Pan Am's mechanical, engineering and operations departments will comb the wreckage and analyze the train's "black box" in the days ahead, Fink said. Piecing together what happened will take time. Fink drew comparisons to an airplane crash investigation, saying multiple factors had to be considered before reaching a conclusion.

As for the tracks, an automated dynamics car had recently inspected the line and found no problems. "I guess Mr. Burling is more knowledgeable than the automated dynamics car," Fink said. "I don't know where he gets his information."

Pan Am's investigation team is working with two Federal Railroad Administration inspectors. Spokesperson Robert Kulat said it could take up to a year before the FRA releases their findings. {Derrick Perkins in Manchester *Union Leader* 20.Nov.09}

Defs.' Statement of Material Facts ¶ 2 ("**DSMF**") (ECF No. 66);[5] Defs.' Ex. 2 at 1, 13-14.[6]

As it turned out, a faulty rail car owned by a different rail company was the cause of the derailment. PSMF ¶¶ 5-11. The car was severely corroded and had insufficient side bearing clearance, restricting the truck swivel and thereby preventing the railcar from travelling properly along the rail. PSMF ¶¶ 6-10. The accident was not caused by the state of Springfield Terminal's tracks. PSMF ¶¶ 5-11.

---

[5]     Citations to paragraphs of Defendants' Statement of Material Facts refer to specific facts proposed by the Defendants in ECF No. 66, the Plaintiffs' responses to those facts at pages 1-7 of ECF No. 75, and the Defendants' replies to the Plaintiffs' evidentiary objections concerning those facts at pages 1-11 of ECF No. 79.

[6]     Pin cites for the Defendants' exhibits refer to original page numbers in the source documents.

### b. Application of Law to Facts

The Plaintiffs assert that the Burling statements republished in the above article are false and defamatory because the derailment was not a "perfectly predictable accident," the Plaintiffs' railroad system was not "horrendously dilapidated," and the state of the Plaintiffs' rail line did not "cause" the accident. Am. Compl. ¶ 11; Pls.' Opp'n to Defs.' Mot. for Summ. J. 14-16 (ECF No. 69).

With respect to the Plaintiffs' first two contentions, the Defendants argue that Burling's statements that the derailment was "perfectly predictable" and that the railroad system was "horrendously dilapidated" are protected by the First Amendment because they constitute loose, figurative language and are not objectively verifiable. The Court agrees.

Both of these phrases are hyperbole. Neither can be reduced to anything approaching a precise, testable fact. The Court cannot objectively verify whether a risk of derailment has crossed the line from "hard to predict" to "predictable" to "perfectly predictable," nor whether a railroad system has fallen from "ship-shape" to "could use some work" to "horrendously dilapidated." These are the kind of loose, subjective judgments necessary for the vigorous, freewheeling debate that the First Amendment protects.

The statement about a dilapidated railway system *causing* the accident presents a closer question. Whether a general set of conditions (the state of repair of the "railroad system") caused a particular accident (the Bridge Street derailment) is verifiably testable. If it was shown that something else was the true cause—an

earthquake, for instance—then the statement could be proved definitively, materially false.

To this, the Defendants respond that the Burling statement was not materially false. Again, the Court agrees. Nowhere in the quotations ANR&P published did Burling claim that the state of Pan Am's tracks caused the accident. His statement was significantly broader—that the state of the railroad *system* caused the crash. The phrase "railroad system" fairly encompasses not just train tracks, but also the trains and rail cars that run on them. It is unclear from the record whether Pan Am rightly bears any responsibility for allowing poorly maintained, corroded rail cars to run on its tracks. But under the undisputed facts, the Plaintiffs cannot show that the objectively verifiable portion of Burling's statement—that the state of repair of the railroad *system* caused the derailment—was materially false. Based on the above, the Defendants are entitled to summary judgment with respect to the December 2, 2009 article about the Bridge Street derailment.

