# United States Court of Appeals
## For the First Circuit

---

No. 14-2118

PAN AM SYSTEMS, INC.; SPRINGFIELD TERMINAL RAILWAY COMPANY;
DAVID ANDREW FINK,

Plaintiffs, Appellants,

v.

ATLANTIC NORTHEAST RAILS AND PORTS, INC.; CHALMERS HARDENBERG,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

---

Before

Howard, Chief Judge,
Thompson and Barron, Circuit Judges.

---

Thad B. Zmistowski, with whom Jonathan A. Pottle and Eaton
Peabody were on brief, for appellants.
Russell B. Pierce, Jr., with whom Norman, Hanson & DeTroy,
LLC was on brief, for appellees.

---

October 9, 2015

---

**THOMPSON**, **Circuit Judge**.

## Overview

Today's appeal centers on a district judge's decision kicking out this battle-scarred defamation case on summary judgment. By way of introduction, plaintiffs are David Andrew Fink, Pan Am Systems, Inc., and Springfield Terminal Railway Company. Fink is the former President and CEO of Pan Am, the parent corporation of Springfield. Defendants are Chalmers Hardenbergh and Atlantic Northeast Rails & Ports, Inc. ("ANR&P," for short). Hardenbergh is a writer and editor at ANR&P, a trade newsletter and e-bulletin covering the railroad industry. So defendants are — both sides tell us — "media defendants" for all purposes relevant to this case. Saving certain details for later, we quickly sketch the main contours of the parties' dispute.

Basically, plaintiffs are upset because they think four ANR&P articles — published between December 2009 and March 2011 — contained false and defamatory statements. Discussing a train derailment on a Springfield-owned rail line, the first article — after relying on reports in leading newspapers — quoted a state official as saying the accident was "'perfectly predictable'" because the "'railroad system'" was "'horrendously dilapidated.'" The next article said Springfield neither stationed a crew at a certain locale nor provided five-day-a-week service on a certain

- 2 -

line — despite "promis[ing]" to do both.  Touching on Pan Am's "haz-mat service," the third article — relying on an email from an unnamed source — claimed Springfield "'loses' cars on a consistent ongoing basis, including one car 'lost' for over 60 days."  And finally, the last article said Pan Am's owner had "removed" Fink "from management," though some of ANR&P's sources did not know whether Fink had "definitely left" or whether the owner "came to New England to administer the coup de grace," but sources did express the hope that Fink's successor — Fink's son, it turns out — "might have more freedom either to spend more money on railroading, or put the existing money into different [and one would hope more productive] places."  (Brackets in original.)

Fed up with these write-ups, plaintiffs sued defendants in diversity, alleging (as relevant here) defamation.  According to Maine law — which the parties agree applies to this litigation — liability for defamation exists if there is

> (a) a false and defamatory statement concerning another;
> (b) an unprivileged publication to a third party;
> (c) fault amounting at least to negligence on the part of the publisher; and
> (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

Lester v. Powers, 596 A.2d 65, 69 (Me. 1991) (quoting Restatement (Second) of Torts § 558 — which we will call "RST" from now on).

- 3 -

Defendants moved to dismiss the complaint for failing to state a claim, arguing (among other things) that plaintiffs had insufficiently pled falsity and fault — defamation elements (a) and (c), respectively. See Fed. R. Civ. P. 12(b)(6). Acting on the motion, the judge dismissed the complaint without prejudice, granting plaintiffs a chance to replead to fix these problems. The judge also ruled that defendants should be considered "media defendants" and that the complained-about speech involved "matters of public concern" (more on the quoted concepts later).

Taking their cue from the judge's order, plaintiffs seasonably filed an expanded complaint. Worried that a fight over the fault element might require them to divulge confidential sources and threaten their First-Amendment interests, defendants proposed — and the district court accepted — having the parties do discovery on all issues except fault, followed by summary judgment on those issues, followed by discovery on fault if needed. See Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 597-98 (1st Cir. 1980) (discussing how bifurcated discovery like this can protect a defendant's journalistic sources). After the first discovery phase, defendants moved for summary judgment, maintaining that they had published nothing defamatory or false. See Fed. R. Civ. P. 56(a). Plaintiffs opposed the motion, naturally. But the judge granted the motion, concluding (in a

nutshell) that none of the offending statements were actionable in defamation.

Plaintiffs now appeal, making the big-picture argument that the troublesome passages in the offending articles — dealing with the derailment, promises, lost cars, and Fink's departure — are capable of defamatory readings and are provably false. Wrong, and wrong again, defendants fire back. But, for reasons to appear shortly, we think plaintiffs are right about the lost-car comments. And so we reverse only on that issue.

Let us be perfectly clear, though. Our reversal on the lost-car comments does not mean that those comments may proceed to trial. After all, our analysis here concerns only part of the defamation inquiry — whether the battled-over statements are capable of a defamatory meaning and whether they are provably false. There remains the question whether defendants were at fault. To show fault, plaintiffs will need to show at the very least that defendants were negligent — and they may need to show that defendants acted with actual malice. See N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964) (holding that a public figure suing for defamation must show that the defendant acted with actual malice). Because the judge bifurcated discovery, she left the fault issue for another day. And so we must do the same.