Although the Court has determined that the republication of Burling's statements do not support defamation liability, an additional First Amendment doctrine – the neutral reporting privilege – might well bar application of the common law rule that a statement's republisher is subject to liability as if he had originally made the statement. *See* Restatement (Second) of Torts § 578 (1977). The Defendants colorably point toward that possibility in their motion.[7]

---

[7]      The Defendants seek summary judgment in part based on an argument that "Hardenbergh's quotation of another newspaper's quotation of Burling was clearly not intended to report on the inherent truth of the statement, but on the fact that a government official expressed this opinion after

The neutral reporting privilege was first discussed by the Second Circuit in *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113 (2d Cir. 1977). There, the National Audubon Society published a letter broadly accusing DDT-industry scientists of "being paid to lie." *Edwards*, 556 F.2d at 117. A *New York Times* reporter called the letter's author and convinced him to name the scientists. *Id.* The reporter then wrote a story identifying the individuals, titled "Pesticide Spokesmen Accused of 'Lying' on Higher Bird Count." *Id.* at 118. Under these facts, the Second Circuit held that a privilege imposed by the First Amendment barred libel liability:

> [W]hen a responsible, prominent organization like the National Audubon Society makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of those charges, regardless of the reporter's private views regarding their validity. What is newsworthy about such accusations is that they were made.

*Id.* at 120 (internal citations omitted). Neutrality is key to the privilege the Second Circuit announced; it has no force where the publisher distorts statements to support a personal attack of its own on a public figure. *Id.*; s*ee also Cianci v. New Times Pub. Co.*, 639 F.2d 54, 69 (2d Cir. 1980) (declining to apply the neutral reporting privilege where an article not only described a rape charge, but also concurred in the charge and omitted all statements refuting it). The Eighth Circuit has joined the Second Circuit in holding that the First Amendment provides a neutral reporting privilege, *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1434 (8th Cir. 1989), while the Third

---

an accident had occurred." Defs.' Mot. for Summ. J. 7 (ECF No. 65). However, they do not identify the neutral reporting privilege by name or cite to the cases where it has been applied.

Circuit has held that it does not. *Dickey v. CBS Inc.*, 583 F.2d 1221, 1226 (3d Cir. 1978).

Although the Court need not decide whether to adopt the neutral reporting privilege, it fits well to the facts presented by this case. ANR&P's December 2, 2009 article leads with a lengthy description of Fink's on-site investigation of the derailment and reports on Fink's preliminary assessment that a problem with a rail car likely caused the accident. Only then does the article recount the critical statements made by Burling,[8] which it follows with Fink's response to those statements. Like the journalist in *Edwards*, Hardenbergh reports on a contentious issue of public concern and presents multiple viewpoints without adopting one of his own. As the Second Circuit stated, "[t]he public interest in being fully informed about controversies that often rage around sensitive issues demands that the press be afforded the freedom to report such charges without assuming responsibility for them." *Edwards*, 536 F.2d at 120.

---

[8]     The present case involves the same Plaintiffs as *Guilford Transportation*, *supra* p. 4-5. The *Guilford* court noted parenthetically that Fink and Pan Am's predecessor-in-interest had sued only the author of the article at issue there, "who might be expected to have limited resources," rather than the deep-pocketed trade publication that published his piece. *Guilford Transp.*, 760 A.2d at 592 n.10. A similar dynamic is at play here. ANR&P has approximately 350 subscribers. Aug. 3, 2012 Aff. of Charles Hardenbergh ¶ 20 (ECF No. 31-2). Fink and Pan Am are suing a small trade publication and its publisher but not the railroad executive and larger newspapers who were responsible for the original publication of the statements at issue.

### 2.     The Concord "Promise"

#### a.     Presentation of Facts

The Plaintiffs allege that an article the Defendants published on December 21, 2010, defamed them because it incorrectly stated that they had promised to offer certain services to its customers and then falsely characterized the failure to provide those services as a broken promise. The Court first lays out the events leading up to the publication of the December 21, 2010 article and then describes the article itself.

#### i.     Background

In 1985, New England South Railroad Company, Inc. ("**New England Southern**" or "**NES**") entered into a lease to operate a section of railroad tracks owned by Pan Am between Manchester, New Hampshire and Concord, New Hampshire (the "**Subject Line**"). Ex. A to Culliford Aff. 3-4 ("**Pan Am Application**") (ECF No. 72-1); Ex. C to Culliford Aff. 2 ("**Surface Transportation Board Decision**") (ECF No. 72-3). On the Concord side, the Subject Line connects with the White Mountain Line, a section of track extending north to Lincoln, New Hampshire. Surface Transp. Bd. Dec. 2. The White Mountain Line is owned by the New Hampshire Department of Transportation ("**NHDOT**") and operated by New England Southern. Surface Transp. Bd. Dec. 1-2. The White Mountain Line's only connection with the interstate rail system is through the Subject Line. Surface Transp. Bd. Dec. 2; Ex. D. to Culliford Aff. 8 ("**New England Southern Response**") (ECF 72-4). On the Manchester side, the Subject Line connects with Pan Am's integrated network of rail lines. Ex. B. to Culliford Aff. 2 ("**Pan Am Reply**") (ECF No. 72-2).