- 5 -

## Guiding Legal Principles

### Summary Judgment

We give fresh review to the judge's summary-judgment ruling, drawing all reasonable inferences in favor of plaintiffs (the motion's opponents). See, e.g., Collazo-Rosado v. Univ. of P.R., 765 F.3d 86, 92 (1st Cir. 2014). And we will affirm only if no genuine issues of material fact muddle the dispute and only if defendants (the motion's proponents) merit judgment as a matter of law. See, e.g., id.

Two other things worth noting: First, to get the ruling flipped, plaintiffs must offer us "more than arguments woven from the gossamer strands of speculation and surmise." RTR Techs., Inc. v. Helming, 707 F.3d 84, 93 (1st Cir. 2013). And second, we can affirm the ruling on any ground apparent in the record, even one not relied on by the judge. See, e.g., Collazo-Rosado, 765 F.3d at 92.

### Defamation

Modern defamation law is a complex mixture of common-law rules and constitutional doctrines. See, e.g., Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 132 (1st Cir. 1997).

- 6 -

And working one's way through it all can be dizzying.  But work
our way we must.  So off we go.

(a)
Common-Law Rules

Starting with Maine law, we see (and this is a paraphrase
of what we said earlier) that a defamation cause of action "arises
from (1) the defendant's unprivileged publication to a third party
(2) of a false statement pertaining to the plaintiff (3) through
fault amounting at least to negligence, (4) as long as the
statement either is defamatory per se or causes special harm."[1]
See Garrett v. Tandy Corp., 295 F.3d 94, 103 (1st Cir. 2002)
(citing Rippett v. Bemis, 672 A.2d 82, 86 (Me. 1996)).  A statement
is defamatory if it tends to harm the reputation of another either
by lowering the esteem in which he is held or by discouraging
others from associating with him.  See, e.g., Bakal v. Weare, 583
A.2d 1028, 1029 (Me. 1990) (relying on RST § 559).  Because for-
profit corporations have "business reputation[s]," they too can be
defamed.  See RST § 561 cmt. b; see also id. § 561(a) (explaining
that "[o]ne who publishes a defamatory matter" concerning a for-
profit corporation can be liable "if . . . the matter tends to
prejudice [the corporation] in the conduct of its business or to
deter others from dealing with it"); see generally Vahlsing

---

[1] Elements (3) and (4) are not at issue here.

- 7 -

Christina Corp. v. Stanley, 487 A.2d 264, 265-66 (Me. 1985) (dealing with a defamation action brought by a corporation and its president).   And keep in mind that one who repeats a defamatory statement may be as liable as the original defamer.  See RST § 578.

Whether a statement is capable of a defamatory meaning is a threshold question for the court.   See Bakal, 583 A.2d at 1030 (citing, among other authorities, RST § 614).   To discern meaning, a court must draw from the context of the statement and not interpret words "in the most negative . . . way" imaginable. Id. (citing RST § 563 cmt. d for the in-context point); see also Veilleux v. Nat'l Broad. Co., 206 F.3d 92, 108 (1st Cir. 2000). This "is not a question of the intent of the speaker, or author, or even of the understanding of the plaintiff, but of the understanding of those to whom the words are addressed . . . ." Picard v. Brennan, 307 A.2d 833, 835 (Me. 1973) (quoting Chapman v. Gannett, 171 A. 397, 398 (Me. 1934)).  But if the court concludes that the statement can reasonably carry both a defamatory and nondefamatory meaning, it is up to a jury to decide whether the statement was in fact understood as defamatory by its recipients. See, e.g., Schoff v. York Cty., 761 A.2d 869, 871 n.2 (Me. 2000) (citing RST § 614).

Truth is a complete defense, of course.   The Maine courts' direction on this is crystal clear:   so long as the

- 8 -

offending statement turns out to be true, the defendant is free from liability, regardless of how much the statement may have hurt the plaintiff's public reputation. <u>See</u>, <u>e.g.</u>, <u>Picard</u>, 307 A.2d at 834-35. Critically too, a statement need not be 100% true to be protected — if it is "substantially true," a defendant is safe. <u>See</u> <u>McCullough</u> v. <u>Visiting Nurse Serv. of S. Me., Inc.</u>, 691 A.2d 1201, 1204 (Me. 1997); <u>see also</u> RST § 581A cmt. f (stressing that "[s]light inaccuracies of expression are immaterial provided that the defamatory charge is true in substance"). The question is whether the "allegedly false facts" about a plaintiff are "variants of the true" and so do not "paint him in a worse light." <u>Haynes</u> v. <u>Alfred A. Knopf, Inc.</u>, 8 F.3d 1222, 1229 (7th Cir. 1993) (Posner, C.J.); <u>see also</u> <u>McCullough</u>, 691 A.2d at 1204 (deeming the contested statement — that plaintiff was fired "for 'several incidents' when, in fact, she was only terminated for two incidents" — nonactionable because it was "substantially true even though it may not be technically accurate," adding that "[t]o a reasonable person," the comment "is no more damaging to her reputation than an accurate statement would have been"); <u>Picard</u>, 307 A.2d at 836 (holding that the difference between the defamatory statement (that a person was "fired") and the truth (that he had voluntarily resigned) could not cause a reasonable member of the public to think less of plaintiff).