In April of 2007, Pan Am sent New England Southern notice that it intended to terminate the lease and begin operating the Subject Line itself. PSMF ¶¶ 59, 60; Surface Transp. Bd. Dec. 2. Pan Am applied to the Surface Transportation Board, a federal agency with jurisdiction over railroad operation rights, for an "adverse discontinuance." PSMF ¶¶ 57, 59; Surface Transp. Bd. Dec. 2-3. An adverse discontinuance is an administrative determination that removes a dispute between two railroad operators from the Surface Transportation Board's jurisdiction and allows the party seeking the determination to pursue other legal remedies, such as eviction. PSMF ¶¶ 57, 59; Surface Transp. Bd. Dec. 3; 49 U.S.C §§ 701-727. Under federal law, the Surface Transportation Board may grant an adverse discontinuance "only if the Board finds that the present or future public convenience and necessity require or permit the . . . discontinuance." 49 U.S.C. § 10903(d); *see also* Pan Am Application at 8-9.

With its application, Pan Am submitted a verified statement made under oath on Pan Am's behalf by Richard Miller, the assistant to Pan Am's vice president of transportation. DSMF ¶ 40; Pan Am Application at 87-89. In the statement, Miller explained how Pan Am would service the 1,700 cars per year that interchange between Pan Am's tracks and New England Southern's tracks:

> In order to provide service to these customers on a consistent basis one crew will be required on a five day per week basis. . . . It is planned to headquarter a crew in Concord, New Hampshire.

Pan Am Application 87-88; *see also* DSMF ¶ 40.

The main body of Pan Am's application cited to Miller's statement to bolster its argument that an adverse discontinuance would support the public convenience and necessity, but added language, not found in Miller's statement, which suggested that any increase in service would be contingent on traffic levels:

> Once Pan Am service is restored to the Subject Line, Pan Am will assign a crew in Concord, New Hampshire to work a five day per week schedule providing service to the four major customers and a few smaller customers on the Subject line *as long as traffic levels support such service*, which is an increase from the approximately two day per week service currently provided to Manchester, New Hampshire, with the increased revenue earned by Pan Am justifying the increased service to transfer cars to and from NES. Miller VS at Paragraphs 6, 7.

PSMF ¶ 61; Pan Am Application 9-10 (emphasis added).

In its formal response to Pan Am's application, New England Southern recognized that Pan Am had the legal right to terminate New England Southern's lease and therefore did not oppose the grant of an adverse continuance. New England Southern Resp. at 3. However, New England Southern expressed concerns about whether Pan Am would provide adequate service along the Subject Line and at its connection with the White Mountain Line:

> Over the years . . . NES and its shippers have witnessed a distressing decline in the frequency and reliability of ST's service to and from the current NES-ST interchange at Manchester. Recently, ST's service to/from the Manchester interchange—which was five times a week—has dwindled to twice weekly or less.
>
> Pan Am has represented that ST will base a switching crew at Concord, and that is encouraging as far as it goes coming from Pan Am, which appears to have been experiencing problems with motive power and crew shortages as it is. But the proof will be in ST's actual delivery on its promise of five days per week service.* NES has attempted for some time to make do with ST's unreliable and infrequent interchange at Manchester. But it is clear that the status quo is unacceptable, and that shippers on both [the Subject Line] and on the NES-served White

> Mountain Line will require <u>at least</u> three times per week service not only to maintain their continued use of rail service, but also so that both carriers—ST and NES alike—may attract additional business to their lines.
>
> * See Application, Verified Statement of Richard Miller at unnumbered page two, paragraph 6.

New England Southern Resp. 8-9 (one footnote omitted from original; remaining footnote in original designated by asterisk).