(b)
Constitutional Doctrines

On the constitutional side, the Supreme Court — reading
the First Amendment (made binding on the states through the
Fourteenth) — "has hedged about defamation suits" with lots of
"safeguards designed to protect a vigorous market in ideas and
opinions." Desnick v. Am. Broad. Co., 44 F.3d 1345, 1355 (7th
Cir. 1995) (Posner, C.J.); see also Gray v. St. Martin's Press,
Inc., 221 F.3d 243, 248 (1st Cir. 2000). We mention only two.

Because truth can set a defendant free, so to speak, it
follows that defamatory statements are not punishable unless they
are capable of being proved true or false. Which brings us to
opinions. Because they express the speaker's subjective views
(rather than implying that he possesses objectively testable
facts), they are First-Amendment protected — not so, obviously, if
they imply "false assertion[s] of fact." See Milkovich v. Lorain
Journal Co., 497 U.S. 1, 19 (1990); cf. generally RST § 566
(stressing that an opinion statement is punishable "only if it
implies the allegation of undisclosed defamatory facts as the basis
for the opinion"). Likewise, statements of "rhetorical hyperbole"
are not punishable. And neither are statements using words "in a
loose, figurative sense."[2] See Old Dominion Branch No. 496, Nat'l

---

[2] Retail-giant Wal-Mart can call a competitor's store "trashy,"
even if the store is not actually "filthy" — "[t]he word 'trashy'

Ass'n of Letter Carriers v. Austin, 418 U.S. 264, 284-85 (1974); see also Gray, 221 F.3d at 248. Understand, though, that simply saying "'I think'" will not shield a defendant from liability, particularly when what is allegedly "'thought'" is (or suggests) a fact-proposition. See Gray, 221 F.3d at 248. But courts are "likely" to stamp as "opinion" statements involving "expressions of personal judgment, especially as the judgments become more vague and subjective in character." Id.; see also Levinsky's, 127 F.3d at 129 (commenting that "[t]he vaguer a term, or the more meanings it reasonably can convey, the less likely it is to be actionable").

Also and importantly, where truth was once just an affirmative defense, nowadays — thanks to the Supreme Court — if misstatements involve issues of public concern, plaintiffs must shoulder the burden of showing that the comments are false. See Veilleux, 206 F.3d at 108; see also Phil. Newspapers, Inc. v. Hepps, 475 U.S. 767, 776 (1986). This includes, of course, a showing that the statements at issue are not substantially true —

---

is a chameleon that continuously changes colors and shades of meaning" (it can mean unkempt or sleazy, for example); it "is loose language that cannot be objectively verified," and so is not actionable. See Levinsky's, 127 F.3d at 129-30. And the Boston Globe can describe plaintiff's production of "The Phantom of the Opera" (not the one created by Andrew Lloyd Webber) as "fake" and "phony" — these "adjectives admit of numerous interpretations," meaning they are "unprovable" and so not actionable. See Phantom Touring, Inc. v. Affiliated Publ'ns, 953 F.2d 724, 728 (1st Cir. 1992).

or, to remove the negative, that the statements are materially false.  See Veilleux, 206 F.3d at 108-11 (indicating that a statement that is not substantially true is materially false, and vice versa); see generally Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 517 (1991) (emphasizing that "[m]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified" (internal quotation marks omitted)).  To qualify as a matter of public concern, the speech (based on the content, form, and context) must touch on issues in which the public (even a small slice of the public) might be interested, as distinct, say, from purely personal squabbles.  See, e.g., Levinsky's, 127 F.3d at 132.

**Analyzing the Offending Statements**

<u>Train Derailment</u>

Relying on articles appearing in the Nashua <u>Telegraph</u> and Manchester <u>Union Leader</u> (two well-respected New Hampshire newspapers), defendants published a story in December 2009 about a train derailment occurring on tracks owned by Springfield. Headlined "**ST: COAL DERAILMENT\***," the piece began like this (heads up — the Fink mentioned in the article is plaintiff Fink's son):

> 17 November, Nashua.  **THE LOADED [Springfield] BOW COAL TRAIN DERAILED SEVEN CARS** of an 87-car train near Bridge Street at about 11 AM. Three turned over, with coal spilling out.

- 12 -

David Fink, [Springfield's] president,
arrived on the scene in the afternoon. He
said preliminary investigation showed that one
of the truck sides (a truck contains axles,
springs, and other equipment for suspension)
had fallen off one of the cars. That caused
a chain reaction among several subsequent
cars. Asked whether he thought there was a
problem with the tracks, Fink said, "We're
looking at everything, but we don't think so"
because of the evidence with the truck. An
investigation into the cause of the derailment
would likely go on for about a month because
of metal that needs to be tested and other
factors.