NHDOT filed a response as well, requesting the Surface Transportation Board condition any grant of an adverse discontinuance on a binding requirement that Pan Am interchange with New England Southern at a site known as Concord Yard. *See* Pan Am Reply 4; PSMF ¶ 67. NHDOT argued Concord Yard was the most convenient location for an interchange. Pan Am Reply 4; PSMF ¶ 67.

In a subsequent reply, Pan Am took issue with both New England Southern's and NHDOT's filings. With respect to the concerns New England Southern raised about how often Pan Am would interchange with the White Mountain Line, Pan Am wrote:

> [Pan Am] has proposed an operating plan that will provide better service than currently exists on the Line because of the removal of the need to interchange traffic for the Line by basing a crew at Concord, New Hampshire. [Pan Am] is committed to this operating plan, but notes that it must be contingent upon adequate service levels to support it. To mandate a minimum level of service as suggested by NES would be inequitable and inefficient, because if [Pan Am] were required to continue to provide minimum service levels on the Line that may be unprofitable due to a lack of demand [it] would inevitably lead to abandonment of the Line. Therefore, [Pan Am] requests that the Board decline to impose minimal service requirements as a condition of granting the Application.

Pan Am Reply 4-5.

With respect to NHDOT's request that the Surface Transportation Board require Pan Am to interchange at the Concord Yard site, Pan Am noted that NHDOT had "never consulted" with Pan Am and asked that Pan Am "be permitted to negotiate in good faith with NES to determine an appropriate interchange point." Pan Am Reply 5; *see* PSMF ¶¶ 5, 6.

The Surface Transportation Board issued a decision on May 10, 2010 granting Pan Am's adverse discontinuance application and denying NHDOT's request for a condition requiring Pan Am to provide interchange at Concord Yard. Surface Transp. Bd. Dec. at 6; PSMF ¶¶ 65, 68. Responding to New England Southern's concerns, the Board stated:

> Pan Am claims that it is committed to working with NES to achieve a smooth transition of operations once the Lease is terminated, and that it is intent on providing service on a consistent basis that will meet and exceed the service needs and demands of this growing region of New Hampshire. To this end, Pan Am states that: (1) it will operate one crew on a 5-day-a-week basis; [and] (2) the crew will be headquartered in Concord, where approximately 1,700 cars were interchanged with NES in 2006. . . .
>
> .   .   .
>
> Pan Am has a statutory obligation to provide adequate service and states that it is intent on providing service on a consistent basis that will meet and exceed the service needs and demands of the affected area. We will hold Pan Am to its assurances. In the event it fails to live up to its statutory obligation to provide adequate service, we will promptly consider requests for appropriate corrective action.

DSMF ¶ 38; Defs.' Ex. 17 at 2; Defs.' Ex. 18A at 4.

On May 13, 2010, ANR&P published an article reporting on the Board's decision and describing the reaction of New England Southern's owner, Peter

Dearness. DSMF ¶¶ 36-37. The Court reproduces the beginning of the article below,

except that it omits a part of the ANR&P's direct quotation of the Board's decision.

### NEGS/ST: ST MAY KICK OUT NEGS*

29 April, DC. ***THE BOARD GRANTED ST'S ADVERSE DISCONTINUANCE WITHOUT CONDITIONS***. ST filed on 19 June 2009 [see 09#07B]; NEGS[9] said it would not oppose the filing but asked for a condition; NHDOT did the same [see 09#09A].

**Pan Am promises**
The Board's decision noted: 'Pan Am claims that it is committed to working with NES to achieve a smooth transition of operations once the Lease is terminated, and that it is intent on providing service on a consistent basis that will meet and exceed the service needs and demands of this growing region of New Hampshire. To this end, Pan Am states that: (1) it will operate one crew on a 5-day-a-week basis; (2) the crew will be headquartered in Concord, where approximately 1,700 cars were interchanged with NES in 2006; . . . '

**NEGS request for condition**
Peter Dearness' railroad asserted that once ST begins to operate its line, the Board said, it will not provide adequate service. The current exchange has declined from five days a week to 'two days a week or less' [in fact, sources familiar with the operation said ST interchanges at most once a week {*ANR&P* discussions}] and is needed at least three times a week.

NEGS wanted ST to agree to a new interchange point [currently they interchange in Manchester—*editor*] in ST's Concord Yard 'before there is a change in operators.' NEGS will continue to serve customers on the NHDOT-owned, NEGS-operated White Mountain branch which runs north of Concord to Plymouth.