Crews were expected to realign the four
upright cars and move them that same day. Most
of the train—an estimated 74 cars—continued on
to the Merrimack Station power plant in Bow
without a problem. {Karen Lovett in Nashua
Telegraph 18.Nov.09}

The piece continued (reader alert — plaintiffs complain about the

Peter Burling quotes):

### Shows need for track investment?

Peter Burling, chair of the New Hampshire Rail
Transit Authority, blamed [Springfield] for
the accident. "What has happened here is a
perfectly predictable accident—but it's hard
to describe it as an accident, since the
probabilities were so clear it was going to
take place. The only thing we didn't know is
when and where."

Burling said the accident, occurring on
a stretch of line with a speed limit of under
10 miles per hour for large freight trains,
made a track upgrade which might have been
provided had the state won funding for
passenger service to Concord [see 09#10A] more
important. "A horrendously dilapidated

- 13 -

railroad system has caused a slow-moving coal
train to fall off the tracks."

"The point is not to say 'I told you so,'
but to say this is why I feel it is so
important to get this line upgraded, and to
maintain it for passenger and freight
operations. We believe there are institutions
of the federal government that can move to
carry this along. I'm going to Washington in
[the] next couple of weeks to have further
discussions about the issue." {David Brooks
in Nashua Telegraph 18.Nov.09}

And the article ended with these words (remember — the Fink here

is plaintiff Fink's son):

### Fink Response

Any number of reasons could explain why the
cars jumped the track, including equipment
failure, Fink said on 19 November, responding
to Burling's remarks. "I don't know what
(Burling) is basing that on. I don't think he
has any knowledge on it."

Specialists from Pan Am's mechanical,
engineering and operations departments will
comb the wreckage and analyze the train's
"black box" in the days ahead, Fink said.
Piecing together what happened will take time.
Fink drew comparisons to an airplane crash
investigation, saying multiple factors had to
be considered before reaching a conclusion.

As for the tracks, an automated dynamics
car had recently inspected the line and found
no problems. "I guess Mr. Burling is more
knowledgeable than the automated dynamics
car," Fink said. "I don't know where he gets
his information."

Pan Am's investigation team is working
with two Federal Railroad Administration
inspectors. Spokesperson Robert Kulat said it

> could take up to a year before the FRA releases
> their findings. {Derrick Perkins in
> Manchester <u>Union Leader</u> 20.Nov.09}

Later, as an attachment to his affidavit in this case,
David Nagy, Springfield's director of safety and rail security
submitted a report saying a railcar owned by a different rail
company was "a major contributing cause of" the accident.
According to the report, the car's age and poor condition prevented
it from properly travelling along the track.

Before going on, we note the obvious: Burling's comments
came hard on the accident's heels, at a time when even Fink's son
conceded that Pan Am was "looking at everything" as a possible
cause, though Pan Am "d[id]n't think" the problem was track-
related. And far from being one-sided, defendants' piece provided
a full overview of the derailment investigation — told from various
perspectives — and even included Pan Am's official response
doubting the correctness of Burling's remarks.

Now on to the parties' arguments.

Convinced that the phrase "railroad system" encompasses
only tracks (which Springfield is responsible for), not tracks <u>and</u>
trains, plaintiffs insist that the Burling quotes are defamatory
and untrue because another company's railcar — not Springfield's
tracks — caused the derailment. Defendants counter that the
disputed comments are incapable of a defamatory interpretation,

- 15 -

because they are simply Burling's subjective thoughts, expressed in nonactionable hyperbole. Also, their argument continues, the comments address a matter of public concern, and plaintiffs have not met their burden of showing that the remarks are materially false.

For our part, we need not decide who is right on the defamatory-meaning issue. And that is because even assuming (in plaintiff's favor) that Burling's remarks are capable of a defamatory reading — that Springfield's tracks caused the accident — defendants cannot be on the hook because (as they argue) the speech deals with an issue of public concern and plaintiffs have not shown the speech (even if false) is <u>materially</u> false.[3] We explain.

---

[3] Defendants argue that plaintiffs did not preserve any challenge to the judge's public-concern ruling. Their theory is that while plaintiffs argued against a public-concern finding at the motion-to-dismiss stage, they did not ask the judge to revisit her public-concern ruling at the summary-judgment phase. Adopting a belt-and-suspenders strategy, defendants also argue that a prior litigation collaterally estops plaintiffs from suggesting the speech is not of public concern. We by-pass these complicated questions, because even assuming (favorably to plaintiffs) that there are no preservation or collateral-estoppel problems, we easily conclude that the fought-over speech addresses matters of public concern.

Another quick point. Suggesting that the record is not sufficiently developed for us to decide the public-concern question, plaintiffs ask for a remand so the parties can conduct discovery on that issue. But their request comes far too late: defendants squarely relied on the judge's earlier public-concern ruling in their summary-judgment papers, yet plaintiffs never

Examining the speech's content, form, and context (as we must), we note that the targeted comments deal with the safety, efficiency, and viability of plaintiffs' railway system — a system that is part of a highly regulated industry, what with all the federal laws on safety, <u>see</u> 49 U.S.C. §§ 20101-21311, public funding, <u>see</u> 49 U.S.C. §§ 22101-22706, and oversight, <u>see</u> 49 U.S.C. §§ 103, 701-727.  And it should go without saying (though we say it anyway) that the public cares deeply about the safety, efficiency, and viability of railways — something plaintiffs do not contest.  Also, don't forget that the speech appeared in a public newsletter, helping to educate the community and possibly ignite public discourse on topics citizens are interested in.[4]

---

asked for discovery either in their objection or in a motion after the judge awarded defendants summary judgment.