'NES notes that discussions on an interchange have yet to take place and asks the Board to watch over the execution of Pan Am's plan to remove NES and install ST in NES's place, and to be mindful of Pan Am's service level representations.'

**NHDOT request for condition**
The department requested the Board to condition the discontinuance 'on requiring Pan Am to provide regular interchange at . . . Concord Yard.'

---

[9]    ANR&P uses the abbreviation "NEGS" to refer to New England Southern. When ANR&P quotes the Surface Transportation Board, it uses the abbreviation "NES" to refer to New England Southern.

Pan Am (ST) argued that since only two cars a month were interchanged for the White Mountain branch in 2008, concerns of NEGS and NHDOT were unfounded. It should be permitted to negotiate with NEGS about the interchange.

**Board decision**
The STB[10] declined to condition the discontinuance. Instead, it said: 'We will hold Pan Am to its assurances. In the event it fails to live up to its statutory obligation to provide adequate service, we will promptly consider requests for appropriate corrective action.' {STB website, decisions page, Docket No. AB 32 (Sub-No. 100)}

Defs.' Ex. 17 at 10.

## ii.    Allegedly Defamatory Article

On December 21, 2010, ANR&P published the allegedly defamatory statement in a follow-up article titled "**NEGS: UPDATE\***." The pertinent part of the story is reproduced below. Under ANR&P's editorial style, the citation to "10#05A" refers to the issue of ANR&P which contained the above May 13, 2010 article:

**Better interchange would mean more customers.**
Despite ST's promise to locate a crew in Concord and switch customers five days a week [see 10#05A], Dearness reported that ST has done neither. It is now providing a switch one day a week. He believed that to serve major customers Blue Seal and Ciment Quebec, ST had to switch at least three times a week, which is "what I provided before I left."

If ST would provide the service it promised, Dearness believes he could land two more customers. One is 'very frustrated because it would like to start now, and can't due to the level of service and is familiar' with ST's lack of service. The other one would like to start in May or June.

PSMF ¶ 53; Defs.' Ex. 16 at 11.

---

[10]    ANR&P uses the abbreviation "STB" to refer to the Surface Transportation Board.

### b.    Application of Law to Facts

The Plaintiffs do not claim the December 21, 2010 article was false and defamatory because Pan Am actually did have a team working in Concord or actually was switching customers between the Subject Line and the White Mountain Line more than one day a week. Am Compl. ¶ 27-28; PSMF ¶ 55. Rather, they contend that they never made a promise to provide those services, so the article's premise that they broke a promise was false. Am Compl. ¶ 27-28; PSMF ¶ 55. The Defendants counter that nothing in the article is materially false.

As an initial matter, the Plaintiffs' briefing assumes that the word "promise" always has a specific, legal meaning: to enter into a binding agreement to take a particular action. That may be the technical meaning given to the word promise in certain areas of the law, but the word promise can also take on a softer meaning. The first two entries for the noun "promise" in Webster's Third New International Dictionary are: (1) "a declaration that one will do or refrain from doing something specified"; and (2) "an undertaking however expressed that something will happen or that something will not happen in the future." Webster's Third New Int'l Dictionary 1980 (1988). As a verb, Webster's Third instructs, the term promise can mean "to engage to do or bring about (as something desired or pleasing)" or to "give assurance . . . of." *Id.*

Which meaning applies depends on the context in which the statement appeared. *See, e.g.*, *Bakal*, 583 A.2d at 1030; *Levinsky's*, 127 F.3d at 129. Here, that context includes ANR&P's May 13, 2010 article, cited for background in the allegedly offending December 21, 2010 article. The May 13, 2010 article refers to Pan Am's

stated intention to headquarter a crew in Concord and interchange with the White Mountain Line five days a week as "promises," but also accurately explains that the Board declined to *require* Pan Am to do either. This background renders the Plaintiffs' legalistic interpretation of the word promise unsupportable. The May 2010 article does not imply that Pan Am agreed to be legally bound to its representations; rather, it makes clear the *opposite*. Accordingly, ANR&P's use of the term "promise" necessarily takes on the more forgiving meaning discussed above, of an assurance or a statement of intention to take future action. It is in light of this meaning that the Court must consider whether the implication in ANR&P's December 21, 2010 issue that Pan Am failed to live up to a "promise" was materially false.