[4] As the Supreme Court explained in a different context:

> Railroads have from the very outset been regarded as public highways, and the right and the duty of the government to regulate in a reasonable and proper manner the conduct and business of railroad corporations have been founded upon that fact. . . .  The companies hold a public franchise, and governmental supervision is therefore valid.  They are organized for the public interests and to subserve primarily the public good and convenience.

<u>Wis., Minn., & Pac. R.R. Co.</u> v. <u>Jacobson</u>, 179 U.S. 287, 296-97 (1900).

Looking for a way out, plaintiffs basically insist that our saying that this speech implicates a public concern would make any statement about a railroad a matter of public concern. But the charge is off base, because — as we just explained — our ruling today flows from a specific examination of the content, form, and context of the precise speech at issue here. And because the speech falls within the area of public concern, plaintiffs must now prove that the disputed statements are not only false but materially false. <u>Veilleux</u>, 206 F.3d at 108; <u>see also</u> <u>Hepps</u>, 475 U.S. at 776.

But this they have not done. Again, plaintiffs adamantly insist that the derailment's true cause was a badly corroded railcar owned by another company. For support, they rely on an internal report that said only that the railcar was "a major contributing cause" of the accident. Conspicuous by its absence, however, is any suggestion there that the car was the accident's <u>sole</u> cause — and that means this document is far too thin a reed to support plaintiffs' material-falsity charge.[5] See <u>generally</u> <u>Tobin</u> v. <u>Fed. Express Corp.</u>, 775 F.3d 448, 452 (1st Cir. 2014)

---

[5] Plaintiffs talk up an affidavit by Springfield's Nagy which states that federal officials inspected the tracks "just prior to the derailment" (to quote plaintiffs' brief) and found no defects. That inspection occurred about three weeks before the derailment, however, which tells us nothing about the track's condition when the derailment happened.

(emphasizing that "[s]peculation about mere possibilities, without more, is not enough to stave off summary judgment"); Geshke v. Crocs, Inc., 740 F.3d 74, 80 (1st Cir. 2014) (stressing that unsubstantiated conclusions cannot block summary judgment). Sure, there is some difference between saying the tracks caused the derailment (which is how plaintiffs read Burling's remarks) and saying a railcar was "a major contributing cause" — and so the tracks were not the only cause. But even assuming the difference in those two statements about the role of the tracks suggests falsity, plaintiffs point to nothing in the summary-judgment record indicating that their reputations would be improved at all by a more precise explanation of the cause. Cf. generally Veilleux, 206 F.3d at 111 (concluding "that whatever inaccuracies existed were [in]sufficiently material to establish defamation"). Consequently we affirm summary judgment on this article.

Promises

In 1985, New England Southern Railroad Company signed a lease with Pan Am to operate a section of Pan Am's tracks between Manchester and Concord (two of the Granite State's bigger cities).[6] Fourteen years later, in June 2009, Pan Am asked the Surface

---

[6] Among other things, "operate" means that New England Southern could provide rail service to customers "located on or served by" the line as of the lease's effective date.

- 19 -

Transportation Board ("STB," from here on) for permission to end
New England Southern's operating rights (over time, the bond
between Pan Am and New England Southern became frayed over "payment
of invoices and the condition" of the tracks, apparently).  An
agency within the U.S. Department of Transportation, the STB grants
requests like Pan Am's "only if [it] finds that the present or
future public convenience and necessity require[s] or permit[s]
the . . . discontinuance."  See 49 U.S.C. § 10903(d).

Explaining that it wanted to operate the line itself,
Pan Am submitted an affidavit from Richard Miller, the assistant
to Pan Am's vice president of transportation.  Pertinently,
Miller's affidavit said that "[i]n order to provide service" to
rail-line "customers on a consistent basis one crew will be
required on a five day per week basis," with the "plan[]" being
"to headquarter a crew in Concord, New Hampshire."  Pan Am's
application relied on Miller's affidavit to back up its claim that
its plan would serve the "public convenience and necessity" — yet
the application said (in language not found in the affidavit) that
Pan Am would place a crew in Concord if customer demand justified
that action.  Here is the application's money quote:

> Once Pan Am service is restored to the Subject
> Line, Pan Am will assign a crew to be
> headquartered in Concord, New Hampshire to
> work a five day per week schedule providing
> service to the four major customers and a few
> smaller customers on the Subject Line as long

- 20 -

as traffic levels support such service, which
is an increase from the approximately two day
per week service currently provided to
Manchester, New Hampshire, with the increased
revenue earned by Pan Am justifying the
increased service to transfer cars to and from
[New England Southern]. . . .