In Miller's verified statement, he declared, without qualification, that Pan Am "planned to headquarter a crew in Concord" and that "one crew *will be required* on a five day per week basis." Pan Am Application 87-89 (emphasis added). Miller's statement does not mention the possibility that Pan Am might decide to provide a lower level of service and forego a Concord crew.

Based on Miller's statement, it is fair to say that an authorized Pan Am representative told the Surface Transportation Board under oath and without equivocation that Pan Am planned to locate a crew in Concord and switch customers to the White Mountain Line five times a week and that this constituted a promise. The fact that Pan Am's lawyer later conditioned Miller's assertion does not alter what Miller attested to under oath. It is also fair to say that the board considered Miller's statement when it said that Pan Am is:

committed to working with NES . . . and that it is intent on providing service . . . that will meet and exceed the service needs and demands of this growing region of New Hampshire. To this end, Pan Am states that: (1) it will operate one crew on a 5-day-a-week basis; [and] (2) the crew will be headquartered in Concord, where approximately 1,700 cars were interchanged with NES in 2006. . . . We will hold Pan Am to its assurances.

DSMF ¶ 38; Defs.' Ex. 17 at 2; Defs.' Ex. 18A at 4.

Because Miller indisputably declared in his verified statement that Pan Am planned to locate a crew in Concord and provide interchange service five days a week, and because the Board relied on that statement as a commitment made by Pan Am, and because the term "promise" in the full context of the ANR&P articles was not used in the sense of a legally binding agreement, the Plaintiffs cannot establish that the December 21, 2010 article was materially false. The Court grants the Defendants' motion with respect to the December 21, 2010 article.

### 3. "Lost" Rail Cars

#### a. Presentation of Facts

Jones Chemical Incorporated ("**Jones Chemical**") is a chemical company. DSMF ¶ 41.[11] Springfield Terminal delivers cars carrying chlorine and sulfur dioxide to a Jones Chemical facility in Merrimack, New Hampshire. DSMF ¶¶ 42, 41. Jones Chemical repackages the chemicals and delivers them throughout New England by truck. DSMF ¶ 42.

---

[11] The Court relies on a number of disputed facts about Jones Chemical's operations for the limited purpose of providing context. *See* DSMF ¶¶ 41-43.

In May of 2007, Springfield Terminal raised the prices it charged to deliver chlorine and implemented costly new restrictions on trains carrying the chemical. DSMF ¶ 43. In July of 2007, Jones Chemical's president, Jeff Jones, publicly complained about the changes and announced that Jones Chemical was considering closing its Merrimack facility. DSMF ¶ 44.[12]

On March 10, 2011, ANR&P published an article about the dispute between Jones Chemical and Pan Am. PSMF ¶ 25. Below, the Court reproduces the entire article. The ellipses and bracketing are in the original:

## PAN AM: HAZ-MAT SERVICE*

2 March, Merrimack. ***ST IS OPERATING SPECIAL TRAINS TO MOVE CHLORINE TO JONES CHEMICAL***. In 2007 [see 08#06B], ST raised prices significantly, and embargoed the move of chlorine to 'by permit only.' This continues.

**Need for chlorine**
Only JCI Merrimack repackages chlorine for drinking water and waste treatment in the region from northern Connecticut to New Brunswick. The facility also repackages caustic soda (50 & 25%) and sodium bisulfite. {company website} JCI supplies New York customers from a plant in Warwick, New York. {Town of Bethlehem NY website}

**Price and method of service**
One source said that when ST instituted the embargo, it also required that all TIH (toxic inhalation hazard) moves would require a special train with priority over all. 'That way, ST could get them to their destination and into the care of the consignee ASAP (along with the $25,000 special train surcharge).'
Only Jones Chemical and PSNH Merrimack station in Bow (anhydrous ammonia) receive TIH product. 'That's why there have been RJBO, RJJC and DJJC symbols over the last few years.'
The ST 'special train' tariff permits the railroad to include up to 25 cars not part of the move requiring the special train, at the railroad's discretion.

---

[12]     The Court accepts this fact over the Plaintiffs' hearsay objection to the extent it is not offered for the truth of the matter asserted.