New England Southern weighed in, expressing concerns
about whether Pan Am would provide adequate service along the line.
The New Hampshire Department of Transportation ("NHDOT," for
convenience) weighed in too, asking the STB to require Pan Am to
"interchange" at a specific rail yard in Concord.[7]

The STB later granted Pan Am's application in April 2010,
saying:

Pan Am claims that it is committed to working
with [New England Southern] to achieve a
smooth transition of operations once the Lease
is terminated, and that it is intent on
providing service on a consistent basis that
will meet and exceed the service needs and
demands of this growing region of New
Hampshire. To this end, Pan Am states that:
(1) it will operate one crew on a 5-day-a-week
basis; [and] (2) the crew will be
headquartered in Concord, where approximately
1,700 cars were interchanged with [New England
Southern] in 2006 . . . .

---

[7] As best we can tell, "interchange" — in railway lingo — refers
to "the practice of railroads conveying freight cars . . . from
other companies over their lines" at specified junction points.
See Wikipedia, "Interchange (freight rail),"
https://en.wikipedia.org/wiki/Interchange_(freight_rail) (last
visited Sept. 9, 2015).

- 21 -

Case 2:11-cv-00339-NT    Document 88    Filed 10/09/15    Page 22 of 33    PageID #: 792

"Pan Am has a statutory obligation to provide adequate
service," the STB noted, and "states that it is intent on providing
service on a consistent basis that will meet and exceed the service
needs and demands of the affected area."  Given this concatenation
of circumstances, the STB denied the NHDOT's request for a
condition requiring Pan Am to establish an interchange at the
specific Concord yard.  "We will hold Pan Am to its assurances,"
the STB added.  And "[i]n the event [Pan Am] fails to live up to
its statutory obligation to provide adequate service, we will
promptly consider requests for appropriate corrective action."

A month later, in May 2010, defendants published an
article on the STB's decision, noting among other things that "Pan
Am promises" to "'operate one crew on a 5-day-a-week basis,'" with
"'the crew . . . headquartered in Concord,'" and that "the STB
declined to condition the [lease's] discontinuance," though the
STB said it would "'hold Pan Am to its assurances.'"  Then came
the offending article, in December 2010, the pertinent part of
which we now quote (attention — plaintiffs grouse about the
comments from Peter Dearness):

> **Better interchange would mean more customers.**
>
> Despite [Springfield's] promise to locate a
> crew in Concord and switch customers five days
> a week [citing to the May 2010 article],
> [Peter] Dearness [New England Southern's
> owner] reported that [Springfield] has done
> neither.  It is now providing a switch one day

- 22 -

a week. He believed that to serve major customers Blue Seal and Ciment Quebec, [Springfield] had to switch at least three times a week, which is "what I provided before I left."

Plaintiffs do not argue that this passage is defamatory because Pan Am actually stationed a crew in Concord, five days a week. Rather, they protest that they never promised to provide that service and that the passage is provably false to boot. Defendants, for their part, focus their energies on selling the idea that the speech involved matters of public concern and was not materially false. And they have the better of this argument.

As for public concern, the subject article addresses the adequacy of Pan Am's services, and as we noted before, whether a railway provides adequate service is clearly of concern to the public. As for material falsity, the word "promise" is the sticking point, apparently. To plaintiffs' way of thinking, defendants' piece — with the word "promise" front and center — implies that Pan Am made a firm commitment that it later broke. Recall, however, that Pan Am's Miller did tell the STB (via affidavit) that his company "planned to headquarter a crew in Concord" and that "one crew will be required on a five day per week basis." (Emphasis ours.) Miller did not qualify his sworn statement by saying Pan Am might do neither. Just think about that for a second — an authorized Pan Am honcho told the STB under

- 23 -

oath and without qualification that Pan Am planned to locate a crew in Concord, five days a week.

Yes, Pan Am did put a qualifying phrase — "as long as traffic levels support such service" — in the application. Yet the STB still called what Pan Am said "assurances" — "assurances" that Pan Am "will . . . headquarter[]" a crew in Concord, five days a week. Plaintiffs have no beef with the STB's "assurances" tag. And since an "assurance" is a "promise,"[8] there is no falsity — let alone a material one — when it comes to this statement. So we affirm the entry summary judgment on this article.

### "Lost" Railcars

Jones Chemical, Inc. — known as JCI — is (as its names suggests) a chemical company. Springfield delivers cars carrying chlorine to JCI's New Hampshire facility. In May 2007, Springfield raised its chlorine-delivery prices, adding special handling charges too. About four years later, in March 2011, defendants reported on how all this affected JCI. Entitled "**PAN AM: HAZ–MAT SERVICE\***," the article's offending part said this (ellipses and brackets in original):

> **Quality of rail service**
>
> In addition to price and the need for special trains, JCI has had difficulty with

---

[8]    See    Oxford    English    Dictionary    Online, http://www.oed.com/view/Entry/12057 (last visited Sept. 9, 2015).

consistency of service, according to another
source. It requires switching of at least four
cars a week.

The railroad "loses" cars on a consistent
ongoing basis, including one car "lost" for
over 60 days . . . even though certain DHS and
DOT statutes require carriers to release [TIH]
cars within 48 hours. {e-mails to ANR&P
2.Mar.11}.