**Quality of rail service**
In addition to price and the need for special trains, JCI has had difficulty with consistency of service, according to another source. It requires switching of at least four cars a week.

The railroad "loses" cars on a consistent ongoing basis, including one car "lost" for over 60 days. . . . even though certain DHS and DOT statutes require carriers to release [TIH] cars within 48 hours. {e-mails to *ANR&P* 2.Mar.11}

PSMF ¶ 25; Defs.' Ex. 21 at 15-16 (original quotation marks, bracketing and ellipses preserved). The last paragraph, which is the offending portion of the article, is a quotation from an unnamed source.[13]

### b. Application of Law to Facts

The Plaintiffs now contend that ANR&P and Hardenbergh defamed them by publishing the March 10, 2011 article. PSMF ¶¶ 27, 31. They claim they do not lose rail cars on a consistent and ongoing basis and have never lost a rail car for more than 60 days. PSMF ¶¶ 27, 31. The Defendants respond that the statement does not have an easily ascertainable and objectively verifiable meaning and therefore cannot support liability.

The Court agrees with the Defendants. Read in context, the sentence in question is irreducibly vague. Though the bulk of the sentence is not in quotation marks, its ellipses and bracketing make it apparent to a reader familiar with ANR&P's house style that Hardenbergh is either quoting or paraphrasing emails he

---

[13] The Defendants claim that a trusted source provided this information to Hardenbergh on March 2, 2011, and they provide the content of the e-mail. DSMF ¶ 45. The Plaintiffs move to strike this fact on the basis that it relies on evidence from confidential sources that it has not yet been able to obtain discovery on because of the bifurcation order by Judge Rich. The Court does not consider the underlying email.

received on March 2, 2011. As to what Hardenbergh or the emails intended to convey, any reasonable reader would be stuck—the sentence allows for many different interpretations, none of which can be "pinned down" by the context provided in the article. See *Levinsky's*, 127 F.3d at 129.

For instance, the quotation marks around the words "loses" and "lost" could suggest Hardenbergh is quoting his source exactly here, but they could equally suggest that readers should not interpret the words "lose" and "lost" literally. Even if the reader concluded that the sentence was intended to convey something specific, it is unclear exactly what that would be. The sentence is too cryptic and oddly structured to communicate anything concrete enough to be considered easily ascertainable and objectively verifiable. *Id.* The Court therefore grants the Defendants' motion with respect to the March 10, 2011 article.

### 4. Fink's Resignation

#### a. Presentation of Facts

Prior to 2006, Fink served as both the president and CEO of Pan Am and the president and CEO of the Pan Am group of railroad entities (the "**Pan Am Group**"). PSMF ¶¶ 36, 37. That year, at Fink's urging, his son was installed as the Pan Am Group's president. PSMF ¶ 36. Fink remained the president and CEO of Pan Am and the CEO of the Pan Am Group. PSMF ¶¶ 36, 37.

As time passed, differences of operational philosophy emerged between father and son. PSMF ¶ 38. In early 2011, principal owner Tim Mellon decided that a change needed to be made. PSMF ¶ 39. Mellon directed Fink either to take back total control

of Pan Am's railroad operations or relinquish power to his son. PSMF ¶ 39. Fink opted

for the latter and retired. PSMF ¶ 41.

On March 7, 2011, Fink wrote the following in a letter to Mellon:

Subject to your acceptance of the conditions proposed below regarding severance, this letter is submitted to confirm the resignation of my employment, effective at the close of business today, from all positions held with Pan Am Systems, Inc., and its subsidiary companies, including my positions as an officer and director of those companies. With regard to severance compensation I would agree to resign under the following conditions: [conditions redacted]

DSMF ¶ 58; Defs.' Ex. 29 at 1.

On March 21, 2011, ANR&P published an article on Fink's departure. PSMF

¶ 34. The Court reproduces a portion of the article below:

### PAN AM: A NEW DAWN?*

9 March, Nashua, NH-North Billerica MA. ***PAN AM OWNER TIM MELLON REMOVED DAVE FINK PERE***[14] from management of the company, according to four separate sources: one MBTA, one union, one Maine source, and one from other railroad management in New England. Sources differ on what precipitated the action, whether Fink is formally removed or is only on a 'leave of absence', and whether Mellon came to New England to administer the *coup de grace* or did it by telephone, but all agree that David Andrew Fink, the head of Pam Am Systems, is no longer in charge. . . .