TIH stands for toxic inhalation hazard.  The quotes are from an

email to ANR&P.  Defendants kept the sender's name out of the

article.

After plaintiffs filed this lawsuit, Hardenbergh

contacted the sender and got a response from the sender's lawyer

saying the car "lost" for over 60 days "was not a TIH car."

Defendants then published a clarification explaining that the

source "was not referring to lost TIH cars."

Plaintiffs claim defendants defamed them by telling

readers that they consistently lose cars carrying TIH, including

one car for over 60 days — a charge, defendants add, that is flat-

out false.  Looking to parry this attack, defendants claim the

sentence is too cryptic to convey anything specific enough to be

considered a verifiable statement of fact.[9]  And, defendants add,

---

[9] "Obviously," defendants told the judge, the word "loses" "was
not intended to suggest that the railroad permanently 'loses cars,'
within the wide ambit of connotation of the verb 'to lose.'"
"[T]he idea," defendants stressed, "is not that [p]laintiffs

assuming that argument does not carry the day, they should still win because the gist of the sentence is true.  This time, however, plaintiffs come out on top.

     For one thing, the statement is capable of being read in a defamatory way.  Just consider the following:  Federal law requires rail carriers (like Springfield) to "forward" hazardous materials (like TIH materials) every 48 hours until they reach their final destination.  See 49 C.F.R. § 174.14.  Federal law also requires rail carriers (like Springfield) to have "procedures in place to determine the location and shipping information for each railcar under its physical custody and control that contains [hazardous materials]."  See 49 C.F.R. § 1580.103(b).  And defendants do not deny that their readers readily know what a big deal it is for a rail carrier to act like a scofflaw when it comes to hazardous materials.  So we do not doubt that having defendants accuse them of losing track of TIH cars (even temporally) — a readily verifiable charge, supposedly based on specific events — certainly lowers plaintiffs' standing in the community.

     On top of that, the summary-judgment evidence (taken in the light most favorable to plaintiffs) shows the statement — dealing with public safety, a quintessential issue of public

---

literally lose cars, but that [p]laintiffs had difficulty tracking where certain cars may be at any given time on the system."

concern, as we explained earlier — is materially false.  According
to an affidavit by Doug Steward, Springfield's superintendent for
transportation, Springfield uses a computerized monitoring program
to track all TIH-carrying railcars, ensuring the cars "are fully
accounted for."  And Springfield never "lose[s] TIH or other
railcars on a consistent and ongoing basis," Steward emphasized.
Federal agencies — the Federal Railroad Administration and the
Transportation Security Administration — routinely audit
Springfield, he added, to evaluate Springfield's compliance with
federal law.  Yet no agency, he stressed, has ever accused
Springfield of losing TIH or other railcars, or of violating any
federal laws in shipping cars to JCI.[10]

---

[10] Defendants take shots at an exhibit attached to Steward's
affidavit, calling it "a cryptic set of unclear documents" — e.g.,
"a one-page undated and illegible screen shot and a two-page
waybill for an empty car" dated two years after the offending
comment.  Steward, though, based his affidavit not just on his
review of the documents but on his personal knowledge.  And
defendants complaints do not suggest that the statements we've
highlighted fall outside his personal knowledge as the officer
responsible for "management and oversight on tracking rail cars
moving on [plaintiffs'] rail system" — "including TIH rail cars"
— "to ensure they are full[y] accounted for and are not lost or go
missing."  Defendants' complaints about Steward's affidavit may
perhaps be pressed via a pretrial motion or before a jury, if the
case goes to trial.

    One other thing.  Defendants submitted an affidavit by
Dearness (New England Southern's owner) saying that "TIH cars often
sat several days in the Concord Yard" and that the "bunching" of
railcars (including TIH cars) probably gave rise to "technical[]
. . . violation[s] of the 48-hour rule on occasion."  Dearness's
affidavit does not say that plaintiffs lost track of any cars, let

- 27 -

All that is left to do then is compare the challenged defamatory comment (that plaintiffs lose TIH cars en route to JCI, including one for over 60 days in violation of federal law) with what we take as true at this stage of the case (that plaintiffs never lost railcars carrying hazardous materials, even temporarily). And having done this, we conclude that a sensible juror could find that a more precise explication of the TIH issue would have improved plaintiffs' public reputation — meaning we must vacate the grant of summary judgment on this article.

### Fink's Departure

Up until 2006, Fink was both president <u>and</u> CEO of Pan Am and president and CEO of the Pan Am group of railroad entities (the "Pan Am group," for easy reading). That year, at his request, his son became president of the Pan Am group, though Fink stayed on as president and CEO of Pan Am and CEO of the Pan Am group.