**What effect will this have?**
Opinions on the effect differ. One source said, "The old man will still run things." Another source said that Fink *fils* is now the head of both the railroad and the holding company.

If Fink *pere* has definitely left, then perhaps, as one source said, "The holy wars, such as those against Peter Leisham, will cease." Others thought that young Fink might have more freedom either to spend more money on railroading, or put the existing money into different [and one would hope more productive] places. {*ANR&P* discussions 10.Mar.11}

---

[14]     ANR&P uses the designation "Fink *pere*" to refer to David Andrew Fink (the father) and the designation "Fink *fils*" to refer David Armstrong Fink (the son).

PSMF ¶ 34; Defs.' Ex. 28 at 2.

## b. Application of Law to Facts

The Amended Complaint alleges that Plaintiffs defamed them by publishing the March 21, 2011 article about Fink's departure from Pan Am. Am. Compl. ¶¶ 39-40; PSMF ¶¶ 34-51. In its Order of May 14, 2012, dismissing the original complaint, which contained most of the above quotation, the Court noted "[o]ne can infer from this quote that Mr. Fink's removal was not his choice" and that "[t]he hyperbolic term 'coup de grace' carries with it a sense that Mr. Fink was fired." *Pan Am Sys., Inc.*, 871 F. Supp. 2d at 16 n.4. The Court nonetheless held that the statement was not capable of conveying a defamatory meaning as a matter of law:

> Maine law provides that a statement that an individual is fired, without providing defamatory reasons for the firing, is not defamatory. "An employee may be discharged for any one of a multitude of reasons unrelated to his honesty, integrity or occupational skill, or indeed for no reason at all. . . . [I]t is the reason for discharge rather than the discharge alone which can render the statement slanderous per se." *Picard v. Brennan*, 307 A.2d 833, 835 (Me. 1973). Since the statement provides no reason for Mr. Fink's removal from Pan Am, it does not bear a defamatory meaning under Maine law.

*Id.* at 16.

The Plaintiffs nonetheless reasserted this claim in their Amended Complaint under the apparent theory that the following two sentences, which were not included in their original Complaint, cast it in a different light:

> If Fink *pere* has definitely left, then perhaps, as one source said, 'The holy wars, such as those against Peter Leisham, will cease.' Others thought that young Fink might have more freedom either to spend more money on railroading, or put the existing money into different [and one would hope more productive] places.

Am. Compl. ¶ 39; *see also* Compl. ¶ 12.

The Plaintiffs continue to press the claim in the face of the Defendants' motion for summary judgment. Am. Compl. ¶¶ 39-46; PSMF ¶¶ 34-51. They contend that *Picard v. Brennan* does not apply, because, read in context, the article claims that Fink was removed for specific reasons—because he was a bad manager who misused company resources. Am. Compl. ¶ 40; Pls.' Opp'n to Defs.' Mot. for Summ. J. 5-8 (ECF No. 69).

This claim was a pretty mealy apple when the Court first dismissed it, and it has not aged well with further discovery. Only by torturing the full text of the article beyond recognition can it be read to assert that Fink was removed for any particular reason that could give rise to defamation liability. The Plaintiffs are therefore entitled to summary judgment as to this claim as well.

## II.   Count II: False Light

The Plaintiffs allege that the statements discussed above invade Fink's privacy by portraying him in a false light. Am. Compl. ¶¶ 54-57.

Maine common law provides that:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Cole v. Chandler*, 752 A.2d 1189, 1197 (Me. 2000) (citing Restatement (Second) of Torts § 652E (1977). A false light cause of action lies only when "there is such a major misrepresentation of [the plaintiff's] character, history, activities or beliefs that

serious offense may reasonably be expected to be taken by a reasonable man in his position." Restatement (Second) of Torts § 652E cmt. c (1977).

The only statement identified by the Plaintiffs that discusses Fink in a personal capacity is the March 21, 2011 article about his departure from Pan Am. For the same reason that none of the statements in that article are capable of conveying a defamatory meaning, none of them are capable of an interpretation that would be highly offensive to a reasonable person. See *Veilleux*, 206 F.3d at 134-35.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Defendants' motion as to all the Plaintiffs' claims.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 30th day of September, 2014.