Unfortunately, father and son did not share the same operational philosophy. Things came to a head in 2011, when Tim Mellon, Pan Am's principal owner, decided that the dual-leadership situation "was no longer working." Mellon gave Fink two options: take back total control of Pan Am's railroad operations or

---

alone the ones sitting in the Concord Yard. Nor does it state that an agency actually cited plaintiffs for losing cars. Again, defendants might perhaps pursue these Dearness-based arguments in a pretrial motion or before a jury, if a trial is in the offing.

surrender power to his son.  Fink chose the latter, writing Mellon

in March 2011:

> Subject to your acceptance of the conditions
> proposed below regarding severance, this
> letter is submitted to confirm the resignation
> of my employment, effective at the close of
> business today, from all positions held with
> Pan Am Systems, Inc., and its subsidiary
> companies, including my positions as an
> officer and director of those companies.  With
> regard to severance compensation I would agree
> to resign under the following conditions:
> [conditions redacted]

A few days later, defendants published an article about

Fink's departure.  Headlined "**PAN AM: A NEW DAWN?\***," the piece

started out this way (FYI — the article uses "Fink <u>pere</u>" to refer

to defendant Fink (David Andrew Fink) and "Fink <u>fils</u>" to refer to

defendant Fink's son[11]):

> 9 March, Nashua, NH–North Billerica MA.  **PAN
> AM OWNER TIM MELLON REMOVED DAVE FINK PERE**
> from management of the company, according to
> four separate sources:  one MBTA, one union,
> one Maine source, and one from other railroad
> management in New England.  Sources differ on
> what precipitated the action, whether Fink is
> formally removed or is only on a "leave of
> absence", and whether Mellon came to New
> England to administer the <u>coup de grace</u> or did
> it by telephone, but all agree that David
> Andrew Fink, the head of Pam Am Systems, is no
> longer in charge. . . .

---

[11] "Pere" means "father" and "fils" means "son."  <u>See</u> Oxford English
Dictionary Online, http://www.oed.com/view/Entry/140661 (last
visited Sept. 9, 2015); Oxford English Dictionary Online,
http://www.oed.com/view/Entry/70268 (last visited Sept. 9, 2015).

"One source," the article added, stated that "'[t]he old man will still run things.' Another source said that Fink <u>fils</u> is now the head of both the railroad and the holding company." "If Fink <u>pere</u> has definitely left," the article said, wrapping up, then some sources "thought that young Fink might have more freedom either to spend more money on railroading, or put the existing money into different [and one would hope more productive] places." (Brackets in original.)

The parties fight hard over whether this article is capable of conveying a defamatory meaning and whether the statements are about matters of public concern. As plaintiffs tell it, one can easily infer — given quotes like "removed . . . from management," "<u>coup de grace</u>," and spending money "more productive[ly]" — that Mellon removed Fink for performance reasons. And the point of the speech, they add, was to spotlight an internal employment issue, not to raise a matter of public concern. As defendants see it, though, the article is not actionable because a statement that a person was fired — without more — is not defamatory. <u>See</u> <u>Picard</u>, 307 A.2d at 835. And — given quotes like "[s]ources differ on what precipitated the action" — one would have to torture the story's text to conclude that Mellon fired Fink for a specific reason, or so defendants want us to rule. Also, they contend, the speech focuses on the

- 30 -

corporate shakeup at a major railway company, which is a matter of concern to the public.

Once again, we need not take sides on the defamatory-meaning question. Even assuming (favorably to plaintiffs) that the article communicates the message that Mellon removed Fink for performance reasons and that such a message may be defamatory, defendants cannot be liable because (so far as the summary-judgment record shows) the disputed statements relate to public concerns and are not false in any material sense.

Starting with the public-concern issue, despite defendants' best effort to pass Fink's departure off as involving a purely private matter (his employment status), the speech at issue implicates railway safety, efficiency, and viability. We say that because the article talked about how his leaving might cause Pan Am "either to spend more money on railroading, or put the existing money into different [and one would hope more productive] places." And a discussion about leadership change tied to railroad improvement is firmly within the sphere of matters of public concern.

Turning then to material falsity, we point out what Fink's affidavit makes plain. The father/son leadership structure was a no-go, given their different views on how best to run the business. And Mellon had had enough. So to end the dysfunction,

- 31 -

Mellon delivered what defendants called the "coup de grace" (which can mean an action "that settles or puts an end to something"[12]), essentially telling Fink — according to Fink — either you take charge or let your son take charge, but no more power-sharing. His hand forced by Mellon's "directive" (another quote from Fink's affidavit) the elder Fink "agree[d] to resign" (a quote from Fink's letter to Mellon).   Now perhaps there is a difference between saying Mellon "removed" Fink for performance reasons (which is how plaintiffs read the article) and saying Fink left following a Mellon "directive" to either retake the reins of power or give them up forever — a directive issued to end the corporate problems caused by the father/son infighting (which is how plaintiffs describe Fink's departure).   But even assuming any difference suggests falsity, plaintiffs identify nothing in the summary-judgment record showing their reputations would be changed for the better by a more fulsome account of Fink's leaving.   Cf. generally McCullough, 691 A.2d at 1204 (finding no defamation liability where the challenged statement was no more damaging to plaintiff's reputation than a more accurate statement would have been).   So we affirm the summary-judgment ruling on this article too.

---

[12]      See    Oxford    English    Dictionary    Online, http://www.oed.com/view/Entry/43112 (last visited Sept. 9, 2015)

- 32 -

## Final Words

Our work over, we reverse the grant of summary judgment on the TIH article and affirm in all other respects.  The parties shall bear their own costs.

**So ordered**.